# EXHIBIT A

**Online Reputation and Repair Assessment**

**Expert Witness Report**

---

**Regarding:**

Leigh M. Rothschild

*Plaintiff,*

*v.*

Rachael Lamkin

*Defendant*

---

**Prepared By:**

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

&

Douglas J. Ryder

Ryder, Mazzeo & Konieczny LLC

September, 2nd, 2025

# TABLE OF CONTENTS

Prologue........................................................................................4

**Section 1: Expert Witness Engagement and Basic Findings..........................................6**

Engagement Summary.......................................................................7

Documents Reviewed - Appendix A........................................................7

Case Background, Basic Findings, and Conclusions.......................................8

Sameer Somal Biography...................................................................11

Articles Authored By and Featuring Sameer - Appendix B1.................................11

Recent Speaking Engagements and References - Appendix B2...............................11

Continuing Legal Education (CLE) Programs - Appendix B3.................................11

Expert Witness Case History  - Appendix B4..............................................11

About Blue Ocean Global Technology LLC...............................................12

Douglas Ryder Biography...................................................................13

Alexandra Lajoux Biography................................................................14

Alexandra Lajoux's CV and Bibliography – Appendix D..................................14

Statement of Compensation................................................................15

**Section 3: Defamation and Its Impact on Reputation......................................16**

Tort Law...................................................................................17

Traditional Defamation....................................................................22

False Allegations Amounting to Defamation...............................................24

Commercial Defamation....................................................................26

Patent trolls & Cancel culture..............................................................28

**Section 4: Reputation in the IP industry..................................................31**

Impact of Reputation in the Industry.......................................................32

Analysis of Patents - Background, reputation, and expectancy of IP assets...............34

**Section 5: Nuances of Online Reputation Management....................................35**

Online Reputation Management (ORM)....................................................36

Build.......................................................................................37

Monitor....................................................................................39

Repair......................................................................................40

The Nuances of Digital Reputation Repair.................................................42

**Section 6:  Legal Cases, Decisions, and Awards............................................50**

Defamation.................................................................................51

Defamation and Tortious Interference...................................................55

Commercial Defamation..................................................................57

**Section 7: Assessment of Damages........................................................61**

Rationale For Recommendation of Damages................................................62

Summary Findings.............................................................................................63
Damages.............................................................................................................64
    Economic Damages...................................................................................... 64
    Reputational Damages...................................................................................67
    Rehabilitation Damages................................................................................ 70
    Emotional Distress Damages........................................................................ 73
    Punitive Damages......................................................................................... 75

*****Disclaimer: Please note that we are not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided. In addition, please note that some of the observations made in the general background sections of the report are based on materials previously published by Sameer Somal.***

# PROLOGUE

On October 10, 2024, Ms. Rachael Lamkin, a patent defense attorney describing her work to an influential legal publication with hundreds of thousands of followers[1], made the unprovoked and unmerited remark that "with Leigh Rothschild, we never get the money because the shells go bankrupt"[2].

To defend his honor, Mr. Rothschild has been forced to undergo the time, expense, and emotional toll of suing the Defendant in the matter of *Leigh M. Rothschild  v. Rachael Lamkin* (2025), wherein we are serving as testifying experts. With our respective backgrounds in online reputation management and Intellectual Property law, we agree that defamation has occurred and that a damage award is due.

The following expert report will show that the object of Ms. Lamkin's attacks is a man who has made and continues to make positive contributions to our nation. The Plaintiff Leigh Mitchell Rothschild is a prolific inventor and successful entrepreneur. Beginning with a vision for an analog recording system at the age of 17 (a "Multi-Channel Cassette System For Sound Recording and Reproduction With Interlocked Stacked Cassettes"), pursued with his brother for a patent grant at age 21, he now holds at least 157 patents to his name. Mr. Rothschild is also the founder and CEO of the company Patent Asset Management (PAM), founded in 2017, which has fostered IP protection for many patents beyond his own, to help inventions monetize their inventions.  It is important to note that PAM creates separate LLCs to hold patents as assets, and for each LLC, pays all fees necessary for legitimate corporate existence and pays out fully on any and all obligations. While PAM is financially successful, Mr. Rothschild is known for contributing its returns to charities.

---

[1] "Bloomberg Law News gets millions of Google hits per month, has hundreds of thousands of social media followers (substantially more than other legal news providers), and appears on the Terminal, Apple News, Flipboard, and more." Top 10 Reasons Legal Professionals Value Bloomberg Law News - Bloomberg Law Accessed September 1, 2025. https://pro.bloomberglaw.com/insights/legal-solutions/top-10-reasons-legal-professionals-value-bloomberg-law-news/#trusted

[2] Michael Shapiro, Starbucks Levels Fraud Claim in New Tactic to Fight Patent Suit, (Oct. 10, 2024), https://news.bloomberglaw.com/ip-law/starbucks-levels-fraud-claim-in-new-tactic-to-fight-patent-suit.

What Ms. Lamkin has derisively and falsely called "shells" that are "bankrupt" could be viewed with respect to IP holdings as similar to the early days of General Electric, founded by the famed American inventor Thomas Edison (1847 – 1931).[3] In summarizing the legacy of Thomas Edison, the Library of Congress notes that he "exerted a tremendous influence on modern life," And goes on to note that in addition to being an inventor, Edison also was a successful businessman: "A myriad of business liaisons, partnerships, and corporations filled Edison's life, and legal battles over various patents and corporations were continuous."[4]

At age 73, Mr. Rothschild still has a future ahead of him as an inventor and as a champion for the inventors who have relied on him to monetize their creations. Both Mr. Rothschild and PAM have been harmed through this defamation, as we will show.

*Sameer Somal*

*Douglas Ryder*

---

[3] Edison's Patents, Thomas Edison Papers, Rutgers-New Brunswick School of Arts and Sciences. https://edison.rutgers.edu/research/edison-s-patents

[4] https://www.loc.gov/collections/edison-company-motion-pictures-and-sound-recordings/articles-and-essays/biography/life-of-thomas-alva-edison/1`

## Section 1: Expert Witness Engagement and Basic Findings

Engagement Summary

documents reviewed

Basic Findings and Conclusions

## ENGAGEMENT SUMMARY

Leigh M. Rothschild of Patent Asset Management, LLC, engaged me to ascertain the damages associated with the reputational and financial harm caused to him as a direct and proximate result of defamatory statements made by Rachael Lamkin.

A large portion of my professional time as CEO of Blue Ocean Global Technology is spent on actual traditional and digital reputation client situations. As such, I feel confident in my ability to approach this case from the lens of both an expert witness and a professional with a track record of successfully mitigating reputational damages originating from negative, false, or defamatory statements published on the internet. As a reputation expert, I apply my cumulative knowledge and experience to assess an individual's damages and recommend the appropriate course of action to remediate damages moving forward.

Douglas J. Ryder will provide an expert opinion regarding Intellectual Property matters referred to in this report. Douglas is a Registered Patent Attorney with 25+ years of dedicated patent experience, with a Bachelor of Science in Electrical Engineering from Drexel University, a Master's in Engineering Management from George Washington University, and a Juris Doctor from the University of Maryland Law School. He is a member and Intellectual Property Attorney of Ryder, Mazzeo & Konieczny, LLC.

## DOCUMENTS REVIEWED - APPENDIX A

## CASE BACKGROUND, BASIC FINDINGS, AND CONCLUSIONS

Leigh M. Rothschild is one of the most prolific inventors in the United States, having at least 156 issued patents as a sole inventor, as can be seen in Appendix H. He was the Chairman and founder of BarPoint.com, a NASDAQ publicly traded wireless information company that was the leader and early creator of connecting symbology, such as barcodes, to the internet. He has inventions in various fields, including cardiology, exercise machines, and computer servers.

Mr. Rothschild has licensed and sold patents within his own patent portfolio to numerous major Fortune 100 companies around the world, including Apple, Intellectual Ventures, General Motors, and Home Depot. His technologies are in use at companies ranging from most major automotive companies, eBay, the US Department of Commerce, and Citrix.[5]

Mr. Rothschild's patent-holding entity, Analytical Technologies (AT), sued Starbucks for infringement of the US Patent No. 8,799,083. In the dispute, Starbucks accused Rothschild of fraud and alleged that he was using AT as a sham entity to shield himself from personal financial responsibility while he extracted settlements from defendants through AT. Starbucks' legal team was led by Baker Botts attorney Rachael Lamkin, who targeted Mr. Rothschild personally.[6]

Rachael Lamkin and her team claimed that Rothschild was fraudulently transferring settlement funds to a parent company rather than leaving them in AT, preventing defendants from recovering legal costs in the event they successfully defended the patent suit and were awarded attorneys' fees. Ms. Lamkin stated that "*we never get the money because the shells go bankrupt*"[7], damaging Mr. Rothschild's reputation.

After a thorough analysis of the defamatory articles surrounding Leigh M. Rothschild, my basic findings and conclusions are:

---

[5] Patent Assessment Management Team. *PAM Team.* Available at: http://pam.shortcart.com/team/

[6] Brett Trout, *When Your Patent Case Turns Into a Fraud Case That Turns Into a Defamation Case*, (Feb. 11, 2025), https://blawgit.com/2025/02/11/when-your-patent-case-turns-into-a-fraud-case-that-turns-into-a-defamation-case/

[7] Brett Trout, *When Your Patent Case Turns Into a Fraud Case That Turns Into a Defamation Case*, (Feb. 11, 2025), https://blawgit.com/2025/02/11/when-your-patent-case-turns-into-a-fraud-case-that-turns-into-a-defamation-case/.

Leigh M. Rothschild has incurred significant damages resulting from the defamatory and false statements made by Rachael Lamkin of Baker Botts on behalf of her client, Starbucks, consisting of:

(a)  Reputational Damages: in the range of $500,000 – $750,000.

(b)  Six categories of Economic Damages

- Recent opportunity cost (8 hours per week for two people at blended rate of $1,800 per hour or $14,400 per week times 47 weeks) $676,800

- PV of reduction in potential future  revenue from campaigns due to decreased activity $2,196,340

- PV of future reduction in potential ROI from campaigns:  $99,373

- PV of future diminution in exit value for sale of PAM:  $2,381,101.

- Ongoing out of pocket legal and filing costs: At least $150,000,not including any possible appellate costs.

Total estimated economic damages are at least $5,503,614.

(c)  Rehabilitation Damages: In the range of $114,000 - $171,000.

(d)  Emotional Distress Damages: as the court deems fit.

(e)  Punitive Damages: as the court deems fit.

## Section 2: Expert Witness Qualifications

SAMEER SOMAL BIOGRAPHY

ARTICLES AUTHORED BY AND FEATURING SAMEER SOMAL - APPENDIX B1

RECENT SPEAKING ENGAGEMENTS AND REFERENCES - APPENDIX B2

CONTINUING LEGAL EDUCATION (CLE) PROGRAMS - APPENDIX B3

EXPERT WITNESS CASE HISTORY  - APPENDIX B4

ABOUT BLUE OCEAN GLOBAL TECHNOLOGY

DOUGLAS RYDER'S CV - APPENDIX C

ALEXANDRA LAJOUX BIOGRAPHY

ALEXANDRA LAJOUX'S CV AND BIOGRAPHY - APPENDIX D

STATEMENT OF COMPENSATION

## SAMEER SOMAL BIOGRAPHY

Sameer Somal is the CEO of Blue Ocean Global Technology LLC and Co-Founder of Girl Power Talk. He is a CFA Charterholder, a CFP® professional, and a Chartered Alternative Investment Analyst$^{SM}$. Sameer leads client engagements focused on digital transformation, risk management, and technology development.

A testifying subject matter expert witness in economic damages, intellectual property, and internet defamation, he authors CLE programs with the Philadelphia Bar Foundation. Sameer is a frequent speaker at private industry and public sector conferences, including engagements with the Federal Home Loan Bank (FHLB), Global Digital Marketing Summit, IBM, New York State Bar Association (NYBSA), US Defense Leadership Forum, and the US State Department's Foreign Service Institute. He proudly serves on the Board of Directors of Future Business Leaders of America (FBLA) and Girl Power USA.

Committed to building relationships, Sameer is an active member of the Abraham Lincoln Association (ALA), Academy of Legal Studies in Business (ALSB), American Bar Association (ABA), American Marketing Association (AMA), Business Transition Council, International Trademark Association (INTA), and Society of International Business Fellows (SIBF). A graduate of Georgetown University, he held leadership roles at Bank of America, Morgan Stanley, and Scotiabank. Sameer is also a CFA Institute 2022 Inspirational Leader Award recipient and was named an Iconic Leader by the Women Economic Forum.

## ARTICLES AUTHORED BY AND FEATURING SAMEER - APPENDIX B1

## RECENT SPEAKING ENGAGEMENTS AND REFERENCES - APPENDIX B2

## CONTINUING LEGAL EDUCATION (CLE) PROGRAMS - APPENDIX B3

## EXPERT WITNESS CASE HISTORY  - APPENDIX B4

## ABOUT BLUE OCEAN GLOBAL TECHNOLOGY LLC

Blue Ocean Global Technology LLC is an 8(a) minority-owned small business established in 2012 to provide digital transformation, business consulting, and technology development services. Guided by proactive communication, our innovative team of analytics, creative, legal, marketing, and strategy professionals collaborates to solve client challenges and deliver tech-empowered results. We are relentlessly committed to earning trust on merit. We respect two of your most precious assets: time and reputation.

Blue Ocean Global Technology LLC is a team of global professionals committed to learning, excellence, and helping our clients — both individuals and entities — achieve optimal results when it comes to repairing, building, and protecting their online reputation.

Blue Ocean Global Technology LLC creates and promotes top digital assets that accelerate growth and brand equity. We effectuate comprehensive reputation management services, which often include Search Engine Optimization (SEO), Social Media Marketing (SMM), and web development. When an individual or organization faces a reputation crisis or legal or public relations issues that involve the internet, we specialize in assessing the extent and type of harm caused by the defamatory content and calculating the compensatory damages owed. In addition, we have recognized expertise in mitigating the impact of this harm and proactively restoring and enhancing the reputations of those who have been defamed.

## DOUGLAS RYDER BIOGRAPHY

Douglas J. Ryder is a Registered Patent Attorney with expertise in intellectual property law, particularly in the electrical, computer, mechanical, software, communications, Internet, and business method arts. His technical background as an Electrical Engineer provides him with unique insights into complex technological innovations.

Douglas completed his Bachelor of Science in Electrical Engineering at Drexel University in 1989, followed by a Master's in Engineering Management from George Washington University in 1992. He then earned his Juris Doctor from the University of Maryland Law School in 1996 and became a Registered Patent Attorney in 1997.

Currently working from his office in Colmar, PA, Douglas offers comprehensive intellectual property services including preparation and prosecution of patent applications, trademark registrations, copyright filings, and trade secret protection.

Douglas has been an active member of several professional organizations, including the Pennsylvania Bar Association, the Bucks County Bar Association, and the Montgomery County Bar Association. He served as the Intellectual Property (IP) Section Chair for the Bucks CountyBar Association from 2020 to 2023, demonstrating his leadership in the intellectual property legal community.

As part of his commitment to professional development, Douglas completes at least 12 hours of Continuing Legal Education annually to stay current with developments in intellectual property law. He has also shared his expertise through CLE presentations to fellow legal professionals. Douglas's analytical skills as an Electrical Engineer, combined with his legal expertise, enable him to effectively communicate complex technical and legal concepts to clients, patent examiners, and colleagues.

## DOUGLAS RYDER'S CV – APPENDIX C

## ALEXANDRA LAJOUX BIOGRAPHY

Alexandra (Alex) Reed Lajoux, Ph.D., M.B.A., is the founding principal of Capital Expert Services, LLC, owned by Blue Ocean Global Technology, a U.S.-based technology company powered by Girl Power Talk, based in India. She serves as an advisor to the National Association of Corporate Directors (NACD), where she holds the title Chief Knowledge Officer Emeritus in recognition of her 15 years in that role. Recently named to the NACD Directorship 100, she is regarded as a trusted source of useful insights and introductions in the field of corporate governance, M&A, and the professional disciplines that underlie these two domains. She has expertise in not only financial capital but also human and intellectual capital.

Dr. Lajoux views issues from multiple perspectives, ranging from the latest regulatory standards in key industries to emerging best practices across domains. A Series Editor for De Gruyter Publishing, she has published or contributed to books on corporate finance, human capital, insurance fintech, and intellectual property, among other topics. She has worked with a major audit firm in the development of a series titled Human Capital.

As editor-in-chief of NACD's Directors' Monthly for more than 15 years, Dr. Lajoux helped NACD develop the world's largest library of director-centric thought leadership publications. In addition, Dr. Lajoux has conceptualized and authored/coauthored all nine titles in the McGraw-Hill Art of M&A series (1989-2024), as well as books on valuation with the late Robert A. G. Monks (Wiley, 2010), on money with Peet van Biljon (De Gruyter, 2020), and on municipal sustainability (De Gruyter, 2021). Her articles have appeared in Financier Worldwide, Risk & Compliance, and Capital Insights, and her works are cited in more than 950 academic studies.

She holds a Ph.D. in Comparative Literature from Princeton University, an M.B.A. from Loyola University Maryland, and a B.A. from Bennington College. She is fluent in English and French and has conversational competence in German and Spanish.

## ALEXANDRA LAJOUX'S CV AND BIBLIOGRAPHY – APPENDIX D

## STATEMENT OF COMPENSATION

Sameer is compensated at $750/hour, which covers research, investigation, testing, analysis, writing, reading, interviewing, responding, and the time required to author his expert witness report. Douglas Ryder is compensated at $550/hour. All payments are made to Blue Ocean Global Technology LLC.

## Section 3: Defamation and Its Impact on Reputation

TORT LAW

TRADITIONAL DEFAMATION

FALSE ALLEGATIONS AMOUNTING TO DEFAMATION

COMMERCIAL DEFAMATION

PATENT TROLLS & CANCEL CULTURE

*Disclaimer: Please note that we are not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided. In addition, please note that some of the observations made in this section of the report are based on materials previously published by Sameer Somal.*

## TORT LAW

Defamation is a well-established branch of tort law, grounded in the principle that individuals have a legally protected interest in their reputation. A defamatory statement, whether spoken (slander) or written (libel), constitutes a civil wrong when it exposes a person to public hatred, contempt, ridicule, or causes harm to their personal or professional standing. Unlike criminal defamation, which penalizes the act in the interest of public order, the tort of defamation primarily seeks to compensate the injured party for reputational harm.

It is a serious legal issue that can profoundly affect both individuals and businesses. False statements have the power to tarnish reputations, undermine professional credibility, and cause lasting economic and emotional harm.

Florida law provides a structured framework for addressing defamation while balancing it against First Amendment free speech protections. Libel (written or published defamatory statements) is actionable by statute, while Slander (spoken defamation) is recognized by common law.

Florida requires a claimant to establish five elements to prevail in a defamation lawsuit:

- publication of the statement;
- falsity;
- misuse of fault—namely, knowledge of falsity or reckless disregard for the truth when concerning a public figure, or negligence for a private individual;
- that the statement was defamatory in character; and
- actual damages unless the defamatory communication is per se actionable.

*See Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008).*[8]

Importantly, Florida recognizes *defamation per se* for statements so inherently harmful that injury is presumed. These include false assertions that:

---

[8] Jews For Jesus, Inc. v. Rapp, 997 So.2d 1098, 1106 (Fla. 2008).

- Someone committed an infamous crime;

- The individual suffers from a loathsome disease;

- A woman is unchaste; or

- Another's statements impart hatred, distrust, or disgrace; importantly, false statements that damage one's business or profession are treated as defamation per se when they attack professional integrity.

The Defendant has been making defamatory remarks about the Plaintiff since 2013, as shown in the articles "*A Patent Troll Conversation*"[9] and *"It Takes a Village to Kill a Patent Troll"*[10]. On October 10, 2024, Rachael Lamkin stated that "*and with Leigh Rothschild, we never get the money because the shells go bankrupt*"[11].

In the current matter, the Defendant carried out a prolonged defamatory campaign against the Plaintiff. Specifically, the statement that Mr. Rothschild's companies as "*shell companies that go bankrupt*" fails to qualify as a legal opinion or mere hyperbole. It constitutes a false factual assertion that directly impugns his professional standing and trustworthiness, qualities essential for successful patent licensing and industry partnerships.

Ms. Lamkin made great efforts to publicize this negative narrative against Mr. Rothschild, see the attachments below.

---

[9] *A Patent Troll Conversation - One on One with Rachael Lamkin - IPWatchdog.com | Patents & Intellectual Property Law*, IPWatchdog.com (June 21, 2013), https://ipwatchdog.com/2013/06/21/a-patent-troll-conversation-one-on-one-with-rachael-lamkin/id=42133/.

[10] *It Takes a Village to Kill a Patent Troll - Part 2 with Rachael Lamkin - IPWatchdog.com | Patents & Intellectual Property Law*, IPWatchdog.com (June 23, 2013), https://ipwatchdog.com/2013/06/23/it-takes-a-village-to-kill-a-patent-troll-part-2-with-rachael-lamkin/id=42241/.

[11] Michael Shapiro, *Starbucks Levels Fraud Claim in New Tactic to Fight Patent Suit*, (Oct. 10, 2024), https://news.bloomberglaw.com/ip-law/starbucks-levels-fraud-claim-in-new-tactic-to-fight-patent-suit.



Screenshot of LinkedIn post, available in Appendix G.

Moreover, Ms. Lamkin has publicized the defamation on her X profile, see below.



The screenshot is available in Appendix G - Inventory of Unfavorable Links & Social Media Analysis.

Under Florida law, such statements, which question an individual's fitness in their trade or profession, fall squarely within defamation *per se*. Thus, harm to reputation is presumed, and the plaintiffs are not required to demonstrate specific economic loss to sustain their claim.

**Elements of Defamation Under Florida Law**

The elements of a defamation claim as straightforward:

To establish a cause of action for defamation, a plaintiff must show that

- the defendant made a false statement about the plaintiff
- to a third party, and
- the falsity of the statement caused injury to the plaintiff.

*See NITV, L.L.C. v. Baker, 61 So. 3d 1249, 1252 (Fla. 4th DCA 2011).*[12]

The essence of defamation lies in the unjustified harm caused by untrue statements, rather than criticism, opinion, or hyperbole. Within the framework of tort law, defamation is recognized as a civil wrong because it unjustly infringes upon an individual's right to reputation.

The Defendant casts doubt on the financial propriety and trustworthiness of the plaintiff, thus directly defaming him and striking at the heart of his reputation as an inventor and entrepreneur. Ms. Lamkin perpetuates a negative narrative that Mr. Rothschild is unfit for business, incapable of sustaining ventures, and undeserving of investor confidence.

From a tort law perspective, reputation is a legally recognized interest, and the wrongful imputation of dishonesty or professional incompetence amounts to a direct violation of that interest. Because these statements undermine Mr. Rothschild's professional integrity and

---

[12] NITV, L.L.C. v. Baker, 61 So. 3d 1249, 1252 (Fla. 4th DCA 2011).

competence, they fall within the category of defamation *per se*, where harm to reputation is presumed without the necessity of proving specific damages. The law recognizes that the injury is self-evident: false allegations of business misconduct inherently erode trust, credibility, and professional standing.

## TRADITIONAL DEFAMATION

Defamation, in its traditional sense, is rooted in the protection of an individual's reputation and social standing. It is premised on the recognition that reputation is a valuable asset, and that false and malicious statements can cause irreparable harm to a person's dignity, livelihood, and community relationships. In today's digital landscape, libel has become particularly damaging due to the permanence of online publications and the speed at which misinformation spreads.

Courts recognize that even subtle derogatory statements can erode professional credibility, diminish public trust, and impair an individual's capacity to conduct business. When the defamatory remarks target a person's competence, honesty, or integrity within their trade or profession, the law considers the harm particularly acute.

As mentioned earlier, to successfully bring a defamation claim in Florida, a plaintiff must establish all of the following elements such as publication, falsity, misuse of fault, defamatory character, and actual damages. In circumstances where the plaintiff is a public figure, the standard is heightened, requiring proof that the defendant acted with "actual malice", knowledge of falsity, or reckless disregard for the truth.

Similarly, the accusation that Mr. Rothschild operates "*shell companies*" is a loaded assertion. A "shell company" is generally understood, both in legal and business contexts, *as an entity with no independent operations or substantial assets, often used to conceal ownership, evade regulation, or perpetrate financial misconduct.* To allege that an entrepreneur routinely creates such companies, only to let them "*go bankrupt,*" suggests a pattern of deception, irresponsibility, or even fraud. In this way, the statement imputes dishonesty and financial instability, traits fundamentally inconsistent with the trustworthiness required in patent licensing and innovation.

Although shells can be used for legal or illegal purposes, it is a derogatory term meant to attack Mr. Rothschild's credibility and reputation. In the current case, the manner in which the Plaintiff operates his business is not correlated to being a shell company; he does not engage in fraud, and the statements are defamatory.

While bankruptcy itself is a lawful process designed to provide relief to debtors and fairness to creditors, accusing someone of deliberately engaging in serial bankruptcies for strategic gain

Page no. 22

paints them as unfit for business. When such allegations are presented as fact, rather than as protected opinion or commentary, they cross the line into defamation because they convey false assertions that tarnish professional competence and credibility.

The defamation implies unethical practices and an absence of legitimacy in business dealings. By suggesting that Mr. Rothschild thrives on predatory litigation and financial manipulation, these statements constitute defamation per se because they strike at the heart of his ability to function within his profession.

The allegations directed at Mr. Rothschild, that he operates "*shell companies that go bankrupt*", fall squarely within the ambit of traditional defamation. These statements are false factual assertions communicated publicly through social media, portraying him as dishonest, financially irresponsible, and unworthy of investor trust. By attacking the essence of his professional reputation as an inventor and entrepreneur, they satisfy the classical definition of defamation, distinct from mere commentary or opinion.

## FALSE ALLEGATIONS AMOUNTING TO DEFAMATION

Defamation law recognizes that certain types of statements are so inherently damaging to a person's reputation that injury is presumed, even in the absence of direct proof of loss. This principle, known as **defamation per se**, relieves the claimant of the burden of establishing specific damages because the nature of the falsehood itself is considered gravely injurious.

Under Florida law, defamation per se applies to certain categories of false statements that are deemed so inherently harmful that harm to reputation is presumed without the need for the plaintiff to prove actual damages. Florida jurisdictions recognize the following types of statements as defamatory per se:

- False accusations of a felony or other criminal wrongdoing;
- False assertions that the plaintiff suffers from a loathsome or infectious disease;
- Statements that bring the plaintiff into public hatred, contempt, ridicule, or disgrace, or tend to injure the plaintiff in his or her trade, business, or profession; and
- Imputations of unchastity or extramarital sexual misconduct (historically applied to women).

In the present matter, the remarks suggesting that Mr. Rothschild operates "*shell companies that go bankrupt*" fall squarely within this doctrine. Such allegations directly undermine his professional reputation as an inventor and entrepreneur. They portray him as financially irresponsible, deceitful, and untrustworthy; traits that are fundamentally inconsistent with the credibility required to engage in patent licensing, foster innovation, secure investors, and sustain professional partnerships.

Because these statements impugn Mr. Rothschild's integrity and competence in his chosen field constitute defamation per se by attacking his professional capacity. In this context, the law presumes reputational harm without requiring proof of specific damages, as the allegations strike at the heart of his livelihood and professional standing.

The defamatory remarks signal a coordinated tactic intended to undermine Mr. Rothschild's credibility in the patent-licensing arena.

This was not a fleeting remark but part of a strategic, multi-year defamation campaign. The repeated portrayal of Mr. Rothschild's enterprises as "sham shell companies" engaged in bankruptcy patterns has had compounding effects, each repetition reinforcing the false narrative and amplifying its reach. Through ongoing publication and commentary, the defamatory portrayal has continuously eroded professional trust, complicating Mr. Rothschild's ability to secure new licensing partners or defend existing relationships.

For an inventor-entrepreneur whose livelihood depends on trust and reputation, such sustained defamation carries enduring consequences. Over time, the mischaracterizations risk becoming ingrained in public perception, retrievable by search algorithms, media archives, and litigants in future disputes. A defamatory campaign of this nature not only damages current opportunities but also leaves a lasting stain on the inventor's professional legacy, long after the litigation subsides.

## COMMERCIAL DEFAMATION

Commercial defamation, often referred to as trade libel, injurious falsehood, or business disparagement, arises when false statements are made that directly target a person's business, products, or commercial practices. Unlike traditional defamation, which primarily protects an individual's personal reputation, commercial defamation safeguards economic interests by ensuring that competitors or other actors cannot unlawfully undermine a business's credibility or market position through falsehoods.

At its core, commercial defamation involves a false and disparaging statement concerning the quality of goods, services, or the integrity of business operations, published to a third party, which causes financial harm. Courts have recognized that such statements, even when not directly attacking the individual's character, can be equally destructive by eroding customer trust, deterring investors, and damaging professional relationships.

The elements typically required to establish a claim of commercial defamation or business disparagement include:

- A false and disparaging statement concerning the plaintiff's business, products, or services;
- Publication of the statement to a third party;
- Malice, bad faith, or reckless disregard for the truth; and
- Special damages, usually in the form of actual pecuniary loss.

Florida courts have also refined the doctrine of defamation and business disparagement (injurious falsehood). In *Hoch v. Rissman, Weisberg, Barrett, 742 So. 2d 451 (Fla. 5th DCA 1999)*[13], the court distinguished between defamation, which protects personal reputation, and injurious falsehood, which protects business or economic interests. Similarly, in *Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330 (M.D. Fla. 2006)*[14], the court emphasized that false statements must impugn the plaintiff's professional integrity or business practices to be

---

[13] Hoch v. Rissman, Weisberg, Barrett, 742 So. 2d 451 (Fla. 5th DCA 1999)

[14] Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330 (M.D. Fla. 2006)

actionable as defamation per se. Florida courts consistently hold that commercial defamation is not intended to remedy mere affronts to dignity, but rather to address falsehoods that cause demonstrable harm to professional or economic reputation.

False allegations suggesting, for instance, that a company is fraudulent, financially unstable, or engaged in unethical practices, can constitute commercial defamation because they attack the very foundation of trust essential for market participation. Courts recognize that such falsehoods are particularly harmful in competitive industries where reputation operates as a form of currency.

Commercial defamation thus occupies a unique space within the law; it protects not only the dignity of reputation but also the economic viability of enterprise. By doing so, it ensures a level playing field in commerce and deters malicious attempts to gain unfair advantage through falsehoods.

In this case, the statements at issue are not mere opinions but targeted assertions that impugn the integrity of Mr. Rothschild in the marketplace. By portraying them as engaging in abusive or illegitimate business practices, the Defendant's conduct goes beyond casual criticism and enters the realm of commercial disparagement. Under Florida law, specifically **Fla. Stat. § 501.211**, remedies are available where a party suffers loss or injury to business reputation due to unfair or deceptive practices. Here, the allegations diminish consumer confidence, harm established business relationships, and impair Plaintiff's competitive standing in the industry. Such reputational harm, grounded in demonstrably untrue assertions, squarely falls within the ambit of commercial defamation and warrants redress.

## PATENT TROLLS & CANCEL CULTURE

The term "patent troll" is a pejorative label commonly used to describe entities that acquire patents not for the purpose of producing or commercializing an invention, but primarily to assert them against others through litigation or licensing demands. These entities are often characterized as exploiting the patent system by targeting operating companies with infringement suits, frequently seeking quick settlements to avoid the high costs of protracted litigation. While the term has gained traction in popular discourse, it is important to note that "patent troll" has no precise legal definition under U.S. federal or Florida law. Instead, it reflects a narrative judgment that can unfairly stigmatize patent holders, even those who may be legitimately enforcing their intellectual property rights.

Under the Patent Troll Prevention Act (*Fla. Stat. §§ 501.991–501.997*), Florida does not explicitly use the term "patent troll," but instead prohibits bad-faith assertions of patent infringement. The statute identifies specific indicators of bad faith, including:

- sending demand letters without basic patent information,
- making false or misleading claims about infringement,
- seeking unreasonable or unjustified licensing fees,
- failing to conduct a reasonable investigation into the patent's applicability, and
- initiating or threatening litigation with no intent to actually pursue a legitimate claim.

Collectively, these statutory elements define what is commonly understood as "patent trolling" within the state. To be classified under Florida law as engaging in "patent troll" behavior, an entity must meet one or more of the statutory indicators of bad faith.

Florida's Patent Troll Prevention Act sets out clear requisites for classifying a party as engaging in "patent troll" activity, including the use of bad-faith, deceptive, or vague demand letters, concealment of patent information, and attempts to leverage litigation threats for unjust financial gain. Mr. Rothschild's enforcement efforts are tied to actual patents, supported by disclosures, and pursued with reasonable grounds to believe in their validity and applicability.

This position finds further support in Rothschild's own statements, reported by Bloomberg Law. As Rothschild explained in a 2023 interview with patent attorney Pat Muffo:

*"We've won a lot of suits—we have hundreds of licenses. Licenses are an admission that they're infringing; people won't pay you money if they don't feel they're infringing."*[15]

He went further, noting that if asserting valid patents in court with supporting evidence is what defines a "troll," then he stands in the company of the Wright brothers, Alexander Graham Bell, and Thomas Edison. Far from demonstrating abusive tactics, such reasoning suggests that his conduct is aligned with lawful and historically recognized practices of patent enforcement.

Labelling Mr.  Rothschild as a "patent troll" without establishing the statutory indicia of bad-faith conduct mischaracterizes their legitimate patent enforcement efforts. The attribution of "troll-like" conduct and "shell companies", absent evidence meeting Florida's legal threshold, constitutes a defamatory attack that injures reputation, undermines credibility, and misleads the public discourse around lawful intellectual property enforcement.

The label of "patent troll" functions in many ways like a tool of cancel culture within the commercial and legal marketplace. Once affixed, the term carries heavy stigma, suggesting abusive litigation tactics, exploitation of intellectual property rights, and bad-faith conduct. However, in practice, such allegations often disregard the underlying legal legitimacy of a patent holder's actions. By branding an inventor or business entity as a "patent troll," competitors, media outlets, or critics can effectively undermine their credibility, discourage potential partners, and delegitimize otherwise valid enforcement of intellectual property rights.

This phenomenon mirrors cancel culture: reputational harm is inflicted not through substantive adjudication in a court of law but through narratives circulated in the public domain. Instead of engaging with the merits of the patents or the validity of claims, the conversation is shifted toward social judgment and condemnation. As with cancel culture more broadly, the danger lies in collapsing complex legal realities into a simplified and often defamatory label that can irreparably damage a professional reputation and commercial standing without due process.

---

[15] Starbucks Levels Fraud Claim in New Tactic to Fight Patent Suit, Oct. 10, 2024, Michael Shapiro https://news.bloomberglaw.com/ip-law/starbucks-levels-fraud-claim-in-new-tactic-to-fight-patent-suit

In addition to the harm caused to individual reputation, the defamatory statements at issue also amount to commercial disparagement. Defendants' false statements interfered with both Leigh M. Rothschild and Analytical Technologies' ongoing and prospective business relationships, particularly in the acquisition and licensing of patents.

By branding the Plaintiff as "*patent trolls*" and associating them with fraudulent business practices, Defendant undermined their credibility in the marketplace, creating reluctance among potential partners and licensees to engage in business dealings. This type of injurious falsehood not only damages goodwill but also constitutes unfair competition under, as it confers an unjust enrichment for the Defendant by discrediting competitors through misinformation rather than lawful competition. In this case, such false characterizations have created reputational harm that extends far beyond the courtroom, amounting to defamation and commercial disparagement, rather than fair critique.

## Section 4: Reputation in the IP industry

IMPACT OF REPUTATION IN THE INDUSTRY

ANALYSIS OF PATENTS - BACKGROUND, REPUTATION, AND EXPECTANCY OF IP ASSETS

*Disclaimer: Please note that we are not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided. In addition, please note that some of the observations made in this section of the report are based on materials previously published by Sameer Somal.*

## IMPACT OF REPUTATION IN THE INDUSTRY

Most of the Intellectual Property business community follows basic IP strategies with the goals to minimize risk and to reduce costs[16], including unnecessary legal costs. Although there isn't a definite set of values in the IP business community, the USPTO Rules of Professional Conduct can be applied to the community in general and they state that:

> *"(a) No individual will be registered to practice before the Office unless he or she  (...)*
>
> *(i) Possesses good moral character and reputation;"[17]*

Furthermore, it means that:

> *"Good moral character and reputation means the possession of honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the legal process and the administration of justice, as well as the condition of being regarded as possessing such qualities."[18]*

The false accusations of fraud created by the Defendant cast the impression that the Plaintiff is dishonest and doesn't have good moral character and reputation. Rachael Lamkin attacked Leigh Rothschild's reputation and planted doubt on values that are intrinsic to the industry practices.

A high degree of trust is required in the Intellectual Property Industry and in business in general; the conviction that both parties have integrity and keep all their commitments in good faith is a necessary element in any contract or business relationship. The defamation plants mistrust, and it discredits the achievements Mr. Rothschild has achieved in his career.

Attorneys handling litigation matters, such as patent infringement suits, may be paid hourly, a fixed price, on a contingency, or some type of hybrid arrangement.  Handling a case on contingency means that the attorney is not paid for their time but rather is paid a percentage of

---

[16]  *IP and Business: Managing IP as a Set of Business Assets*, (Feb. 19, 2008), https://www.wipo.int/web/wipo-magazine/articles/ip-and-business-managing-ip-as-a-set-of-business-assets-36097.
[17] *37 CFR § 11.7 - Requirements for registration.*, US Law https://www.law.cornell.edu/cfr/text/37/11.7.
[18] *37 CFR § 11.1 - Definitions.*, US Law https://www.law.cornell.edu/cfr/text/37/11.1.

any settlement (they receive their compensation as a portion of the backend upside). A contingent arrangement has a high degree of risk, as you could end up without profit.   As such, trust and good faith are essential in Intellectual Property litigation.

It's important to note that the United States Patent and Trademark Office (USPTO)'s Strategic Plan states that:

*"Innovation in key technology areas can strengthen economic resilience, support response to and recovery from current and future pandemics, and introduce green technologies that bolster climate resiliency. (...)"*

*(...) All Americans should have the opportunity to participate fully in the innovation ecosystem that helps drive our economic growth. The door to the innovation ecosystem should be open to anyone who has a bold new idea, be it an invention, an entrepreneurial dream, or a game-changing new product, so that more can benefit from the achievements and products enhanced innovation will produce.* [19]

It's possible to ascertain that the dissemination of false accusations about one of the most prolific inventors harms the whole innovation ecosystem and humanity's progress, hindering the work of people who are trying to improve the world with their creations.

---

[19]   United States Patent and Trademark Office. *2022–2026 STRATEGIC PLAN.* Available at: https://www.uspto.gov/sites/default/files/documents/USPTO_2022-2026_Draft_Strategic_Plan.pdf.pdf

## ANALYSIS OF PATENTS - BACKGROUND, REPUTATION, AND EXPECTANCY OF IP ASSETS

Intangible assets are the hidden gems that power knowledge-driven global economies. These assets include intellectual property (IP) rights, as well as related assets like brands and software. They play a crucial role in fueling innovation, productivity, and economic growth. For businesses, they create long-term value through the creation of a market niche, increasing revenue, and profitability. For example, a company's brand recognition can convey quality and reliability to customers. As a result, these intangible assets contribute to increased sales and may command higher prices.[20]

IP assets are legally protected, and that protection can be enforced in a court of law. They can be independently identified, are transferable, and have an economic lifespan. The value of an IP asset essentially comes from the right the owner of that asset has to exclude competitors from using it. For an IP asset to have a quantifiable value, it should:

- generate a measurable amount of economic benefits to its owner/user; and
- enhance the value of other assets with which it is associated.[21]

Additionally, the value of an IP asset represents the potential future economic benefits to the IP owner or authorized user. Value can be derived through:

- direct exploitation of the IP by integrating it within the product;
- sale or licensing of the IP to a third party; and
- other means, such as raising barriers to entry or reducing the threat of substitutes.[22]

The defamation in the present case harmed the reputation of Mr. Rothschild as a patent holder, it damaged the commercial perception of his patent portfolio, it caused discredit to the Plaintiff on a personal level, and it reflected negatively on his business.

---

[20] *Intangible Assets and Intellectual Property*, https://www.wipo.int/en/web/intangible-assets.
[21] *Valuing Intellectual Property Assets*, https://www.wipo.int/en/web/business/ip-valuation.
[22] *Valuing Intellectual Property Assets*, https://www.wipo.int/en/web/business/ip-valuation.

Generating economic benefit and selling or licensing are valid ways in which to use IP (e.g., patents).  As such, Mr. Rothschild and AT are well within their rights to pursue licensing deals with third parties or sales of their assets. Thus, filing a suit against a potential infringer is a strategic tactic that is within the Plaintiff's rights.

## Section 5: Nuances of Online Reputation Management

ONLINE REPUTATION MANAGEMENT (ORM)

BUILD

MONITOR

REPAIR

THE NUANCES OF DIGITAL REPUTATION REPAIR

## ONLINE REPUTATION MANAGEMENT (ORM)

As a direct consequence of the defendant's actions and malicious statements, Mr. Rothschild will incur substantial expenses and damages if he attempts to manage and rehabilitate his online reputation.

Online Reputation Management (ORM) refers to the strategy and tactics employed to present one's personal and/or professional brand in the best possible light on the internet. Generally speaking, it involves promoting positive brand messaging and managing negative criticism most appropriately. Blue Ocean Global Technology LLC defines ORM as the process of building, monitoring, and repairing the digital content that appears when you or your company is searched on the internet.  The emergence of social media allows negative content and false information to be shared easily and circulated among large numbers of internet users. This could be an offensive comment about you, a negative story published about you, or a past legal issue. Your online reputation determines how others perceive you when they search for your name directly or stumble on it online. Consequently, Online Reputation Management (ORM) is an exercise at proactively or reactively influencing what information people will find about an individual.

## BUILD

Building and managing your online reputation means proactively influencing the impression left on internet users, especially those who are actively or reactively seeking to learn more about you. Building a strong online reputation is critical to both people and businesses seeking to market themselves and grow. An agile public relations strategy that includes positive online content and public perception will create a preemptive defense against future defamatory content.

An effective Online Reputation Management (ORM) strategy will protect your personal identity and company brand from negative information appearing on search results. Digital media has greatly improved the public's access to both individuals' and companies' identities and brands, but also vastly increased the risk of negative exposure.

Social media platforms such as Facebook, Twitter, Instagram, LinkedIn, and YouTube, along with search engines like Google, Yahoo, and Bing, have disrupted and realigned the global economy by providing instant access to unfiltered information. Search engine results pages (SERPs), which generally show news, videos, images, and third-party content, now represent a key foundational pillar of a person's overall reputation and brand. Moreover, unlike in traditional media, where a negative news story appears only for a short time, negative stories in search engine results will often remain on the internet in perpetuity. Fortunately, these results can be properly managed and influenced to a certain degree through various tools such as search engine optimization (SEO) techniques within an ORM campaign.

**Active Social Media Presence**

Social media is now the most effective tool for publicly sharing information and creating word-of-mouth buzz. Active posting of pictures or links across popular social media communities helps direct traffic to your website and brand. Social media can also play a crucial role for individuals and companies trying to combat negative or false information.

**Positive Blogs**

Telling your story not only reinforces a positive digital footprint for you and your brand, but it can also protect against the effects of negative press in the future. Search engine results pages

(SERPs) are comprised of three different types of content that can define your personal or business online presence:

- Managed Content: Content you can control. This includes everything that is published on your website(s), along with articles, videos, etc., that you publish elsewhere online.

- Partially Managed Online Presence: Platforms like social media, review sites, and professional directories often host partially managed content regarding individuals. For instance, on platforms such as LinkedIn, individuals can curate their profiles but cannot control all content posted about them.

- Unmanaged Content: This includes everything from news about you to blog posts and photos that you cannot influence because you have no control over the original content source. Unmanaged content is the most dangerous form of online content to your brand, and is the reason companies have evolved to protect and manage online reputations (David, 2016)[23] (Dewey, n.d.)[24].

---

[23] David, J. P. (2016). How to Protect (or Destroy) Your Reputation Online: The Essential Guide to Avoid Digital Damage, Lock Down Your Brand, and Defend Your Business. New Page Books,US.

[24] Dewey, C. (n.d.). Study finds 6 in 10 of us share links without reading one word. Retrieved from https://digitaledition.chicagotribune.com/tribune/article_popover.aspx?guid=23f1618f7764- 4cfe-8f4f-cf3226870f9d

## MONITOR

Of course, all this effort will go to waste if you don't know what is being said about you. Proactive anticipation of potential crises is the most effective way to mitigate or even completely avoid negative fallout. To put it simply, you need to be aware of what people are saying about you online, and the most effective way of doing this is by continuously monitoring mentions of your identity and brand on the internet. This is more complicated than reputation building and more difficult than just assigning someone to review and post on your behalf on social media. It should include not only full and continuous oversight of your internet presence but also an evaluative comparison of your actual online reputation to the narrative you are trying to create for yourself.

Monitoring is the key to addressing potentially harmful rumors and falsehoods before they erupt into a full-blown crisis. Unfortunately, people and even thriving businesses can be blindsided by defamatory content on the internet. Monitoring is a proactive step towards managing that risk. (Dietrich, 2014)[25].

Moreover, beyond shaping individual identities online, it is equally important to monitor and manage the online presence of individuals, especially those of significant stature and influence. Individuals who hold positions of prominence, such as business owners, public figures, and professionals in high-profile roles, bear a heightened responsibility to uphold their reputation and integrity in the digital sphere. Those who occupy such positions often serve as role models and pillars of their communities, making them susceptible to increased scrutiny and public opinion. Therefore, it becomes imperative for individuals of this stature to actively monitor their online presence and ensure that it accurately reflects their values, principles, and contributions.

---

[25] Dietrich, G. (2014). Spin Sucks: Communication and Reputation Management in the Digital Age (Que Biz-tech) . QUE.

## REPAIR

A negative reputation can change the trajectory of your life or business and adversely affect your well-being. Defamatory content erodes trust and compromises opportunities. Public relations firms and digital reputation specialists focus on the reduction and removal of online content to repair your online profile. Experienced companies have effective strategies in place for replacing negative search results with positive coverage.

There are several strategies available to repair a digital reputation. Digital reputations are constantly evolving, and it has become necessary to adapt personal and/or professional online presence accordingly. Digital reputation repair is a continuous process that demands periodic reassessment, the addition of new digital tools when appropriate, and modifying said process according to updates and changes to various search engines' algorithms for ranking content.

These ongoing changes to ranking algorithms can make obtaining success from SEO techniques challenging, even for experienced service providers with a track record of results. Search engines seek to deliver the most accurate and helpful results, which include balancing positive and negative content.

Hundreds of calculations and contributing factors are involved in search engine results. Specific aspects of those algorithms, and an associated scoring or ranking framework, apply to Online Reputation Management. Research on all aspects of each unique situation is required for each Online Reputation Management repair case. It requires a customized approach each time. To identify the best solution for an individual, Online Reputation Management professionals conduct thorough analyses of both positive and negative assets and then test the feasibility of both the removal and suppression of content.

An integrated team of professionals, including technical experts, analysts, engineers, and programmers, consistently studies and navigates digital trends in analytics, keyword research, link analysis, and SERPs to conduct highly efficient and effective SEO campaigns. Keywords and URL targeting may be used to mitigate negative links and safeguard against future damage to your reputation.

In a reputation repair and rehabilitation campaign, the focus is on proactively improving upon a reputation that was harmed and viewed by clients and prospective clients.

The false narrative created due to the defendant's actions resulted in reputational damage to Mr. Rothschild.   Defendants published false and defamatory statements about Mr. Rothschild, causing him personal injury, reputational damage, and economic harm. These statements were made with malice and have resulted in emotional distress, including high blood pressure requiring medical attention to Mr. Rothschild, and also affecting his business relationships.

To counteract the resulting negative sentiment, we recommend an ORM rehabilitation campaign. The false content existing about Mr. Rothschild has compromised his digital presence and created a harmful, negative impression on anyone searching for him on the internet.

# THE NUANCES OF DIGITAL REPUTATION REPAIR

**Implementing a comprehensive Online Reputation Management (ORM)**

The ORM plan required to rebuild Mr Rothschild's reputation will integrate numerous disciplines which include: SEO, public relations, content marketing, social media marketing and monitoring, community management, web analytics, and psychology and website engineering integrated with relevant content which is calculated to create a positive impact on a digital presence on social media, online review websites, forums, and blogs.

**The difference between ORM and SEO**

It is understandable that for many people, even successful executives and entrepreneurs, terms like Online Reputation Management (ORM), digital presence, Search Engine Optimization (SEO), reverse SEO, and content optimization often sound similar, and the difference can be confusing.

ORM is a broad concept that encompasses everything a company does to build its brand online. SEO is a strategy used to accomplish specific elements within a digital marketing campaign. ORM involves everything from building an SEO friendly website with relevant content to having a positive presence on social media, online review websites, forums, and blogs. While SEO is a technique that helps websites and specific digital assets appear higher on Search Engine Results Pages (SERPs), ORM combines different disciplines — online PR, content marketing, social media marketing and monitoring, SEO, community management, web analytics, and psychology — to proactively build and control the brand's reputation online. This multi-disciplinary and multi-channel approach is what differentiates ORM from SEO.

SEO is a foundational tool used within many successful ORM campaigns. SEO improves a target webpage's visibility through on-site optimization and managing the technical aspects of the page, such as creating HTML code, meta descriptions, and tags. As part of a content marketing strategy, SEO tactics help optimize a website's content by using specific keywords. Off-site optimization, another aspect of SEO, deals with building quality inbound links that can serve to "vouch" for the website in front of Google's spiders (software that crawls the web to find

updated site information). Off-page SEO uses social media marketing and external websites to create traffic.

**Suppression and Reverse SEO**

Reverse SEO is accomplished when SEO and ORM considerations are integrated effectively to mitigate the reputational impact of negative search results appearing prominently on Google search results.

Targeted suppression campaigns for related keywords focus on creating specialized content and tactfully optimizing the featured group. When done correctly, and in accordance with Google's policies and best practices, these efforts directly 'suppress' or 'push down' the defamatory web pages that are adversely affecting a person or company's reputation. Specific strategies, for example, targeting landing pages fueled by Facebook ads and Google AdWords to drive traffic in support of the reputation repair, are often considered.

Consistent with industry language and established practices, ethical and organic baseline suppression campaigns often require a minimum of one year for measurable and material progress, even under an aggressive mandate. Repairing the reputation of Mr Rothschild is definitely important, as defamatory information has ruined his online identity.

Influencing search engine rankings must be gradual and organic. When the goal is influencing Google to favor (and disfavor) specific content, it is naturally counterintuitive to what the algorithm wants to rank. Generally speaking, Google seeks to provide a balance of information, and this, of course, refers to accounting for and integrating all perceived positive and negative information available for display within specific Search Engine Results Pages (SERPS).

An Online Reputation Management company would seek to mitigate as much negativity as possible to achieve sustainable results that are more permanent in nature. Links will move gradually in the client's favor, and there will also be natural partial reversals. This give and take is necessary, so as not to abruptly change the search results for a particular keyword, otherwise it could be considered manipulation and 'blackhat' practices, and thus a violation of Google's terms and conditions.

Effective suppression focuses on making a growing group of positive current assets and ensuring they are stable before strategically cross-pollinating that content. Integrated technical and public relations teams collaborate to evolve their approach and create priorities according to the most recent results throughout a Reverse SEO & Suppression campaign. The links will fluctuate up and down on the targeted keywords identified when repairing Mr Rothschild's digital presence. The overall aim here is to create long-term stability. Until then, weekly and even daily fluctuations in search engine results are to be expected.

The following are guidelines for creating new positive assets within digital reputation repair campaigns:

- High quality, original, and technically accurate content – search engines reward authentic and resourceful content;

- Keyword density – too many instances of primary or secondary keywords will penalize a particular page for the target search engine results page

- Relate URLs to primary keywords – URL customization when creating new positive assets can significantly improve authority for specific search queries, especially when the URL closely matches the key search phrases.

- Web property cross-linking – embed hyperlinks and use links in newly created digital assets to cross-pollinate page authority and significantly improve campaign suppression results.

- Thorough optimization – cover all on-page SEO ranking factors and control all possible static quality elements for each positive asset. The success of a suppression campaign is always subjective and flexible because results are dictated by search engines. Google is highly secretive with respect to its complex search algorithm. Suppressed negative links can easily reappear on search engines, even from a seemingly minor update to the search algorithm. Major Google algorithm updates include:

  1. 2020 Google Featured Snippet Deduplication – Updated featured snippet rankings that list websites so that they are not repeated within organic listings.

2. 2019 Google BERT – Updated algorithm model with deep learning and natural language processing to better understand nuances of context;

3. 2017 Google Fred – Updated algorithm to penalize websites that violate Google's webmaster guidelines, notably blogs with low-quality posts;

4. 2016 Google Possum – Updated algorithm to ensure that local results correlate better with the searcher's location;

5. 2015 Google RankBrain – Updated algorithm as part of Hummingbird to factor in lack of query-specific relevance features, poor user experience, and shallow content;

6. 2015 Google Mobilegeddon – Updated the algorithm to provide a boost to mobile-friendly pages when searching Google from mobile devices.

7. 2014 Google Pigeon – Updated algorithm for local searches and created a more integrated relationship between local and core search.

8. 2013 Google Hummingbird – Updated the algorithm to positively impact best results for specific queries, particularly the emergence of conversational search. This update favors websites providing high-quality content that reads well for searchers and provides helpful answers.

9. 2012 Google Penguin – Updated the algorithm for link quality. Websites with low-quality directories, blog spam, and purchased links are negatively impacted in search results; and

10. 2011 Google Panda – Updated the algorithm for the quality of content. Lower-quality content, including duplicate content, will negatively impact search results.

Search Engine Journal - (Journal, 2018)[26];

---

[26] Journal. (2018). Retrieved from https://www.searchenginejournal.com/seo-guide/

Search Engine Land - (History of Google Algorithm Updates, n.d.)[27]

## Content Removal

Sometimes, content can be removed. Where feasible, content removal can be a more permanent solution, but it may be prohibitively expensive because of the time investment required. Additionally, there are no guarantees for successful removal or deindexing of target links through search engines..

Section 230 of the Communications Decency Act (CDA) of 1996 certainly facilitated the development of today's internet by encouraging innovations and new business models. Its primary goal is to safeguard the business owners of any "interactive computer service" from culpability for anything published by third parties. It states that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."

Companies like Blue Ocean Global Technology invest resources in the study and development of all options for the negotiated, legal, and strategic removal of information causing negative reputational damage. With multiple pieces of damaging information, the general approach to reputation management incorporates the following four removal strategies:

1. Negotiated (sympathetic) removal via direct outreach;

2. Relationship-driven removal via our network of agency & publisher partnerships;

3. Strategic (technical) removal at the source search engine or hosting company; and

4. Court or attorney-assisted removal

**Negotiated (sympathetic) removal via direct outreach.**

Our research and analysis often include:

---

[27] History of Google Algorithm Updates. (n.d.). Retrieved from
https://www.searchenginejournal.com/google-algorithm-history/

- Review of each of the prominent links' website properties for information in support of sympathetic removal inquiries;

- Research of key stakeholders, executives, and employees for identification contacts;

- Signed letter to the company address requesting the removal of identified links with supporting documentation; and

- Direct outreach via phone to the website owner and administrator.

**Relationship-driven removal via our network of agency and publisher partnerships.**

The second strategy relies upon our established proprietary network of PR, media, and publication partners who may have relationships with publications or their parent companies. As our network of PR partners expands in perpetuity, so does our ability to remove links via those strategic relationships.

**Strategic (technical) removal at the source search engine or hosting company.**

Strategic removal is another option where technicalities are identified, and cases are made in favor of removal. Every website platform host or service provider has contractual agreements in place with the owner of a particular website domain. For instance, to receive hosting services from GoDaddy.com or Bluehost.com, one must remain in compliance with thousands of terms and conditions. As such, a negative post may be in violation and subsequently justify removal from the corresponding authority. In one search result, there can be more than fifty thousand points of regulatory consideration. It is important to note that this type of removal is done independently of any conversation or notification to the website owner or administrator. With technological innovation, integration, and investment, the ORM industry is rapidly evolving. Cutting-edge analysis and resources are expanding the opportunities to repair an online reputation with confidence.

The following are required when identifying technicalities and exploring strategic removal:

- Hosting requirements and terms;

- Analysis of ISP (Internet service provider) terms protocol;

- Hosting site mandates and guidelines;

- Background of author and/or website media company;

- Intent and motivations of website purpose; and

- Google quality terms of use.

**Google Removal Policies**

Google seeks to organize the world's information and make it universally accessible, but there are specific instances where it will remove content from its search results.

Google will remove content from search results if it includes:

- Child sexual abuse imagery;

- Content in response to valid legal requests, such as copyright notifications that meet the requirements of the Digital Millennium Copyright Act.

With respect to personal information, Google will remove certain types of sensitive personal information from Google Search Results. How Google decides whether or not to remove a piece of personal information is dependent upon the following:

- Is it a government-issued identification number?;

- Is it confidential, or is it publicly available information?;

- Can it be used for common financial transactions?;

- Is it a personally identifiable nude or sexually explicit photo or video shared without consent?; and

- Can it be used to obtain more information about an individual that would result in financial harm or identity theft?

**Court or attorney-assisted removal**

Website domains and hosting companies may not have a legal obligation to remove content unless a court determines that the information that harms the interested party is false or defamatory in nature. In other words, it must be proven that the content is defamatory as outlined in Section 230 of the U.S. Communications Decency Act of 1996 (CDA).

To prove defamation, the following criteria must be met:

- The subject information is false and not factual.

- The negative information is now public and seen by others (at least one person); and

- The reputation of the individual has been adversely affected by the publication of the content.

Again, for Mr. Rothschild, content removal is - conceptually - the best tool to restore his reputation, but just the same, given the extent of the negative publicity, complete removal is impossible because publications are loath to respond. Even with the most aggressive campaign, negative internet content featuring Mr. Rothschild will likely reappear and affect his reputation in perpetuity.

## Section 6:  Legal Cases, Decisions, and Awards

DEFAMATION AND DEFAMATION PER SE

INTELLECTUAL PROPERTY AND DEFAMATION

COMMERCIAL DEFAMATION

**\*Disclaimer: Please note that I am not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided.**

## DEFAMATION

1. **Sirer v. Aksoy, No. 6:21-cv-1505-CEM-DCI (M.D. Fla. Apr. 28, 2023)**

   **Summary:**

   The plaintiff, a computer scientist and CEO, was falsely accused online by the defendant of being a member of a terrorist organization. The court found these statements to be defamation per se and awarded the plaintiff substantial general, special, and punitive damages after a bench trial.

   **Rationale:**

   Under Florida law, statements that falsely impute a criminal offense or characteristics inconsistent with the proper exercise of one's profession constitute defamation per se, for which general damages are presumed. A finding of express malice or reckless disregard for the truth can support an award of punitive damages.

   **Relevance:**

   This case is highly relevant as it provides a strong example of a successful defamation per se claim resulting in a significant damages award. The court's analysis of how false accusations damaged the plaintiff's professional standing and business interests is directly analogous to the present case's situation, where the claim of running "shell" companies that go bankrupt attacks your integrity as an inventor and businessman. In the final judgment following a bench trial, the court awarded the plaintiff, Emin Gun Sirer, a total of $3,025,000, General Damages: $3,000,000 for reputational harm. Punitive Damages: $25,000.

2. **Block v. Matesic, No. 8:22-cv-2158-VMC-TGW (M.D. Fla. Dec. 8, 2023)**

   **Summary**

The defamation counterclaim was brought by David Matesic (counterclaim-plaintiff) against Frederic Block (counterclaim-defendant). The dispute arose within their condominium association, where Matesic served as President of the board. Alleged statements. Block allegedly made defamatory statements to other association members in multiple communications. In a 2020 email, he accused Matesic of engaging in "last-minute electioneering" to influence a board election. In a 2021 candidacy letter, Block accused Matesic of illegally nullifying ballots, being "in charge" when a contractor allegedly damaged the lobby, sending a "vicious and defamatory letter," and defaming Block in his profession by accusing Block of making false statements and hacking emails. The court dismissed the defamation claims tied to the 2020 and 2021 communications as barred by the statute of limitations, but allowed Matesic leave to amend as to claims stemming from a more recent 2023 letter.

**Rationale:**

The court's order (on a motion to dismiss) lays out Florida defamation categories: defamation per se, defamation per quod, and defamation by implication. Defamation per se includes statements that charge a person with a crime or impute conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office. For per se, the plaintiff does not need to plead special damages. Defamation per quod requires pleading special damages. Defamation by implication can arise where statements, even if literally true, convey a false defamatory implication. On the specific claims, the court dismissed the counts based on 2020 and 2021 statements as time-barred, but granted leave to amend for any viable claims arising from the 2023 letter.

**Relevance**

This order gives a clear Florida framework for pleading defamation and confirms that accusations of illegal or unethical activity, or conduct incompatible with one's office or profession (e.g., claims of fraudulent election conduct or professional misconduct), fit defamation per se—meaning no special damages need be pled. It also flags two strategic points for your matter: (1) focus on recent, unprivileged public statements to avoid

limitations issues, and (2) frame accusations like running "shell" companies or "fraudulent" conduct as per se because they directly attack both the person and their business/professional fitness.

### 3. Walters v. Blankenship, 931 So. 2d 137 (Fla. 5th DCA 2006)

**Summary:**

The plaintiffs, Richard and Roberta Walters, were owners of four condominium units within a complex. The defendants were their neighbors who also owned units in the same complex. The case does not center on defamation (false statements) but rather on tortious interference through physical actions. The Walters listed their four condominium units for sale through a real estate auction. On the day of the auction, the defendants collectively placed "for sale by owner" signs in front of their own units, an act prohibited by the condominium rules. The plaintiffs alleged this was an intentional and malicious act designed to interfere with their auction. The complaint alleges that one day prior to the sale, one of the defendants, Thomas Klinehofer, told another unit owner, "You wait until the day of the sale and see what we are going to do to Dick Walters." The plaintiffs claimed that the sudden appearance of multiple "for sale" signs created a false impression of a flooded market, which caused the potential bidders to offer less, resulting in the Walters' units selling at a "substantial loss." Immediately after the last of the Walters' units was sold at the auction, the defendants removed all of their "for sale by owner" signs. The plaintiffs argued this was further evidence that the defendants' actions were specifically targeted to disrupt their sale. The plaintiffs sued for, among other things, tortious interference with a business relationship. The court reversed a dismissal, finding the plaintiffs had stated a valid cause of action.

**Rationale:**

The elements of tortious interference with a business relationship are: the existence of a business relationship, the defendant's knowledge of the relationship, an intentional and unjustified interference with the relationship by the defendant, and damages resulting from the breach of the relationship.

**Relevance:**

While this isn't a case about Intellectual Property, it shows the elements of a tortious interference claim. The defamatory statements were published despite the knowledge that they were untrue. The defendants intended for these false statements to interfere with the existing and prospective licensing deals, thereby satisfying the elements described in this case.

4.  **Spears v. Albertson's, Inc.\*, 848 So. 2d 1176 (Fla. 1st DCA 2003)**

**Facts:**

A manager at an Albertson's supermarket was fired after being accused of sexual harassment. The store director allegedly told other employees that the plaintiff was fired for "the sexual harassment claim." The plaintiff sued for defamation. The trial court granted summary judgment for the employer.

**Rationale:**

The appellate court held that a false statement accusing someone of misconduct in their employment is defamation per se. Specifically, a statement "is defamatory per se if, when considered alone without innuendo, it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace, or tend to injure one in one's trade or profession." Because the accusation of sexual harassment would injure the plaintiff in his trade as a manager, it was per se defamatory and did not require proof of special damages.

**Relevance:**

This Florida state court precedent reinforces a core argument in this matter. The false statement that Leigh Rothschild, a prolific inventor and licensor, operates his businesses as "shells that go bankrupt" is a direct attack on his professional integrity and business methods. Following the logic of Spears, such a statement, considered alone, tends to subject him to distrust and disgrace and is injurious to his trade or profession as an inventor and licensor. This strengthens the position that the statements are defamatory per se, and general damages are presumed.

**Defamation and Tortious Interference**

1. **Walters v. Blankenship\*, 931 So. 2d 137 (Fla. 5th DCA 2006)**

    **Facts:**

    The plaintiffs were selling luxury condominium units at a public auction. On the morning of the auction, their neighbors, the defendants, engaged in a coordinated and malicious campaign to derail the sale by placing large "For Sale By Owner" signs on their own properties to create the false impression of a glut of available units, thereby driving down the plaintiffs' auction prices.

    **Rationale:**

    The court reversed the dismissal, holding that the plaintiffs had stated a valid cause of action for tortious interference with a business relationship. The elements are: (1) the existence of a business relationship (here, between the plaintiffs and potential auction bidders), (2) the defendants' knowledge of the relationship, (3) an intentional and unjustified interference with the relationship, and (4) resulting damages. The court found that the defendants' malicious conduct, if proven, would constitute unjustified interference.

    **Relevance:**

    This Florida state court precedent is crucial for the tortious interference claim. Mr. Rothschild has business relationships with numerous licensees and potential licensees. The defamatory statements in the Bloomberg article were published with a minimum knowledge of his extensive patent licensing business. Richard L. Walters and Roberta Walters support the argument that the defendants' publication of false and damaging statements was an intentional and unjustified act intended to interfere with those existing and prospective licensing deals, thereby satisfying the elements of the tort.

2. **Music with Mar, LLC v. Mr. Froggy's Friends, Inc.\*, No. 6:20-cv-1558-RBD-EJK (M.D. Fla. Dec. 30, 2020)**

**Facts:**

The plaintiff, a music education company, sued a competitor for making false statements to customers and instructors about the plaintiff's licensing rights for its educational materials. The defendant falsely claimed that the plaintiff was operating illegally and no longer held valid rights.

**Rationale:**

The court denied the motion, holding that a plaintiff states a valid claim for defamation under Florida law by pleading with particularity the defamatory words, their publication, their falsity, the defendant's fault, and resulting damages. The court found that statements harming a business's reputation by questioning its legitimate rights to its own intellectual property are actionable.

**Relevance:**

This case provides direct support for a claim where false statements are used to interfere with business activities based on intellectual property. In our case, the defendants' claims that Mr. Rothschild's companies are "shells" are designed to undermine his legitimacy as a patent holder and interfere with his ability to license those patents. This precedent demonstrates that such statements provide a valid legal basis for a defamation suit aimed at protecting a business model built on Intellectual Property.

**Commercial Defamation**

1.  **Collier County Publishing Co., Inc. v. Chapman, 318 So. 2d 492 (Fla. 2d DCA 1975)**

**Facts:**

The plaintiff, a home builder who also sold Kirby vacuum cleaners, placed an ad in the defendant's newspaper for a giveaway. The newspaper repeatedly and erroneously printed the value of the prize as "$133" instead of the correct "$339," making the promotion seem less appealing. Despite the plaintiff's repeated requests for a correction, the newspaper failed to fix the error. The plaintiff sued for trade libel.

**Rationale:**

The court affirmed that trade libel is the malicious publication of a false statement of fact disparaging a business, which causes special damages (direct pecuniary loss). Importantly, the court held that malice does not require proof of ill will but can be inferred from the defendant's reckless disregard for the truth or falsity of the statement, such as failing to correct a known error.

The jury awarded $7,800 in compensatory damages and $5,000 in punitive damages.

**Relevance:**

This case is highly relevant for the trade libel claim against LMR's business entities. The false statements that the companies are "shells" that go bankrupt are a direct disparagement of the business enterprise. The present case supports the argument that such a false statement, published publicly, constitutes trade libel. Furthermore, it supports the argument that malice can be inferred from the defendants' reckless conduct in publishing such a damaging and unverified claim, which can justify an award of both compensatory and punitive damages for the economic harm.

2. **Falic v. Legg Mason Wood Walker, Inc., 347 F. Supp. 2d 1260 (S.D. Fla. 2004)**

**Facts:**

Shareholders of a company sued an investment firm, Legg Mason Wood Walker, Inc., after one of its employees wrote and circulated an internal memo to bondholders that contained false and disparaging statements about the company's financial stability and management. The memo accused the family of "a history of restructurings, write-offs, bankruptcies, falling stock prices, [and] dubious inter-family business transactions."

**Rationale:**

The court held that allegations of financial instability and corporate mismanagement made against a business can form the basis of a claim for injurious falsehood (trade libel). The court also analyzed the qualified privilege defense, noting that such a privilege to comment in a business context is lost if the defendant acted with malice.

**Relevance:**

This case is directly on point. The defendants' claims are precisely about alleged financial instability ("go bankrupt") and corporate mismanagement ("shells"). The allegations in Falic are remarkably similar to the disparaging statements made against LMR and his companies. This precedent strongly supports the action for commercial disparagement and provides a clear framework for anticipating and defeating any claim of privilege by demonstrating the defendants' malicious intent to harm.

3. **Unico Holdings, Inc. v. Nutramax Products, Inc.\*, 264 B.R. 779 (Bankr. S.D. Fla. 2001)**

**Facts:**

The plaintiff sued a competitor for distributing a "Technical Bulletin" to customers that contained false and misleading information about the plaintiff's products and its manufacturing process. The plaintiff brought claims for defamation, tortious interference with business relations, and unfair trade practices.

**Rationale:**

In its analysis, the court recognized that the distribution of false and misleading public statements about a competitor's business and products can support intertwined claims for defamation, tortious interference, and unfair competition under Florida law.

**Relevance:**

This case provides a strong parallel for the LMR matter. The defendants' use of a nationally recognized media publication, a Bloomberg article, to disseminate false information to the business community is analogous to the defendant's use of a "Technical Bulletin" to mislead customers. This precedent validates the multi-pronged legal approach of the LMR lawsuit, directly connecting the defamatory statements to broader claims of unfair competition and interference with business activities.

4. **Stucchio v. Tincher, 726 So. 2d 372 (Fla. 5th DCA 1999)**

   **Facts:**

   A group of homeowners, represented by attorney Mr. Tincher, sued a paving company owned by Mr. Stucchio. The case ultimately settled, with Stucchio's company agreeing to pay the homeowners. Shortly after the settlement, Mr. Tincher wrote a letter to the editor of a local newspaper, the Daily Sun, in which he discussed the case and made statements that Mr. Stucchio alleged were false and defamatory. In response to the publication, Mr. Stucchio filed a libel lawsuit against Mr. Tincher personally. Tincher moved to dismiss the lawsuit, arguing that his comments in the newspaper were protected by Florida's absolute litigation privilege because they related to a judicial proceeding in which he was counsel. The trial court agreed with Tincher and dismissed Stucchio's libel complaint. Stucchio then appealed the dismissal.

   **Rationale:**

   The Florida Fifth District Court of Appeals reversed the trial court's dismissal, holding that an attorney's defamatory statements published to the general public via a letter to a

newspaper editor are not protected by Florida's absolute litigation privilege. The court reasoned that the privilege is intended to shield statements made in the course of a judicial proceeding. For the privilege to apply, the defamatory statement must have some connection to, or be relevant to, the actual litigation. The court determined that publishing statements to the general public, whose members have no direct interest in the proceeding, fails this test. The act of communicating with the press is not pertinent to the ongoing litigation and serves no judicial purpose, and therefore falls outside the scope of the absolute privilege.

**Relevance:**

This case is critically important for the LMR matter. It provides strong, direct Florida authority to argue that the defamatory statements made by Starbucks' litigation counsel to Bloomberg are not shielded by the absolute litigation privilege. The defendants will almost certainly argue that the attorney's comments are protected because they relate to the subject matter of the ongoing patent lawsuit. However, as per the ratio in Stucchio, this defense does not hold. This precedent establishes that under Florida law, when an attorney steps outside the protected channels of litigation, such as pleadings, discovery, or in-court statements, and instead makes statements to the press, the absolute privilege is forfeited. This case allows for a clear argument that by speaking to Bloomberg, the attorney was no longer acting in the course of a judicial proceeding, making her statements actionable.

## Section 7: Assessment of Damages

RATIONALE FOR RECOMMENDATION OF DAMAGES

SUMMARY FINDINGS

DAMAGES

## RATIONALE FOR RECOMMENDATION OF DAMAGES

The rationale to determine damages and reputational harm involves evaluating the extent and severity of damage inflicted on an entity's public perception, credibility, and industry standing as a result of negative events, actions, or allegations. We also factor in the intention behind the defamatory content, whether it is malice, negligence, or apathy, which compounds the nature of the defamation. Their actions post-publishing also reflect their attitude while publishing.

In the current case, the damages sustained by Mr. Rothschild transcend simple economic loss. They reflect a prolonged defamatory campaign that resulted in loss of professional opportunities, emotional suffering, and reputational harm. The false statements led to the loss of time that could have been spent in better endeavours, a decline in business relationships, and a loss of respect in his community, as reflected by the rejection given by the Florida Inventors Hall of Fame.

These consequences were not only financial but also affected him personally, as Mr. Rothschild's standing in his professional community was gravely impaired. The widespread visibility of the accusations severely disrupted his ability to invest his time, efforts, and financial resources into his business. The defamatory campaign resulted in harm to his physical and mental health and negatively affected how others perceive him.

The public nature of the accusations made by the Defendant made it impossible for Mr. Rothschild to resume his professional life without confronting the false accusations.

Furthermore, the malicious and aggressive acts taken by Rachael Lamkin demonstrate an abnormal need to personally harm Mr. Rothschild's reputation and to cast him in a negative light. The multiple defamatory posts illustrate a personal prejudice carried out by the Defendant that caused incredible emotional distress to Mr. Rothschild. The damages, therefore, account not only for quantifiable loss but also for the irreversible harm to his reputation, relationships, and quality of life.

## SUMMARY FINDINGS

I.   **Leigh Rothschild suffered reputational damage due to Rachael Lamkin's actions.**

Because of the defamatory campaign, Mr. Rothschild's acquaintances now question the nature of the patent litigation activities in which he is involved. His business interests, including Analytical Technologies, LLC (AT), have suffered economically. The false statements have obstructed and may continue to restrict AT's and Mr. Rothschild's ability to acquire and license patents and other intellectual property assets.

The derogatory statements about Leigh Rothschild and Analytical Technologies, LLC (AT) have interfered with business relationships with patent owners and entities, directly impairing the Plaintiffs' efforts to acquire and license patents.

II.   **Mr. Rothschild's Hard-Earned Reputation**

Leigh Rothschild is a renowned inventor; as indicated during my interviews with him, he has issued approximately 150 patents, with more than 40 applications pending before the PTO. He licensed his patents to many Fortune 100 and 500 companies, for millions in licensing fees and royalties. It is extremely unjust that his reputation is tainted by the biased and prejudicial narrative created by the Defendant.

III.   **Aftermath of the Defamation**

The mislabelling of "patent troll" and fraud claims affected Mr. Rothschild's mental and physical health. It also affected his business, since his colleagues questioned his integrity because of the untrue accusations.

IV.   **Direct violation of Fla. Stat. § 501.21**

By constantly publicizing defamatory statements about the Plaintiff, the Defendant has engaged in deceptive acts, unfair practices, and unfair competition, in violation of Fla. Stat. § 501.211. The Defendant gains attention and publicity by giving interviews, defaming the Plaintiff, resulting in unjust enrichment. The attempts to injure the Plaintiff and his business are deeply malicious.

Page no. 64

## DAMAGES

**Economic Damages**

I recommend awarding economic damages to Mr. Rothschild, as the financial harm he suffered is substantial. The financial losses are a direct result of the defamatory statements, and his economic damages can be condensed into five categories.

· Recent opportunity cost

· Recent reduction in campaign revenue due to decreased activity

· Recent reduction in campaigns returns due to difficulty in adding staff

· PV of future diminution in exit value for sale of PAM

· Ongoing out of pocket legal costs

For all of these, we will assume specific periods of damage, even though we know that reputational harm can last for a lifetime. We do so in order to be extremely conservative. Furthermore, we assume a positive reputation campaign lasting at least one year (thus making it unnecessary to project damages beyond the periods estimated).

**Recent Opportunity Cost: Loss of Time That Could Be Spent on Invention and Acquisition**

Since the defamation, Mr. Rothschild and his inside chief operating officer have each spent an average of 8 hours per week on the defamation matter over the past 47 weeks (give or take a few days). Their blended hourly rates amount to $1,800 per hour.  This is a conservative figure considering that in this time on the defamation matter, Mr. Rothschild and his staff were unable to work on campaigns. There have been net zero portfolio acquisitions (the sole acquisition made had to be returned for further due diligence). We estimate the value of this lost time to be at least $676,800.

**PV of Reduction in Potential Future  Revenue from Campaigns Due to Decreased Activity**

Mr. Rothschild reports having only ten (10) active cases on file which is below PAM's typical number in the past. Falling below 15 active cases limits long-term revenue potential, especially since it takes time to produce results (settlements). Valuing each campaign at $800,000, an amount credibly supplied by the Plaintiff, we see damages of $2.4 million. Assuming that the funds would arrive only in three years and using a real discount rate of 3 percent the damages are **$2,196,340**

**Recent Reduction in ROI from Campaigns Due to Difficulty in Adding Staff**

In addition the basic business model of PAM has been disrupted. PAM negotiates with inventors to take the management of their rights or to buy the inventions outright. Then PAM, taking the expense of litigation upon itself, litigates to protect those rights and shares the returns on the campaigns with the inventors.

Due to the defamation, it has been more difficult to achieve successful outcomes. PAM has been trying to hire an additional in-house attorney but has been turned down for reasons credibly tied to the defamation.

We estimate the opportunity cost of this delay in hiring due to the defamation to be based on the loss of at least one year in the returns on investment in the extra litigation that could have been accomplished but for the defamation. Current returns on litigation financing ranges from 30 percent to 50 percent of costs outlaid - with a midpoint of 40 percent. Litigation financing in IP covers several categories, including the cost of a lawyer[28]. (This is not even counting 1.4 x returns on other campaign expenses never won due to lack of a new additional attorney.)

The total compensation for an in-house lawyer in 2025 is at least $288,000[29]. Assuming that payment to this lawyer for the next 12 months would have been $288,000 and that the total returns year would be 40 percent, the gain from hiring him or her would be $403,200, minus the $288,000 paid, and the profit (now not achieved) would be $115,200. Present value of that amount in five years using 3 percent real discount rate is **$99,373.**

---

[28] https://d.docs.live.net/e0b34f33aa8e42ad/Desktop/CAPEX/New%20Damages%20Section.docx#_ftn1
[29] https://d.docs.live.net/e0b34f33aa8e42ad/Desktop/CAPEX/New%20Damages%20Section.docx#_ftn2

**Loss of Exit Value for the Company PAM**

PAM is a privately held company with unpublished financial statements. While Mr. Rothschild has not shared his company's financial statements with us, we make the following observations. As a company in the vibrant field of patent litigation, founded and owned by one of America's most prolific investors, this company's name and business methodology alone combined with its portfolio of patents would be worth $12 million to $20 million to an outside investor, with a middle range of $16 million. The damage to Mr. Rothschild also fell upon PAM. Numerous studies show that reputation accounts for a significant percentage of company value[30]. Assuming only a 20 percent value destruction, we can conservatively estimate the destruction of value to Mr. Rothschild's firm to be $3.2 million. Assuming that the sale does not occur for another ten years as he is still active and in good health, the present value of the loss in value from his exit in 10 years would be valued at **$2,381,101.**

**Ongoing out of pocket legal and filing costs**

Mr. Rothschild and his staff estimate ongoing out-of-pocket costs for this matter to be no less than **$150,000.**

Total Estimated Economic Damages are therefore at least **$5,503,614.**

**General Damage to Professional Reputation**

Moreover, the long-term impact on Mr. Rothschild's career is severe and far-reaching. His professional standing in the community has been irreparably damaged, thereby further reducing his potential earnings. Considering that he was going to be named to the Florida Inventors Hall of Fame, but learned that he was no longer being considered. There is well-documented economic value to receiving a prestigious professional award.[31]

---

[30] https://d.docs.live.net/e0b34f33aa8e42ad/Desktop/CAPEX/New%20Damages%20Section.docx#_ftn3

[31] Bronwen Harrison and Denise M. Jepsen, "The career impact of winning an external work-related award," Journal of Vocational Behavior, August 2015, citing Gehrlein and Kher on the point that "Winning an award may lead to fame, prestige, power or wealth." The career impact of winning an external work-related award - ScienceDirect,

Even if the erroneous record is corrected, the stigma and bias associated with a fraud accusation may continue to influence his business. Potential investors and clients may hesitate to engage with him due to the negative image portrayed by the Defendant.

**Attorney Fees**

Due to the defamatory statements, Mr. Rothschild suffered greatly with legal expenses, including legal fees and expert fees.

**Reputational Damages**

Reputational damages form a part of presumed damages. It is certain to assume that a person has suffered reputational damage and losses as a result of negative content online, since it is meant to attack the reputation. The risks and ramifications of reputational damage are intense, and there is no set standard to determine the actual value associated with it. The courts rely on multiple factors when awarding damages to one's reputation. It is impossible to reverse the past damage and completely rehabilitate Mr. Rothschild's negative reputation.

Reputations hold immense value because they are built on perceptions, beliefs, and opinions that others hold about an individual or a business. These perceptions can shape how people view and interact with someone, influencing their trust, willingness to work with them, and professional prospects.

Mr. Rothschild's professional reputation has been gravely impacted due to the false statements, both emotionally and financially. The accusation of fraud and unethical behavior resulted in multiple news articles questioning his integrity, leading to severe harm to his reputation and to his business.

The defamatory statements given by Rachael Lamkin in a Bloomberg article, claiming that LMR's companies are "*shells*" that go bankrupt, tarnish Mr. Rothschild's reputation, leading to loss of business opportunities and relationships.

When false accusations or negative information are spread about an individual or a business, it can have far-reaching consequences, as this case demonstrates. Professional relationships are built on mutual understanding and respect. Quantifying trust and relationships is challenging because they involve complex emotions, subjective perceptions, and individual experiences. Naturally, measuring the exact harm of losing one's professional reputation is incalculable.

Additionally, Mr. Andrew Silver, owner of the said patent in question, shared that as a result of all this, his relationship and confidence in PAM degraded significantly, even after he was told that the situation had changed such that his patent agent, Raffi and he would not be further pursued. This also affected the broker involved in the said deal and who AT worked with regularly.

I have studied defamation and, again, been retained in multiple defamation cases to assess damages. The reason the category of "*defamation per se*" exists is precisely because calculating damages is subjective. That is why damages are presumed.

However, in my experience, combining several factors can provide a solid structure for assessing damages based on the number of people the defamation reached, as follows:

- **Ring 1** (Immediate contacts, including colleagues, partners, friends, family, and those within the community) – These are people who are intimately aware of and/or directly working with Mr. Rothschild, including colleagues, partners, and investors. The false statements affect these relationships, with Mr. Rothschild having to clarify and prove his stand. The accusations cause them to question his integrity and overall professionalism.

- **Ring 2** (Prospective business relationships, clients, colleagues, and investors) – This ring is the circle that is often the worst affected since the defamation causes individuals to question Mr. Rothschild's professional integrity. This is because these are groups and/or people who know Mr. Rothschild distantly and/or who might have learnt about the defamation through professional circles. Given the negative narrative, their image of Mr. Rothschild is tainted with distrust and questionability, and they may decide not to work or associate with him anymore. Defamation in business settings can result in the loss of investments and a decline in professional engagements.

- **Ring 3** (Strangers' scrutiny) – This is among the most nebulous groups, as the false narrative and general negativity around Leigh Rothschild in his professional community may reach a large number of people through word of mouth. This may frame a negative perspective in the minds of people who hear about Mr. Rothschild for the first time, causing intangible and invaluable damage.

Adding the three reputational rings together, and based on the narrative present, I conservatively recommend damages for this category of $500,000 - $750,000.

**Rehabilitation Damages**

Recovery from reputational damages involves proactive measures. Implementing an effective online reputation management strategy, which includes building a favorable reputation and monitoring online platforms for any further dissemination of the said unfavorable content, is critical in repairing the damage. Furthermore, the entire process usually takes a considerable amount of time and effort, which should also be considered as a factor for determining the damages.

A rehabilitation campaign will cost and consist of the following components:

- Initial target keywords: 8
- Target search engines: Google, Bing, and Yahoo
- Total target negative links: 20+
- Creating positive digital assets: 100+
- Estimated timeline: 12 - 18 Months
- Estimated Budget: $7,000 - $12,000 per month for rehabilitation.
- This equates to an average campaign range of $114,000 - $171,000.

Additional considerations for the campaign include:

I.   **Process**

An effective rehabilitation campaign requires ongoing analysis and testing. Close attention is given to a comprehensive yet fluid list of all search results that populate for a particular keyword. We will first focus on an initial group of 8 keywords.

Our process is first applied to each keyword within the Google search engine. As the campaign yields results, a similar framework is implemented for the keywords on four other major search engines: Bing, Yahoo, DuckDuckGo, and Search Encrypt.

We will begin the image optimization process on the basis of media files provided by the client, which will simultaneously impact progress on the standard search results as well.

A web page with a higher authoritative number of backlinks features more prominently on the search results relative to similar websites without comparable interlinking strength.

Throughout the campaign, we will be using link-building strategies to further strengthen the new digital assets created.

A hallmark of our client experience is transparency. We provide monthly progress reports highlighting work performed and results starting at the end of the second month. While some of our strategies are proprietary, we often include backlinks, profiles, articles, and other tangible updates.

## II.   Content & Publication

100+ Positive Digital Assets will need to be created to counteract the negative sentiment against Leigh M. Rothschild. New positive links are required to rank. Given the scope of content that Mr. Rothschild may be comfortable with, we will likely have to engage a group of both internal writers and external PR professionals. Initial information for content creation, biographical information, topics, and sources will be identified and collected.

Building and maintaining high authority profiles that can rank on specific Search Engine Results Pages (SERPS) will be one core element of our process.

A plan for the promotion and demotion of existing content within each keyword is required.

We will have to work thoughtfully and patiently to leverage social media, which is usually a pillar of our campaigns. We will highlight the career success Mr. Rothschild has as an inventor to authentically translate his offline integrity to his digital image.

Considering all the factors involved and the need for restoration and strengthening of the Plaintiff's reputation, the estimated costs for a baseline rehabilitation campaign, inclusive of SEO and approved written, photo, video, and public relations content by Mr. Rothschild.

As detailed above, a modest baseline rehabilitation campaign can only partially restore Mr. Rothschild's reputation and counteract some of the negative narratives against him.

Considering the factors above and my extensive experience leading rehabilitation campaigns, I estimate the campaign cost to be in the range of $114,000 - $171,000.

**Emotional Distress Damages**

Mr. Leigh Rothschild has endured profound emotional distress and physical harm as a direct result of the defamatory campaign carried out by the Defendant. The psychological toll of being falsely accused of fraud has had lasting effects on his well-being.

The mental anguish, stress, and other health issues he has experienced stem from the significant disruption to his work and the grave injustice he faces with the untrue claims. The discomfort and emotional distress associated with being subjected to public hatred, where false accusations about him were spread through known legal websites, has caused significant distress that cannot be easily remedied.

Due to the defamatory campaign carried out by Rachael Lamkin, Mr. Rothschild now has to use a beta blocker and has abnormally high blood pressure, requiring special medical attention and medication *(see Appendix A),* which demonstrates the physical damage suffered.  He reports that his deductibles for primary and cardio care amount to $10,000 per year and he is likely to have to pay them every year for an indeterminate period  due to the stress of this matter.

Furthermore, Mr. Silver shared, "the claims that were presented to me from attorney Rachael Lamkin attacking us both caused me mental anguish for weeks including affecting my sleep. In reviewing her claims as they were presented to me - they were unfounded and demonstrated she had lambasted us with outrageous claims of intentional malice that were completely false and that she had done so either without researching the complete history of the patents and the previous licensing agreements or that she had deliberately chosen not to do so."

He added, "I recall multiple nights affecting my sleep where I was up constructing the arguments in my head to address each of the false claims she had raised, and how I was going to have to write these arguments to assist my counsel in defending me. I also recall the anguish and worry I had when this was revealed to me in late October 2024 while I was on vacation, prompting me to keep reaching out to Raffi as I tried to connect with him to arrange a time to discuss the matter with him and get his advice. Raffi was traveling in remote South America and we both struggled with our remote communications connections over Whatsapp."

In addition to the calumny in news articles and social media posts, Mr. Rothschild believes the Defendant defames him to attorneys, causing him stress and anguish in professional circles. This compromises his professional identity, which is often a fundamental part of an individual's self-worth and personal fulfillment. Despite being qualified and highly successful in his industry, he is now facing scrutiny and reputational harm.

The need to engage in prolonged legal battles to correct the wrongful allegations has only added to his psychological burden. Given the severe physical and emotional impact of this ordeal, compensation for emotional distress should be awarded to account for both the suffering endured and the consequences on Mr. Rothschild's quality of life and health.

**Punitive Damages**

Mr. Rothschild is entitled to the requisite punitive damages as part of unliquidated damages to be awarded in this lawsuit. Punitive damages are awarded in cases where defamatory statements were made out of actual malice. A determination of *mens rea* (mental state) is essential for an award of punitive damages. In the case of punitive damages, it is extremely difficult to assign a dollar value because reputations are intangible.

According to the Florida Statutes Title XLV. Torts § 768.73[32]:

*"(c) Where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages."*

In the present case, the Defendant's actions support the finding of actual malice, as it is evident that she takes every opportunity to vilify Mr. Rothschild to others. Additionally, as mentioned earlier, the Defendant has been engaging in defaming Mr. Rothschild for a long time through news articles and social media posts. This lays emphasis on and concretises the *mens rea* and warrants a claim for punitive damages.

*Disclaimer: We reserve the right to amend this report and revise our findings, opinions, and/or calculations as new information/evidence becomes available.*

---

[32] FindLaw.com - Florida Statutes Title XLV. Torts § 768.73. Punitive damages; limitation - *last updated January 01, 2024* | https://codes.findlaw.com/fl/title-xlv-torts/fl-st-sect-768-73.html