# EXHIBIT B



**Planet Depos**
We Make It Happen™

# Transcript of Sameer Somal

**Date:** November 12, 2025
**Case:** Rothschild, et al. -v- Starbucks Corp., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

LEIGH M. ROTHSCHILD and ANALYTICAL    )
TECHNOLOGIES, LLC,                    )
                                      )
            Plaintiffs,               )
                                      )
        vs.                  ) Case No.: 1:24-cv-24669-DPG
                                      )
STARBUCKS CORP, and RACHAEL LAMKIN,   )
                                      )
            Defendants.               )
------------------------------------)

VIDEO-RECORDED DEPOSITION OF

SAMEER SOMAL

REMOTELY HELD VIA VIDEOCONFERENCE TECHNOLOGY

NOVEMBER 12, 2025

REPORTED BY:
LYNETTE MARIE NELSON,
CA CSR No. 11585, OR CSR No. 250121,
TN LCR No. 896, RPR, CRR, CCRR, CRG,
REALTIME SYSTEMS ADMIN.
JOB NO. 607923

---

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

LEIGH M. ROTHSCHILD and ANALYTICAL    )
TECHNOLOGIES, LLC,                    )
                                      )
            Plaintiffs,               )
                                      )
        vs.                  ) Case No.: 1:24-cv-24669-DPG
                                      )
STARBUCKS CORP, and RACHAEL LAMKIN,   )
                                      )
            Defendants.               )
------------------------------------)

DEPOSITION OF SAMEER SOMAL,

taken by the Defendants, commencing at the hour of

12:07 p.m. Eastern Standard Time on Wednesday,

November 12, 2025, held remotely via videoconference,

before Lynette Marie Nelson, Certified Shorthand

Reporter in and for the State of California, Oregon, and

Tennessee.

---

APPEARANCES:

    For the Plaintiffs:
        SML AVVOCATI, P.C.
        BY:  STEPHEN M. LOBBIN, ESQ.
        Mailing address:
        4640 Cass Street, #90142
        San Diego, California  92109
        Physical address:
        888 Prospect Street, Suite 200
        La Jolla, California  92037
        (949)636-1391
        sml@smlavvocati.com

    For the Defendants:
        BAKER BOTTS L.L.P.
        BY:  RACHAEL LAMKIN, ESQ.
        BY:  BRENTON COOPER, ESQ.
        BY:  LINUS NEMIROFF, ESQ.
        101 California Street, Suite 3600
        San Francisco, California  94111
        (415)291-6200
        rachael.lamkin@bakerbotts.com
        brent.cooper@bakerbotts.com
        linus.nemiroff@bakerbotts.com

    Also present:  Alexandra Lajoux and Kiras Persky
                   In-house Counsel,
                   Patent Asset Management, LLC

        Lee Utterback-Pair, Tech

        Daniel Esparza, Video Tech

---

I N D E X

WITNESS:  SAMEER SOMAL                          PAGE

EXAMINATION

BY MS. LAMKIN                                    8

E X H I B I T S

| MARKED FOR IDENTIFICATION | | PAGE |
| --- | --- | --- |
| Exhibit 1 | Appendix A, Documents Reviewed | 27 |
| Exhibit 2 | LAW360 Valve Wants Sanctions In 'Patent Troll' Suit In Wash. | 44 |
| Exhibit 3 | Stupid Patent of the Month: "Internet drink mixer" vs. everyone | 47 |
| Exhibit 4 | Rothschild Connected Devices Innovations, LLC v. Guardian Protection Services, Inc., et al. Decision | 51 |
| Exhibit 5 | Appendix F | 59 |
| Exhibit 6 | 11/11/25 search results for "leigh rothschild" | 74 |
| Exhibit 7 | 11/11/25 search results for "leigh rothschild" | 78 |
| Exhibit 8 | 11/11/25 search results for "leigh rothschild" | 79 |
| Exhibit 9 | Appendix G | 86 |
| Exhibit 10 | Y Hacker News, "Gnome patent troll stripped of patent rights" | 89 |

Exhibit 11   Online Reputation and Repair        95
             Assessment Expert Witness
             Report

Exhibit 12   Appendix A                          127

Exhibit 13   Menge v. Ash-Shafii, Slip           128
             Copy (2025)

Rothschild, et al., versus Starbucks, et al., in the United States District Court, Southern District of Florida, Case No. 1:24-CV-24669-DPG.

Today's date is November the 12th, 2025. Time on the video monitor is 12:09 p.m. Eastern Standard Time.

The remote videographer today is Daniel Esparza representing Planet Depos.

All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent.

MS. LAMKIN: Beginning with plaintiff or defendant?

MR. LOBBIN: Oh, I can start.

Steven Lobbin. Law firm is SML Avvocati PC. I am here representing the plaintiffs in the underlying action as well as the expert witness being deposed.

MS. LAMKIN: Do you mind, Mr. Lobbin, announcing who is with you on the record, please.

MR. LOBBIN: Oh, sure.

With me on the record is the witness, Mr. Somal, his colleague at his firm, Ms. Alexandra Lajoux and Kiras Perkey -- Persky who

REMOTE DEPOSITION;

WEDNESDAY, NOVEMBER 12, 2025, 12:07 A.M.

-o0o-

MR. UTTERBACK-PAIR: Thank you to everyone for attending this proceeding remotely. Which we anticipate will run smoothly.

Please remember to speak slowly and do your best not to talk over one another.

Please be aware that we are recording this proceeding for backup purposes.

Any off-the-record discussions should be had away from the computer and please remember to mute your microphone for those conversations.

Please have your video enabled -- please have your video enabled to help the court reporter identify who is speaking and if you are unable to connect with video and are connecting via phone, please identify yourself each time before speaking.

I apologize in advance for any technical-related interruptions.

Thank you.

THE VIDEOGRAPHER: Thanks, Lee. Please stand by for video.

Here begins Media No. 1 in the videotaped deposition of Sameer Somal in the matter of

is an in-house counsel with Patent Asset Management, LLC.

I think it's Lajoux. I mispronounced that.

MS. LAMKIN: And for the defendant, hello, my name is Rachael Lamkin. I'm from Baker Botts.

In the room with me is Linus Nemiroff, another attorney at Baker Botts, and on the Zoom is Brenton Cooper, another attorney at Baker Botts, representing the defendant, Rachael Lamkin.

THE VIDEOGRAPHER: The court reporter today is Lynette Nelson representing Planet Depos.

The witness will now be sworn.

(Witness sworn.)

THE WITNESS: I do.

THE STENOGRAPHER: Thank you.

SAMEER SOMAL,
HAVING BEEN DULY SWORN BY THE CERTIFIED SHORTHAND REPORTER, WAS EXAMINED AND TESTIFIED AS FOLLOWS:
EXAMINATION
BY MS. LAMKIN:

Q. Good morning to me; good afternoon to you, Mr. Somal.

A. Hi. Good afternoon -- or good morning.

Q. Other than the Zoom application or browser,

do you have anything open on your computer?

A. You know, I don't have -- I have a window that has the report in case I need to reference it, so it's like a -- I just have downloaded what was submitted, the report with appendices, I don't know, A to H.

Q. So you have your expert report open on your computer?

A. I don't have it open, but I can open it. Yeah.

Q. Okay. Anything else?

A. No.

Q. Do you have any notes in front of you?

A. No. I mean, I have a notepad, but it's got things that are -- irrelevant to this case; although, if I needed to take some notes, I can have a blank sheet.

Q. And is your phone in front of you? I'm just trying to make sure that we're not going to be texting with anybody during your deposition or anything of that nature.

A. No. No. My phone is not ...

Q. Okay. Great. I read your deposition in the Brian -- is it Menge? How do you pronounce that? M-E-N-G-E?

A. Uh-huh.

Q. I read your deposition -- did I pronounce that right, Menge?

A. Yeah.

Q. Okay. I read your deposition in the Menge matter so I know you've been deposed at least once. Have you been deposed other than the Menge matter?

A. Yeah, probably at least, I don't know, 15, 20 times.

Q. And all of those in your expert capacity?

A. Yeah, I -- I don't think I've ever been deposed outside of my expert capacity.

Q. So, you know, fair to say, you know the rules, we'll try not to talk over each other, okay?

A. Sure.

Q. And if I ask any questions you don't understand, you promise to ask for clarification?

A. Yeah.

Q. Great. And then if you want to take a break, that's totally great, anytime, I would just ask that I finish the subject matter questions that I'm asking before you break; is that okay?

A. Yeah.

Q. Great. What is your area of expertise as it pertains to this matter?

A. Yeah, I'm a reputation digital/traditional reputation branding expert. I also have a background in finance and economic analysis and valuation and so I've done considerable work related to damages to businesses and individuals. And so I -- you know, that's -- I would say my application here is reputation and the harm resulting from harmful content.

Q. So when you say "reputational digital" and "traditional expert," I'm assuming that means online and offline; is that what "digital" and "traditional" means?

A. Yes.

Q. And are there any certification organizations for reputation experts?

A. No, there are not.

Q. How were you retained for this matter, Mr. Somal?

MR. LOBBIN: Objection. Vague. You can answer if you understand the question.

THE WITNESS: I believe someone from Ms. -- is Ms. Lamkin okay?

BY QUESTIONER:

Q. Sure.

A. Okay. Cool. Yeah, I believe a Patent Asset Management, someone had reached out to our team and then there was a back-and-forth correspondence before we were engaged for this -- this matter.

Q. For this deposition, I'm going to call Patent Asset Management, LLC, "PAM." Is that okay with you?

A. Sure.

Q. Okay. Do you recall who at PAM reached out to you?

A. I think it was the gentleman named Daniel.

Q. Does Daniel Falcucci sound familiar?

A. Sounds like the right guy.

Q. Okay. How did Mr. Falcucci reach out to you?

A. I believe, Ms. Lamkin, he may have called me or there was another colleague that was there, her name was Mallory, but she's no longer with the organization. One of them emailed us or -- or called us and then my team handled the intake as depending upon why people reach out to us, that's

Transcript of Sameer Somal
Conducted on November 12, 2025

4 (13 to 16)

13

handled internally. And at some point, I was on a call with Daniel to understand the nature of what was taking place.

Q. Do you recall roughly when the initial reach-out from Mr. Falcucci was?

A. I mean, I know it was earlier -- earlier this year. I may have -- I may have put it in my report, but I don't . . .

Q. Do you have a rough estimate, for example, earlier this year, June, earlier this year, you know, roughly which month?

A. Maybe July/August.

Q. July/August of 2025?

A. Yes, that's right.

Q. Okay. And did you sign an engagement agreement or a contract with PAM?

A. Yeah. They're -- they're typically -- as you would be acutely familiar, when you're hired as a lawyer, you're hired in a professional capacity, there's an engagement letter.

I don't -- I normally sign off on those things. Those things are typically handled internally by our accounting team or somebody on our legal research team. But yeah, there definitely would be a letter in place unless some protocol

14

wasn't followed. But that -- I don't -- I can't remember the last time that happened.

Q. Do you have a sense, roughly, of when the engagement letter was signed?

A. Probably that August, you know, time frame.

Q. There are two experts on your expert report; correct?

A. Yes, Ms. Lamkin.

Q. Mr. Ryder and yourself?

A. Yes, Mr. Douglas Ryder; correct.

Q. How did you divide the workload? What's his expertise and what's yours?

A. Sure. Fair and appropriate question, Ms. Lamkin.

You know, my expertise is understanding the harm from negative, defamatory, erroneous false statements, be it about someone, and so when you think about what somebody has endured, the narrative, how opportunities are compromised as a result of, again, defamatory and harmful comment, that's my nature of expertise.

I also, when you look at from the context of understanding how that harms a business, a lost opportunity set, Mr. Ryder, you know, has pretty deep expertise on just patent trademark IP. He

15

understands, I guess you could say, the industry from just a legal context, but also just how inventors and people make money, monetize these things.

And so from the -- from the nature of, you know, having -- this is oftentimes the case with reports is that he's got very niche-specific expertise to PAM's business. And so him just understanding that and being able to look at that through his lens, you know, I'm not a patent attorney or, you know, you would say I've consulted on cases related to IP and -- and patent and trademark. But it's not a primary area I'm engaged for. So . . .

Q. So you used Mr. Ryder to fill in the gaps of your knowledge of, say, patent valuation; is that fair?

A. And to look at how it typically works when patents are being monetized, there's campaigns, these things when -- yeah.

Q. That's helpful. Thank you.

Did you conduct any interviews in this case?

A. Interviews? Yes, you know, I interviewed the -- well, I interviewed Leigh.

16

Q. By "Leigh," you mean Mr. Rothschild?

A. Yeah, Mr. Leigh Rothschild; correct.

Q. I'm fine if you want to call him "Leigh," I just want to initially identify who we're talking about. So feel free to refer to him as "Leigh" or "Mr. Rothschild," whatever your comfortable with.

A. Yeah, I don't know what I'm comfortable with, but either one is fine with me too.

Q. Other than Mr. Rothschild, did you speak with anyone else to get background on this case or interview anyone else for this case?

A. I believe Daniel was present when -- when I spoke to Mr. Rothschild. So -- and I think Mr. Ryder was present, too, of course.

Q. Okay. Other than speaking to Mr. Rothschild and Mr. Falcucci being present, did you speak with anyone else, have interviews with anyone else for this case?

And this isn't a memory test, sir. If you'd like to refer to your expert -- I'm not trying to put you on the spot. So if you'd like to refer to your report, I'm just getting background here.

A. Okay.

Q. How about -- we're going to go through your report pretty much page by page so if you think of

Transcript of Sameer Somal
Conducted on November 12, 2025

5 (17 to 20)

anybody else you interviewed, you want to let us know at that point as we go through the report?

A. Sure.

Q. Okay. When you spoke with Mr. Rothschild, how many times did you speak with him?

A. More than once. I mean, I would say maybe twice.

Q. Okay. Do you remember roughly the dates of those conversations?

A. I -- I don't recall the dates, no.

Q. Do you know which month they were in?

A. September. I think Mr. Ryder may have spoken with him more. I think I spoke with him twice. I think Mr. Ryder and Dr. Lajoux spoke with him maybe at least three times, maybe four. But I spoke with him, I think, twice.

Q. And did you take notes during those conversations?

A. No, I did not.

Q. Just committed the conversations to memory?

A. Yeah. You know, for me, it's about pressure testing, what is said in the complaint, what took place, and actually hearing it from someone in their own words, yeah.

Q. Did Mr. Rothschild give you any documents during those meetings or any time thereafter?

A. Whatever documents if he would have given would be cited in the report. I don't recall him giving anything special during those conversations. But anything that he shared, we -- we've included, yeah.

Q. What do you recall from those conversations with Mr. Rothschild, if anything?

A. You know, I -- look, I interviewed him on kind of the value of his company at -- at exit and what had taken place that resulted in him getting to the point where he filed a lawsuit where he felt it necessary. So just understanding the events that transpired through his eyes. And -- yeah.

Q. And do you recall any specifics of that? Do you recall any specifics of that conversation?

A. You know, he -- he talked about, you know, the harm to his reputation and how it's something that now being labeled, associated with, you know, somebody who isn't able to pay their bills, who hides money, shell companies, all of the nature of things that are alleged. So he talked about those things being, you know, harmful to him.

You know, I think he -- he said that, you know, his companies have not gone bankrupt, that's

completely false. I mean, he essentially spoke at length, at times going on to speak and describe the false nature of the statements, which is his impetus for wanting to file a lawsuit. So he was, during those conversations, qualifying them to me is probably a good way to put it.

And then, you know, he also talked, of course, about -- you know, like, he gave me examples, like, at his temple, I believe. He talked about how embarrassing it was when people had come up to him, I remember -- I don't remember exactly, but one man confronted him about it.

He -- he did speak about his companies and, like, how they're formed to -- to monetize a patent or a particular campaign and how he makes money and was explaining his business to me to kind of get me up to speed; although, Mr. Ryder, I think, had a better understanding of that from the beginning.

He described licensing deals and business relationships of the past. And, you know, used the word, you know, I think "humiliated" by these comments and they follow him everywhere.

He had many campaigns going for his business and, you know, now he's not able to run those campaigns. It was some of the things that I remember.

Q. Do you have an understanding of what he meant when he used the word "campaign"?

A. Yeah. I -- I do have an understanding of -- of campaigns.

Q. What's your understanding?

A. So when you have like a -- basically when you -- when -- so each company is formed with a -- a -- I don't know, a license or a right. So there's like a patent or group of patents that he earns money from and monetizes based upon a particular campaign. That's, you know, again, my -- my understanding of it. I mean . . .

Q. Campaign is a litigation campaign; correct?

A. Yeah, I -- I believe that would be to, you know, make sure that those who are using the particular patent are -- are paid on the same. So yeah.

Q. Mr. Rothschild explain the corporate structure of his business from assertion entity to PAM to himself?

A. So yeah, I know -- I mean, I know litigation, I think to answer your question and close the loop on that was -- I mean, that's just like a strategy, from my understanding, for

---

**21**

licensing from an entity to PAM.

Could you just repeat your question about -- yeah, could you just repeat your question about --

Q. Sure.

Does Mr. Rothschild explain the corporate structure of his businesses from assertion entity to PAM to himself?

A. Did he walk through, like, the exact, like, all his different entities or how he goes from, like, I've got a patent to, you know, the other end?

I mean, I know his entity, like, you know, collects dollars and -- you know, entity collects dollars and PAM collects it, you know, PAM, I think, takes on the litigation costs of these campaigns and he's paid back. And then the money is shared based upon the recovery.

So I -- that's what I recollect in him explaining it, somewhere along those lines.

Q. Okay. And Mr. Rothschild is the CEO of PAM; correct?

A. Yeah.

Q. He's also an owner; is that right?

A. I believe so, yeah, I believe he's -- yeah. The owner, yeah.

---

**22**

Q. Do you know if he's the only owner?

A. I don't know.

Q. Do you know how many owners there are of PAM?

A. How many owners of PAM, I don't know. I didn't get any -- I didn't get any documentation about an LLC ledger or shareholders.

Q. Did Mr. Rothschild give you any documentation related to PAM?

A. Did he give me any documentation related to PAM?

Whatever he gave, I cited and reviewed. I don't think I received any official, like, company documents.

I got some summaries of information that I used in preparing my report from -- from him. But no -- no corporate documents, nothing -- yeah, no --

Q. Mr. Rothschild gave you written summaries?

A. I -- I know he summarized verbally in -- in -- in the -- I don't believe that he -- I don't believe there were written summaries.

The only reason my memory is a little bit suspect, Ms. Lamkin, is just I have -- just have a multitude of cases that I'm involved in. So I'll just do my best to try to remember, not -- yeah.

---

**23**

Q. Completely understand.

Is it fair to say if Mr. Rothschild gave you any documents, they'd be cited in your report?

A. Yeah. And anything we received, we have a process on -- on intake, which I think is a good reason why we're, I don't know, trusted to give objective opinions. So anything that I receive would be -- would be cited in the report, yeah.

Q. Did Mr. Rothschild explain his compensation?

A. You know, when you say "explain compensation," do you mean like what he's received or just --

Q. In any way, salary, ownership, percentage, stock. Did he explain his compensation to you in any way?

A. No.

Q. In a defamation case, would you normally collect that kind of information?

A. We would ask for -- we -- we would try to seek -- so there's -- anytime you have a case, we would -- we would ask and discuss information and depending upon what the client provides, we would cite that if that information is available; otherwise, we would simply assume the information

---

**24**

gave by the person interviewed is true.

And, you know, there -- I oftentimes explain, you know, Ms. -- Ms. Lamkin, that, you know, data is like a little bit of our compass, the information we're given. There has to be inherent assumptions. If I don't get documentation, then I assume. And then our framework and methodology is kind of our map. And -- and we follow that. So those two kind of work hand in hand.

From my understanding, you know, PAM would get expenses first and then money would be divided up based upon agreements with clients. I know Leigh is an entrepreneur and, you know, he cares about the value of his company and the value of a company or business is correlated dependent and has a lot to do with reputation. So we discussed that, you know.

In terms of his compensation, I believe that would be at his discretion if he's at least the majority owner, if not the only owner, again, not provided to me.

Q. Yeah.

In general, if you're opining about financial damages, you would request financial documents; correct?

A. Yeah. You know, there's -- we would -- we

---

**Page 25**

would typically ask for and there's a multitude of reasons why people decide to give or not give those.

But as an expert, it's -- it's commonplace when we're asked for -- we're given information and we're given -- in conversation, we -- we do ask for documentation.  I think that's -- I think any good expert would ask for information about what they heard.

And then there's, of course, a bunch of factors that I may or may not be aware of as to what we get, what we don't get.

Q.  Have you heard the term "patent troll" before?

A.  "Patent troll"?  Yes, I -- I have heard the word "patent troll" before.

Q.  Do you have an understanding of what the word means or the term means?

A.  You know, as you can imagine, I've heard the term and I've -- you know, in -- in background reading, I've read about the term.  I don't know if I would have the, you know, textbook definition.

But for my understanding, Ms. Lamkin, you know, that word is a disparaging term.  It's not a positive one as one -- you know, if somebody called me a "troll," forget about patent, doesn't seem like

**Page 26**

a positive.

But, you know, "patent troll" I think is a term oftentimes used for an entity, an individual, a particular party that acquires patents, uses them on -- you know, to demand licensing fees or settlements from infringers, and -- yeah, there's litigation involved.  That's, offhand, what I would recall about, like, what that --

Q.  In your opinion, it is a disparaging term?

A.  Yeah, you know, I -- I don't think the word "troll," you know, is used in a positive context, you know.  I think "patent troll" is to just answer in earnest, you know, they obtain patents, they, you know, oftentimes are litigious.  But yeah, I don't think the name would be used as a compliment, the word "troll" in general and particularly "patent troll."

Q.  In your opinion, is the use of the term "patent troll" damaging to someone's reputation?

A.  You mean, if you're -- if you're calling someone a "patent troll"?

Q.  If someone is called a "patent troll," let's say, for example, if Bloomberg calls Mr. Rothschild a "patent troll," is that damaging to his reputation?

**Page 27**

A.  I mean, it could be.  I guess you could say it depends.  I mean, it could -- it could be, although that's not necessarily what, you know, I'm saying here.  I'm not offering an opinion on that in my report, et cetera.  But yeah.

MS. LAMKIN:  Can we please pull up Exhibit 1?

MR. UTTERBACK-PAIR:  Stand by, please, for Exhibit 1.

MS. LAMKIN:  Mr. Somal, I'm going to have the vendor just hold the pages on the screen so we can both view them, but you also, like I said, can feel free to download it.

I don't play any tricks in a deposition so if there are any other pages you want to look at, just let us know.

(Exhibit No. 1 marked for identification.)

BY MS. LAMKIN:

Q.  Do you recognize this document, Mr. Somal?

A.  Yeah, you know, it must be my eyes, but yeah, if it's okay, I would just like to pull up the actual copy here.

That looks like the Appendix A from my report.

Q.  It's dated September 2nd, 2025.  It has you

**Page 28**

and Mr. Ryder's name on it; correct?

A.  Yes, Ms. Lamkin.

Q.  Okay.  And it's got the case title, Leigh Rothschild V Rachael Lamkin, on it?

A.  Yeah.  I'm just going to move this document.  I have another monitor here that's blank, but I'm just going to move it over here so if I'm looking away, it's only because that will allow me to just see it better.

Q.  If we could go to the second page of the PDF, please.

A.  Okay.  Yeah, Appendix A, second page.

Q.  Do you see in the upper left-hand corner there's a date and time stamp 10/9/2025 at 10:46?

A.  Yes.

Q.  Do you understand that to be a printing marker?

A.  Yeah, sure.

Q.  Printing marker is from several months before you were retained; correct?

A.  Correct.

Q.  So you didn't print this document; correct?

A.  You know, I didn't.

Personally speaking, I rarely print documents.  They're normally printed by -- by our

team and then provided to me. I mean, on many cases we receive, I don't know, hundreds, thousands. Regretfully, sometimes.

Q. It was printed several months before you were retained in this matter; correct?

A. It appears so. It appears so. There's a 1/9/2025 on the top of -- yeah, page No. 2. So . . .

Q. Where did your team get these documents in Exhibit 1?

A. You know, I -- this one, it may have been in the case file that was provided to us by the plaintiff.

Q. When you say "case file that was provided to us by plaintiff," what do you mean?

A. Well, typically when we start any case, Ms. Lamkin, we receive documentation associated with the case. And so either we, you know, printed this on our own based upon the date and the date we were engaged that this would have likely come from the -- the team, either counsel or the folks at PAM.

Q. And if you look up in the left-hand corner of the remainder of the articles from Exhibit A, they all have the same print date, January 9, 2025; correct?

A. Mm-hmm.

Q. So do you believe the documents in Exhibit A were in the case file given to you by Mr. Rothschild or his attorney?

A. Yeah. I mean, I -- it's probably in an email thread. Let me see -- yeah, I mean, if that's the date, if that's the date stamp, yeah, I would -- it was provided then.

Q. Did you read all of the documents in Exhibit A?

A. Yeah, I read them when they were received. Yeah. I mean . . .

Q. Remaining on page 2 of the PDF, it's a document titled "Critics Call Him a Patent Troll. He Prefers Modern-Day Edison."

It's dated October 23rd, 2023, and it's from Bloomberg Law.

Why did you include this article in your expert report, Mr. Somal?

A. One, it's an article that is harmful to his reputation and his narrative and -- you know, the Bloomberg article, this one in particular, is at the heart of how Mr. Rothschild has been harmed by statements made therein.

Q. Which statements in this article do you

believe are harmful?

That's -- that's going to make you do too much work. Let me just go through it with you.

The first bullet says:

"Inventor dubbed troll, bully has more than a hundred patents."

Do you understand that to be referring to Mr. Rothschild?

A. I'm sorry. You just say which line? I have it -- I could -- I could screen share. I have it -- I just couldn't see it larger here. So I'm on the same page as you. "Critics," and then you said which line?

Q. The first bullet.

A. Yeah. Okay. "Inventor dubbed troll," yes.

Q. You understand those to be referring to Mr. Rothschild?

A. Yes.

Q. Mr. Rothschild is being called a "troll" and a "bully" in this article?

A. That's correct.

Q. You go to the bottom of this page, there's comments from Pat Muffo.

Do you see that?

A. Yes.

Q. I'm going to read the second-to-last paragraph into the record.

It says:

"Pat Muffo" -- spelled M-U-F-F-O -- "a shareholder at Polsinelli, PC" -- that's P-O-L-S-I-N-E-L-L-I -- "who has represented clients on both sides of patent disputes, is familiar with Rothschild's tactics. Muffo said not all practicing [sic] entities are patent trolls but those that file nuisance suits, actions filed simply to obtain settlements worth less than the cost of litigation, abuse the court system."

Do you see that, sir?

A. Yes.

Q. Do you understand Mr. Muffo to be talking about Leigh Rothschild?

A. Sounds like a general statement given the article's about -- about him or references him. It's possible.

Q. Do you see where it says Pat Muffo "is familiar with Rothschild's tactics"?

Transcript of Sameer Somal
Conducted on November 12, 2025

33

A. I do.

Q. Fair to assume that Mr. Muffo was talking about Leigh Rothschild?

A. Probably not assumption I have to make but it certainly put his name in the same paragraph of his comments.

Q. If you could, please, go to page 4 of the PDF, please.

A. Okay.

Q. Do you see where it's titled "The 'Bully'"?

A. Yes.

Q. That's a reference to the same word "bully" that was aimed at Mr. Rothschild earlier in the article?

A. Correct.

Q. On the fourth paragraph, it says:
"Valve Corp filed a preemptive lawsuit against Rothschild in 2023."
Do you see that, sir?

A. I do. I do, Ms. Lamkin.

Q. Did you read about the Valve bad-faith patent litigation against Mr. Rothschild as part of your research?

A. I didn't pull the documents if that's what you're asking.

34

Q. In your --

A. In general, I would have, you know, read about it, but I mean, I'm not an attorney, as you are aware.

Q. In the case file given to you by Mr. Rothschild or his counsel, there wasn't any articles about the Valve litigation; correct?

A. I don't believe so. I could check the document list. But . . .

Q. There aren't any articles about the Valve litigation in Exhibit A; correct? Exhibit 1?

A. I don't believe there are any direct, like, case documents. It -- it came up in, like, discussion with Doug and when I was working on the report. But I -- I don't recall reading case documents or receiving anything.

Q. Is "Doug" Mr. Ryder?

A. Yes, sorry. I'll refer to him as Mr. Ryder. Correct.

Q. That's okay.
What did you and Mr. Ryder discuss about the Valve litigation?

A. Well, given that his expertise has a lot to do with patents and how they're monetized and how clients and people actually, you know, run their

35

businesses. We discussed that, you know, how Valve -- I just have Valve Corp had come after PAM in litigation. I believe Mr. Ryder may have read and pulled some of those documents to get familiar with them. I -- I didn't.

And it was rather contentious. I think some would call it, I don't know, nasty litigation, contentious litigation, intense. That was what Mr. Ryder had communicated to me based upon his understanding of it.

Q. Valve is accusing Mr. Rothschild of bad-faith patent litigation; correct?

A. Yeah, I mean it sounds like that -- again, based upon what's written and I believe so and my recollection as a nonattorney.

Q. In your opinion, is being accused of committing bad-faith patent litigation damaging to one's reputation?

A. Is -- could you repeat the question?

Q. Mm-hmm.
In your opinion, is being accused of committing bad-faith patent litigation damaging to one's reputation?

A. Is being accused of bad-faith patent litigation -- I mean -- damaging to one's

36

reputation? I mean, it's -- I mean, it's in litigation. It's not a statement to the public.

Q. That's not the question, sir.
If someone is accused of bad-faith patent litigation, is it damaging to one's reputation?

A. I -- I guess it would -- I guess it would depend. You know, I would say not as damaging as, you know, false claims or of being accused that they don't -- one doesn't pay bills, which I know is stated in this case.

Q. On what do you base that opinion?

A. Which?

Q. You said being accused of bad-faith patent litigation is not as damaging as being accused of not paying your bills. And I'm asking, upon what do you base that opinion?

A. Me having worked on hundreds of cases where people have been harmed by statements. And someone's going through a litigation, there's a process there.

But just outright saying somebody can't pay their bills with -- at least with a litigation, there's a process, there is something that's taking place within the context of the law as opposed to a statement made that somebody isn't able to --

37

doesn't have money to pay for something.

Q. How many other cases have you worked on where the accusation was bad-faith patent litigation?

A. I definitely -- I've consulted so -- you know, I've consulted on 500-plus cases. I don't recall the -- the number.

Q. Have you worked on any other cases involving bad-faith patent litigation accusations?

A. Not where -- not where I've been named an expert, no.

Q. Have you been -- have you worked on any cases where the accusation was bad-faith patent litigation and you were a nontestifying expert?

A. I've -- I've consulted on a number of cases related to patents. And, you know, but I wasn't named an expert on those cases. So infringement --

Q. What cases were those?

A. Hmm?

Q. Which cases were those?

A. Those are under NDA with law firms when I hired to consult. And so I don't -- I wouldn't have them offhand, cases that I've worked on. But not a case like this with respect to bad-faith patent litigation.

38

Q. Can you return, please, to Exhibit 1, page 5 of the PDF.

Do you see the heading in the middle, "Inventor or Litigator"?

Mr. Somal?

A. Yes.

Q. Do you see in the second paragraph under there, it says:

"Rothschild Connected Devices Innovations, LLC, had accused ADS Security LP's home alarm of infringing U.S. Patent No. 8,788,090, which the Electronic Frontier Foundation named 'stupid patent of the month'."

Do you see that, sir?

A. Mm-hmm.

Q. Are you familiar with the Electronic Frontier Foundation?

A. No, I'm not.

Q. Were you aware that the Electronic Frontier Foundation had named at least one of Mr. Rothschild's patents stupid patent of the month?

A. Yeah, I know I would've read it here. I know different people have different opinions of

39

patents, that's pretty common.

Q. In the case file that was given to you by Mr. Rothschild or his attorney, did they include any of the Electronic Frontier Foundation's articles naming Mr. Rothschild's patents stupid patent of the month?

A. Did they include any --

Q. In the case file given to you by Mr. Rothschild or his counsel --

A. I don't recall, I don't recall. No, no, no, I don't recall any material on that.

Q. If Mr. Rothschild or his attorney had given you "stupid patent of the month" articles, would they have been included in Exhibit 1?

A. Yeah, you know, not -- not material to, you know, this -- this case. I didn't receive that.

Q. My question is, if Mr. Rothschild or his attorney had given you "stupid patent of the month" articles, would they have been included in Exhibit 1?

A. Yeah, whatever they gave me would be included.

Q. Do you see in the next paragraph on Exhibit 1 where it says:

"ADS countersued Rothschild for

40

its legal bills when he dropped the case."

Do you see that?

A. Mm-hmm. Yes.

Q. It says:

"On appeal, Rothschild's lawsuit was called 'frivolous on its face,' and his claim to have invented the Internet of Things was 'risible rather than simply unreasonable,' Circuit Judge Haldane Robert Mayer wrote in a concurring opinion, 'This suit never should have been filed.'"

Do you see that?

A. Yes, I do. Yeah. I see that.

Q. Did you -- did you read the federal circuit's opinion for Rothschild's Connected Devices Innovations?

A. I -- I did not. Out of the scope for me in terms of defamation and harm, but I didn't read that opinion. And then should I have read that opinion, of course, I'm not a lawyer to proffer any sort of legal conclusions or interpretation.

Q. How do you know it's out of the scope if you haven't read it?

Transcript of Sameer Somal
Conducted on November 12, 2025

41

A. Well, it's not in the scope of defamation to this case.

Q. Why do you believe that?

A. Well, I focused on economic analysis and damages on what -- focused on what inventors think of PAM and economic harm. So I -- I didn't read this case.

You said shows and he's bankrupt and that's at the center of this case. So not the quality of patents.

Q. In your opinion as an expert in defamation damages, if the federal circuit opines that Mr. Rothschild's lawsuit was "frivolous on its face," that's beyond the scope of this case?

A. Look, one, yes. Beyond the scope of this case. And it's my understanding that there have been dozens, hundreds, many litigations associated with Mr. Rothschild. And so reviewing his body of opinions associated with his work was not something that was in the scope of what I did.

Q. Neither Mr. Rothschild nor his counsel gave you the federal circuit opinion; correct?

A. No. If they did, it would be included there. Yeah.

Q. Earlier, you said that you and Mr. Ryder

42

talked about the Valve litigation; is that correct?

A. Yes, we did.

Q. The --

A. In a general sense, we spoke about it.

Q. This first article in Exhibit 1, Appendix A to your report, is dated October 23, 2023; correct?

A. Yes.

Q. The allegedly defamatory statements that Ms. Lamkin made was in October of 2024; correct?

A. If you're -- I don't believe you had asked me the questions on a false premise. So sounds about right.

Again, the exact -- exact dates, not always accurate. So if you're saying that's correct, then I assume that to be correct.

Q. I'll represent to you, and we'll get to the article, that the Bloomberg article at issue here is dated October 10, 2024. Why did you include an article from October 23rd, 2023, in your report?

A. Could you repeat the question, please.

Q. Why did you include an article dated a year prior to Defendant Lamkin's allegedly defamatory statement in your expert report?

A. Background on the case.

Q. What do you mean?

43

A. I mean that it was background information on the case.

Q. How so?

A. It was what -- any information that was provided to me, I included.

Q. You included this first article because it was given to you by Mr. Rothschild or his attorney; correct?

A. Yeah, this is -- we're still in Appendix A, page 2; right?

Q. Yes.

Do you need the question repeated, Mr. Somal?

A. It was all given from -- you know, to us, this entire -- so this wasn't our research. This was provided to us.

Q. In this article, in the title, it said, "He Prefers Modern-Day Edison."

Do you have an understanding of what that means, Mr. Somal?

A. Can you just point to where that is?

Q. Sure.

A. From the Edison, because you said "in the title" and so just "prefers modern-day Edison."

Yeah, you know, he's -- I think that's

44

referencing to the fact that Mr. Edison was a prolific inventor. I think Mr. Rothschild has 140 inventions. More than most people today.

Q. Are you aware of any individual inventor that has more patents than Mr. Rothschild?

A. Am I aware of any individual -- am I aware of -- I mean, me personally? I mean, I'm sure -- I mean, I'm sure there are. But I wouldn't say me personally.

Q. I'm not aware of any. I was just wondering if you were.

A. You know, you -- you're in this domain and space, Ms. Lamkin, so I -- you know, that would probably be a good question for Mr. Ryder. He might know some. But I -- yeah, I'm . . .

MS. LAMKIN: Could you please pull up Exhibit 2.

MR. UTTERBACK-PAIR: Stand by, please.

(Exhibit No. 2 marked for identification.)

BY MS. LAMKIN:

Q. Have you seen this document before, Mr. Somal?

A. That is the article, Law360, "Valve Wants Sanctions in Patent Troll Suit in Washington."

Yeah, I believe I had -- I believe I had

45

read -- I have to look and see if this was indeed cited.

Is this taken from our report?

Q. It's not.

A. Okay. Because this is part of that Valve litigation seems like.

Q. This is -- references the Valve litigation that you and Mr. Ryder discussed; correct?

A. Yeah, we -- if my memory serves correct, I asked Mr. Ryder to tell me about the Valve litigation from his standpoint what took place. So . . .

Q. You didn't include any articles about Valve in your expert report, did you?

A. No, I don't believe so. Mr. Ryder and I didn't get into the nitty-gritty or nuances of this particular case. I asked him to give me an overview. He may have pulled the documents and read in more depth, but I didn't.

MS. LAMKIN: Mr. Somal, we've been going about an hour. How about we take a ten-minute break.

THE WITNESS: Yeah, that would be great, Ms. Lamkin, and, you know, thank you. Thanks. Thanks for -- yeah. Thank you.

46

MS. LAMKIN: Again, as I mentioned, I don't play deposition hardball, if you want a break, just let me know.

THE WITNESS: Yeah, no, I've been in many very intense hardballs, you're, you know, in this and so I'm just trying to do the best that I can and I appreciate you -- I appreciate your line of questions.

You don't come across as -- you know, again, I gotta be careful what I say here, but, you know, you don't come across as a bully here, so I appreciate -- yeah.

MS. LAMKIN: You bet.

And just before we get off the record, I apologize for the lighting. I know you can't see me very well. It's not on purpose. It's a function of the office. So I apologize for that.

THE VIDEOGRAPHER: We are going off the record, the time is 1:07 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record, the time is 1:23 p.m.

BY MS. LAMKIN:

Q. Mr. Somal, welcome back.

A. Thanks.

47

Q. Did you speak with anyone on the break?

A. No.

MS. LAMKIN: Could the team please pull the exhibit marked as Exhibit 4, but it's actually going to be Exhibit 3.

MR. UTTERBACK-PAIR: Stand by, please.

(Exhibit No. 3 marked for identification.)

MR. UTTERBACK-PAIR: There is Exhibit 3.

MS. LAMKIN: Thank you.

BY MS. LAMKIN:

Q. Mr. Somal, this is an article called "Stupid Patent of the Month: 'Internet Drink Mixer' versus Everyone."

Have you seen this article before?

A. Internet -- let me see. Is it -- I don't -- I don't believe so, no.

Q. This document is not included in Exhibit 1, which is Appendix A, to your expert report; correct?

A. No, I -- I don't recall. Yeah, no, not from our report.

Q. It was not provided to you in the case file?

A. No, if it was, it would have been included. And it would be provided, yes, so not included, ma'am.

48

Q. You see right under the title it says:
"Leigh Rothschild urges his fellow inventors to rise up and stop patent reform"?

A. I do see that.

Q. Do you understand this to be an article about Leigh Rothschild, the plaintiff in this case?

A. Seems -- seems to be true, yeah.

Q. If you turn to the next page in this article, the second full paragraph says:
"RCD's complaint against Toshiba seeks royalty payments over remote operation of cameras. The patent trolls" --

A. I'm just going to move this to the other screen so I can see it. That's why I'll be looking at your share over here, that's all.

Okay. I'm sorry.

Q. Can you now see Exhibit 3?

A. Yeah. Go ahead.

Q. The second full paragraph says:
"RCDI's complaint against Toshiba seeks royalty payments over remote operation of cameras. The patent troll's lawsuit against Sharp says

49

that sending scanned documents to a mobile device infringes the patent. Given interpretations like that, it's hard to imagine what part of the 'Internet of things' doesn't owe inventor Leigh Rothschild money."
Is a fair reading of that paragraph that Mr. Rothschild is being called a "patent troll"?

A. You just read that paragraph RCDI, right?

Q. Correct.

A. I mean, we didn't, of course, opine on this patent. But probably, yes, I mean, that sounds -- yeah, I would -- yeah, sounds like that could be, certainly, an interpretation based upon what's being said there, yeah.

Q. Okay. If you turn to the next page, please.

THE STENOGRAPHER: Ms. Lamkin, your audio feed has had a disruption.

MS. LAMKIN: I don't know what to do about that. Can you hear me?

THE STENOGRAPHER: Yes, now we can. Your screen froze and the audio stopped for a moment.

MR. LOBBIN: I think just repeat your question.

50

BY MS. LAMKIN:

Q. Under "Save the inventor," it says:
"The patent was filed by Leigh Rothschild, a Florida man."
Do you see that, sir?

A. Yes. "A Florida man who appears" -- I see "Save the inventor," yeah, I have it on the larger screen so I can read it.

Q. In the third paragraph says:
"The article doesn't mention the nearly 100 lawsuits filed by his shell companies."
Is a fair read of this article that they're calling Mr. Rothschild's companies "shell companies"?

A. This -- this article appears to be calling -- yeah, him, I don't know, owning or being in possession -- let me see.
The article -- this article does not -- doesn't mention the nearly 100 lawsuits filed by his companies.
And then your question was?

Q. Is it a fair read of this article that they're identifying Mr. Rothschild's companies as "shell companies"?

51

A. I mean, well, it -- it says "shell companies." It says that.

MS. LAMKIN: Please pull the document identified as Exhibit 7, but we'll make it Exhibit 4.

MR. UTTERBACK-PAIR: Stand by, please, for Exhibit 4.

(Exhibit No. 4 marked for identification.)

BY MS. LAMKIN:

Q. Mr. Somal, do you remember from the first article in your Appendix A there was a citation to a federal circuit opinion calling Mr. Rothschild's patents "frivolous on its face"?

A. This was the circuit opinion, I think, did you ask me about earlier?

Q. Yeah. Yes.

A. Okay. And are you asking me did I recall that?

Q. Do you recall we were talking about the federal circuit case?

A. Yes. Yes.
And is this -- I see an exhibit on the screen. I'm just going to move it back over here.

Q. Have you read this federal circuit opinion, Mr. Somal?

52

A. I don't -- I don't believe so.

Q. It was not included in the case file that Mr. Rothschild or his attorney gave you?

A. I don't recall this being in that file, no. Do not believe so.

Q. If we could please turn to PDF No. 14.
And I'm assuming, then, so you haven't read Mayer's concurrence?

A. Circuit Judge Mayer; right?

Q. Federal circuit judge, yes.

A. No, I have not -- I have not read that.

Q. I'm just going to read a little bit of the opinion into the record starting with the last line in this paragraph:
"Because the infringement complaint filed by Rothschild Connected Devices Innovations, LLC, or Rothschild, was frivolous on its face, the district court abused its discretion in refusing to award attorneys' fees under 35 USC 285."
Is a fair read of this opinion that the federal circuit is calling Mr. Rothschild's lawsuit frivolous on its face?

A. Could you just scroll up to the beginning.

53

"Because the infringement complaint filed by Rothschild Connected Devices Innovations, LLC, was frivolous on its face."
It would appear to be based upon your summary that you gave, Ms. Lamkin.

Q. If you look at the footnote cited in Judge Mayer's concurrence at the bottom of page 2, Judge Mayer cites an article by Larry Downes called "The 4 Worst Patents of 2015."
Do you see that, sir?

A. Yes, I do. WashingtonPost.com/news/innovations, yep.

Q. And Judge Mayer quotes Mr. Downes who says:
"Although the '090 patent is 'largely gibberish' and 'laughably obvious,' Rothschild is suing everyone who connects something to the Internet."
Do you see that?

A. I do.

Q. Is it a fair read of this that Mr. Downes quoted by the federal circuit is calling Mr. Rothschild's patent "largely gibberish and laughingly [sic] obvious"?

54

A. Yeah, no, this is an opinion, Ms. Lamkin, on specific patent and campaign. As you read and as I've read when you put up the article is saying in quotes largely -- I'm sorry, the ruling saying "largely gibberish and laughably obvious," that appears to be true. That's what the article says.

Q. About Mr. Rothschild's patent?

A. Yes, about this specific one, Larry Downes' article, December 14. It's a cited opinion and, yeah, a notation on that.
So I guess in this -- in this case, based on my limited knowledge of patents, the patent, you know, when somebody is saying that if it indeed has gone through the case, then a patent should be, you know, invalidated perhaps. That's the extent of my knowledge.

Q. Mr. Rothschild didn't provide you with this federal circuit opinion; correct?

A. He did not.

Q. Let me turn to Exhibit 1, please, Mr. Somal. Page 22 of the PDF.

A. Okay.

Q. This is an article from 2013 --

A. Okay.

Q. -- from IP Watchdog titled "A Patent Troll

55

Conversation One on One with Rachael Lamkin."
Do you see that, sir?

A. Yes, yes, Ms. Lamkin.

Q. In your report, you accused Defendant Lamkin of engaging in a campaign against Mr. Rothschild since 2013.
Do you recall that?

A. Yes, that sounds about right.

Q. Is this the article you're thinking of when you start the date at 2013?

A. It is, yeah, I believe so. This is the article that comes to mind, yeah.

Q. Is Mr. Rothschild mentioned in this article?

A. Could we allow me to review the article?

Q. Please. Please, take your time.
I'm going to ask you about both Gene Quinn articles. So please go ahead and review both.

A. Okay.

Q. They're back to back in your report.

A. These would be in?

Q. Exhibit A starting on page 22 of the PDF.

A. 22. Exhibit A, 22.

Q. I guess I should say Exhibit 1, Appendix A. I think you're following me.

56

A. Yeah, I am. Thank you.
Yeah. Okay. I recall this. I think it's the conversation with Mr. -- I think it was Quinn, right, about patent trolls, kind of what -- you know, a broad definition of what a troll is seems to be the . . .

Q. And you used this article to benchmark when Defendant Lamkin allegedly began her campaign against Mr. Rothschild; correct?

A. "Benchmark"? I don't know if that's an appropriate characterization.

Q. In your report, you say that Defendant Lamkin began her campaign against the Rothschild in 2013; correct?

A. Correct.

Q. And is this the article you rely on as a foundation for that opinion?

A. Well, I know that was shared directly by Mr. Rothschild. I think, you know, previous articles about -- yeah, I believe that to be the case. This was included in that foundation. Also qualitatively him explaining that to be the case.

Q. 2013 date as the beginning of Defendant Lamkin's campaign against Rothschild comes from this article; correct?

Transcript of Sameer Somal
Conducted on November 12, 2025

57

A. It's one of -- one of the factors from that.

Q. Where is Mr. Rothschild mentioned in this article?

A. I -- I think I mentioned that the conversation here is a broad definition. He's not mentioned specifically. He's certainly been -- been called a "troll" by -- by others, but I think this article specifically, as I think you're asking me, he's not mentioned by name here.

Q. So why does this article begin the date in your expert report about Defendant Lamkin's campaign against Mr. Rothschild?

A. Well, he's been called a "troll." And, you know, Defendant Lamkin is out there to get after trolls.

Q. So in your opinion, someone reading this article, "A Patent Troll Conversation," when they read "patent troll," they would necessarily think of Mr. Rothschild?

A. Based upon the collective narrative that's out there and the discussion with Leigh and articulating that this is been going on and originated in 2013, they may.

Q. Again, sir, I'm trying to understand your

58

basis.

You claim Defendant Lamkin's campaign against Rothschild started with this article.

What, in this article, indicates Leigh Rothschild?

A. This is one talking about patent trolls. You've referred to him as a patent troll, though not in this article. And the -- I don't know, I guess you could say the confrontation or litigious nature of the battles you had, there's nothing specifically about Leigh in this article. Leigh had mentioned that he's been, I don't know, attacked or you've been pursuing against him since this particular date.

Q. Upon what do you base the opinion that Defendant Lamkin ever called Leigh Rothschild a "patent troll"?

A. Well, if you google "troll," and it's -- it's inferred based upon the collective narrative here.

Q. Can you cite to a single document or article in which Defendant Lamkin has ever referred to Leigh Rothschild as a "patent troll"?

A. Not offhand.

Q. At the end of Exhibit 1, Appendix A,

59

there's a collection of Mr. Rothschild's medical records; correct?

A. Again, don't have it memorized but sounds about -- sounds about right.

Q. Do you intend to offer any opinions about damages based on Mr. Rothschild's medical records?

A. I'm sorry. Could you say that again?

Q. Do you intend to offer any opinions based on Mr. Rothschild' medical records?

A. No.

MS. LAMKIN: If we could please pull up the document currently labeled Exhibit 8.

It will be, I believe, Exhibit 4, but let us know.

MR. UTTERBACK-PAIR: This will be 5.

MS. LAMKIN: Thank you.

MR. UTTERBACK-PAIR: Stand by, please, for Exhibit 5.

(Exhibit No. 5 marked for identification.)

BY MS. LAMKIN:

Q. Mr. Somal, have you seen Exhibit 5 before?

A. Yeah, that appears to be Appendix F from -- yeah -- my report.

Q. Appendix F is your work, not Mr. Ryder's; correct?

60

A. Yeah.

Q. And what is Appendix F?

A. Appendix F is taking a look at search results as well as keywords that document what information is populating on Mr. Rothschild. Yeah.

Q. What's an "unfavorable search engine link"?

A. Well, that's information that is, I would say, a detractor. It's not positive, is harmful, and typically when I've outlined content, you know, shows negativity that ranks when one is searched online.

Q. If you could turn to the keyword list. Maybe roughly page 6 on the PDF. They're not numbered.

A. Okay. I have it here.

Okay.

Q. What is a "keyword list"?

A. Keyword list is a group of keywords that when typed into Google -- so search engine results pages are geared around keywords. Someone searches Sameer Somal, they search Rachael Lamkin, that's a keyword. And then the collective group of keywords, so in the context of this document, these are the collective words that are searched that would populate, be harmful, negative content that is

outlined therein that ranks.

And so keywords are input terms on a search engine that relate to particular results in this case, and sometimes those are also included like as autosuggestions, for example.

Q. "Autosuggestions" meaning you start to type something into Google and Google populates it for you?

A. Yeah, so if you're -- depending upon where you search in the United States, if -- how we get these terms is we use tools.

We have a bunch of enterprise subscriptions so we look at tools, we also do our own kind of manual testing. That's how we ultimately get this collective group of keywords that content populates on that is being used on search. So . . .

Q. Did your team come up with these keywords in the keyword list?

A. Well, those are terms that are being searched and terms that are ranking the content in question. So yeah, we -- we worked on a collective keyword group to identify where the traffic and what I refer to as digital real estate is associated with Mr. Rothschild and the negative statements. Yeah.

Q. Could you just explain with a little more specificity how you came up with this list?

A. Yeah. You know, it's a collective process.

One, it's utilizing tools that we have for search engine optimization and generative AI to understand what terms are being searched around Leigh Rothschild to -- they're autosuggestions depending upon where you're located in the United States. Those change geographically. So we look at those autosuggestions. And then we also analyze the H1, H2, H3 tags associated with this specific content that's out there.

That collective information yields a group of keywords that when those are typed in the harmful narrative and harmful content populates on.

Q. H1, H2, H3, is the H header?

A. Yeah, well, that -- that's, of course, one factor. So based upon the header and the tags on the specific pages, those will result and relate to what keywords end up being the ones that feature the article. So that's one factor I would say that is used collectively.

Q. In your keyword list, the third term from the bottom is "Leigh M. Rothschild trolled"; correct?

A. Yeah.

Q. Why did you use the word "trolled" instead of "troll"?

A. That would be the word that has come out of our research and analysis. We didn't necessarily use it. It's either being labeled and it's in particular tags or it's what's being searched. So it's not necessarily me using it.

Q. How did you decide which terms in your keyword list to include on this page?

A. Well, the ones that feature the content.

Look, anytime, you know, our company runs dozens of campaigns at any one point in time so there are a whole bunch of factors that relate to why certain terms rank, why certain content populates.

This is the collective group of keywords that represent a large amount of the negative content is showing up on these particular keywords. That's what, you know, kind of digital forensics and analysis and tracking, this is cornerstone to work that's ultimately had a degree of success for clients, which resulted in me being asked to be an expert witness. So it's just -- it's just a group of keywords representing the search searches from which a number of those negative articles show up on.

Q. Is it fair to assume that these terms listed on your keyword list came up the most often in the software you use or in the methodology you use?

I'm just trying to understand why these specific terms and not others are included here.

A. These -- these came up often featuring the content that is in question here with respect to the harm. So I think the answer to your question would be -- would be yes. Came up more often. But that would be the content that is articulating some of the harm, it's showing up for these keywords.

Q. Is the keyword list in any particular order?

In other words, do we assume that most of the harmful content came out with "Leigh M. Rothschild" and least number of harmful content came out with "Rothschild Defamation"? Are these -- is this list rank-ordered in any way?

A. It's not. And -- and it depends, Ms. Lamkin -- I appreciate where your question is coming from. It depends upon which geographic location. They vary. There's also not one particular -- there's not just, like, one primary.

Transcript of Sameer Somal
Conducted on November 12, 2025

65

There's different articles, so it's -- it's a collective group. It wasn't done in any particular ranking order to say this one is the -- the most severe, per se.

Q. If you look at your table of content in the preceding pages, doesn't look like "Leigh M. Rothschild trolled" is included in the table of contents; is that correct?

A. Yeah, you know, I -- I picked a few of these to put in there. I didn't do every single one. I didn't do -- you know, I forget how many pages, I have it here, you know. It's already 141 pages, you know. I could have done for every term. I -- I don't believe I did for every -- every single term on different geographies and on different searches. So I believe that you're correct in that regard that some of these are on there and some of 'em aren't.

Q. Do you recall why you didn't include the search results for "Leigh M. Rothschild trolled"?

A. No. I -- I don't recall. I wanted to show just examples of the process and methodology. But there wasn't a specific reason why I chose others. It was more of I wasn't going to put them all there, otherwise, then we'd have a document that was maybe,

66

I don't know, 20 times larger or something. So I did some of them.

Q. Okay. If you could turn to page 8 in the PDF where it says "Duckduckgo Search Results." Why did you include Duckduckgo?

A. There's a -- I mean, there's 375 searches on search engines for every one on large language models. Within that pie of search results, Google has a pretty large market share. I think Bing's got second. And then there's a few other search engines that have a share of the pie. I -- we just try to be comprehensive.

Our efforts, if somebody were to ask us to address the harmful content, you know, there's a campaign, Mr. Rothschild said, hey, we want to address the negative content. We would address them systematically on and across the different search engines.

So we're just merely showing that they exist, not just on one search engine, they exist on the others. So it's just showing the inventory of where the harmful content shows up. That's . . .

Q. In the Duckduckgo search, you select the "All" filter; correct?

A. Yeah, that's the main --

67

Q. That's what's highlighted?

A. -- the main initial search, yeah.

Q. Why did you include the "All" search as opposed to "Video," for example?

A. Well, "All" shows the collective and general search results. If we wanted to see what videos or images showed up, we could -- we could click on those. But I did the general search.

I guess the -- the, you know, there -- perhaps the question would be why I didn't click on "All" if it showed videos. So I mean, there's -- there's just a lot of permutations with respect to taking inventory of what's online.

Q. Do you have any data or do you have an understanding as to statistically when people do searches on search engines like Duckduckgo or Google whether they use "All" or say "Images" or "News"? Do you have any data to say which ones people go to first?

A. Well, "All" is a default. So they -- "All" is the one that's used more than clicking specific. And there's a consortium of studies about what percentage click where. I guess you could say depending upon, you know, what you're looking for when -- yeah.

68

Q. Most people search under "All"?

A. Yeah, "All" -- "All"'s the -- yeah, "All"'s the default. Yeah.

Q. And in the Duckduckgo search, we're looking at the third header is the Valve Corporation lawsuit we've been discussing?

A. Yeah. That looks to be the case. Right. Yeah.

Q. If you could go to page 10 in Appendix F. Why did you include "Google Images" as part of your search?

A. Well, images because they engage people, different images and videos, many times images in a particular article are ranking and they're an entry point for traffic and a reason why something ranks highly. So I just tried to show a comprehensive look at the search results. And I just tried to show some of those.

It shows the inventory of what is populating. So sometimes a particular article doesn't necessarily show on the "All" search as prominently. But it's gaining strength, it receives more traffic interest because when somebody clicks on the image, it's the first thing there.

There's no -- there's no set standard as to

why things show on particular pages. But I just -- I just tried to show what the different results are if you click on the different categories.

Q. I beg your patience here, Mr. Somal, it's going to be a little challenging because there aren't page numbers on the document. So we may have to fuss around with PDF numbers.

Try -- let's see if I can get this.

MR. LOBBIN: Sorry about that. You could have added them.

MS. LAMKIN: Let's try page 12.

BY MS. LAMKIN:

Q. So on page 12, you see the "Critics Call Him a Patent Troll. He Prefers Modern-Day" -- that's the first article in your case file; right?

A. Yeah, this is Appendix F, page 12; am I right?

Q. Correct.

What do these terms mean at the top left, "Location: Pennsylvania," and "Total Negative Links: 3"?

A. Am I -- I'm sorry. Oh.

"Location" is where the -- the screenshot for this is showing up and then "Total Negative Links," or ones that are harmful, is that someone would look at and say this is a detractor, those, I believe, are the ones out of the first ten, but location is Pennsylvania where the screenshot was taken from.

Q. How do you know that the location is Pennsylvania other than someone typed it on this page?

A. Well, that was where I was based at the time.

Q. Understood.

Okay. So this is a search that comes up from your desktop because you're in Pennsylvania?

A. I was in Pennsylvania at the time, yeah.

Q. Okay. Okay.

And then the "Total Negative Links," these are the three articles on this page that resulted from your search; is that right?

A. That's right.

Q. And then what's the "Domain Rating" and "Position" -- "Position: 3" and "Domain Rating: 82," what is that?

A. "Position: 3" was, you know, this particular day, this keyword, this location, this article was showing up as position 3.

"Domain Rating" is a measure used to reflect the strength of a particular website's domain. So I think depending upon the tool, there's different ways to measure that, but typically, they're one to 100, 100 being the strongest. I don't think any website ever gets 100. But, you know, ones that are used and authoritative, so, like, Instagram and Facebook are some of the, you know, most to authoritative websites. They're in the 90s. And so domain rating is essentially a measure for qualifying the strength of a particular website.

And so in this case, the domain rating of 82 news.BloombergLaw, for a multitude of reasons, among them Bloomberg Law receives a significant amount of traffic to their website so it's a stronger website as opposed to if -- I don't know, if I created a website tomorrow, it would have a domain rating that would just be, like, maybe somewhere between with 1 to 10 and then over time, for a multitude of reasons, optimization, backlinks, traffic, advertising, and according to the hundreds, if not thousands, of factors that Google decides on what should rank, the domain rating is certainly a qualification factor, what makes a website strong from Google's eyes.

Q. Just to make sure I understand what "position" means, in other words, if you do a Google search for Leigh M. Rothschild, if you say Position: 3, that means that's the third article that came up in the search?

A. Correct.

Q. Okay. Can we try -- can you go back to 11, PDF page 11?

Probably should have numbered -- put page numbers on your report, Mr. Somal, but I didn't want to mess with your work.

A. I know you would never do that, Ms. Lamkin.

Q. I actually wouldn't.

A. No, I would -- I would assume, based upon the number of factors, that wouldn't be in the cards no matter what. So . . .

Q. Okay. Let's go down three. I'm going to just hunt around here until I can find the right page.

Okay. Let's stop there. That's good.

So that's page 14 of the PDF.

And here, if I understand it right, Mr. Somal, you've done a Google images search for Leigh M. Rothschild and a Google "News" search for Leigh M. Rothschild; correct?

Transcript of Sameer Somal
Conducted on November 12, 2025

73

A.  Correct.

Q.  Why did you use "News" instead of "All"?

A.  I think "All" might be shown in here earlier.

Again, I'm just trying to give a slice of what the results happen to be for that particular keyword.

As I mentioned, we -- we could have done every keyword and every "Images," "Videos," "News," for all of them.  I'm just trying to give some perspective as to where the content and narrative in question is -- is populating.

Q.  I'll represent to you, Mr. Somal, and please feel free to look through the exhibit yourself, I couldn't find a single search where this Google "News" search was done under "All" instead of "News."

Maybe you could take a minute to look through that exhibit in your report and confirm or deny that representation.

A.  That this was the only place news was shown?

Q.  That there was not a single place that "All" was used, every search is Google "News."

A.  That's entirely possible.  I can -- I can

74

go through and look and if it would be helpful as of, you know, whatever date, we could -- we could do another appendices and redo it and do all of them.

Q.  Do you have an understanding, as you sit here today, why the default search of "All" wasn't used in your report?

A.  I know that we mentioned and showed the rank, I think earlier you said what position.  I think that was for "All."

In -- in -- yeah, I -- I -- I don't have -- there wasn't a particular reason.  I was just trying to show an inventory where these things populate.

If there -- if there's specifics that you'd want us to go back and do and amend this, I'm happy to.

MS. LAMKIN:  If we could please load as an exhibit, exhibit currently marked as Exhibit 9, which will be, I believe, 6.

MR. UTTERBACK-PAIR:  Stand by, please, for Exhibit 6.

(Exhibit No. 6 marked for identification.)

BY MS. LAMKIN:

Q.  I'll represent to you, Mr. Somal, this is a Google search done by one of the attorneys on my team for Leigh Rothschild under the "All" filter.

75

Do you see that?

A.  I'm going to move you, yeah, over to -- okay.  Yes, I see that.

Q.  As we walk through the first header, that's a March 10th of 2025 post about Mr. Rothschild speaking at the Inventors Society of South Florida; correct?

A.  Mm-hmm.

Q.  And the next one is an article called "When Your Patent Case Turns Into a Fraud Case."  That BlawgIT article is in your case file; correct?

A.  I don't recall it.  If you say it's there, Ms. Lamkin, I'm sure it's there.

Q.  The next are a series of three videos, one is about the Valve case we've been discussing; right?

A.  Mm-hmm.

Q.  And then one is an "Interview with NPE Leigh Rothschild" from Seyfarth Shaw.

Are you familiar with that YouTube interview by Pat Muffo?

A.  I believe I've seen that collectively in my initial review.  But I don't recall anything that was in that at this point several months later.

Q.  The next link is just a teaser for that

76

same interview; right, Mr. Somal?

A.  Yeah, are you talking about the line under it?  Yeah.

Q.  Correct.  A teaser for the Pat Muffo interview with Leigh Rothschild?

A.  Yeah, where his name is bolded here?

Q.  Yeah.

And then if we could go to the next page.  Then we have a list of Mr. Rothschild's inventions on Justia; correct?

A.  Yeah.

Q.  And then an article from the Electronic Frontier Foundation, and it's a transcript of a deposition with Mr. Rothschild; correct?

MR. LOBBIN:  Objection.  Document speaks for itself.

BY THE WITNESS:

Q.  Is that correct, Mr. Somal?

MR. LOBBIN:  You can answer.

THE WITNESS:  Yeah, that's what it says, yeah.

BY MS. LAMKIN:

Q.  Okay.  And the next page.

This is -- the top one is this article we've been talking about that's in your case file,

Transcript of Sameer Somal
Conducted on November 12, 2025

---

77

"Critics Call Him a Patent Troll"; is that correct?

A. Mm-hmm.

Q. There's an IMDb. I don't think that's about Mr. Rothschild, I don't think he started an alien invasion; is that a fair read?

A. Yeah, I mean, I don't know either, but -- I don't recall.

Q. I'm sorry, what?

A. I said yeah, doesn't seem like that's him.

Q. Okay. And then there's an article from Patent Progress, if you could slide up, please, about attorney misconduct that mentions Mr. Rothschild; right?

A. Mm-hmm.

Q. And then something about Patent Asset Management that refers to Mr. Rothschild; correct?

A. Mm-hmm.

Q. So on page 1 of the Google search under "All" for Mr. Rothschild, the defamation suit is mentioned once; correct?

A. Yeah. I think that was about right.

MS. LAMKIN: If you could please put up formerly Exhibit 10, now 7.

MR. UTTERBACK-PAIR: Stand by, please.

(Exhibit No. 7 marked for identification.)

---

78

BY MS. LAMKIN:

Q. Represent to you, Mr. Somal, this is page 2 of the Google search under "All" for Leigh Rothschild.

Can you please take your time and look through each of these articles. You can ask the vendor to move forward when you're ready.

The question I'm going to ask you is on page 2 of the Google search under "All," is there any mention of the defamation suit by Leigh Rothschild or Defendant Lamkin's alleged defamation?

A. Doesn't -- doesn't appear so based on what I've seen.

MS. LAMKIN: Do this one more time for page 3 of the Google search. So if we could pull the next exhibit up.

MR. UTTERBACK-PAIR: Counsel, I just want to make sure I have the correct document, that will be Exhibit 11 which will now be 8; correct?

MS. LAMKIN: Yes, thank you.

MR. UTTERBACK-PAIR: Thank you. Stand by, please.

MS. LAMKIN: I would say it takes a village, but that's probably not funny in this

---

79

deposition.

(Exhibit No. 8 marked for identification.)

BY MS. LAMKIN:

Q. So same question, Mr. Somal, if you could please look through page 3 of the Google search for Mr. Rothschild, Leigh Rothschild under "All," do you see any mention of the defamation case or Defendant Lamkin's allegedly defamatory statements?

A. No.

Q. Is it fair to assume that if the searches had been done under "All" instead of "News" in Exhibit F, we'd have different results?

A. I'm not sure what you mean by the question. Could you say that again?

Q. Well, if you look at Appendix F --

A. Mm-hmm.

Q. -- on any page where the search is done under "News," there's a lot more hits on the defamation case, isn't there?

A. That could be true, Ms. Lamkin. I mean, the search results vary based upon who did the search results, did they clear cache, what geography they're in, and what terms and they're constantly fluctuating and changing, they're not static.

Q. Is it fair to assume that if the searches

---

80

had been done under "All" instead of "News" in Appendix F, we'd see different results?

A. Yeah, there are different results based upon the keyword and, you know, news or images or videos.

MS. LAMKIN: If we could turn to the last page on Appendix F, please.

BY MS. LAMKIN:

Q. Okay. I'm going to work backwards from here. I think it will be easier. Go to the second-to-last page.

This was a Google Images search for Rothschild patent lawsuit; correct?

A. At this point --

Q. If you can go to the top of the page, please.

A. Appendix F. We're on the last page of Appendix F?

Q. Correct.

A. Okay. Yeah.

Q. This is -- the top is the Google Images search for Rothschild patent lawsuit; correct?

A. Mm-hmm.

Q. And there are several thumbnails for Stupid Patent of the Month?

---

81

A. Oh, yeah, I see -- I see -- well, I see one for Stupid Patent of the Month.

Q. Well, on the top row, the first one is Stupid Patent of the Month. And on the bottom row, the second thumbnail is Stupid Patent of the Month; correct?

A. Oh, it says it -- okay. Yeah. It says it on the image. It's on the image, sure, yeah. I was looking at the description underneath. One says how patent sorting -- yeah, the other says stupid patent.

MS. LAMKIN: We can go up about eight.

Two more.

BY MS. LAMKIN:

Q. Okay. So this is page 130 of the PDF. Are we in the same place, Mr. Somal?

A. Yep.

Q. On the top row, four over, it says:
"Patent troll attacks Gnome Foundation."
Do you see that?

A. Uh-huh.

Q. Did you and Mr. Ryder discuss Mr. Rothschild's lawsuit about the open-source Gnome Foundation?

82

A. That's for the -- it's a FOSS; right?

Q. Correct.

A. No, we did not on this.

Q. You don't have articles in your report talking about Mr. Rothschild's lawsuit against the Gnome Foundation?

A. We -- we may. I'd have to go look again. I don't recall exactly. I just don't recall discussing that lawsuit with Mr. Ryder.

Q. Then you see the thumbnail right next to it is "Valve versus Troll."
Do you see that?

A. Mm-hmm.

Q. Is it fair to assume that's the Valve lawsuit against Mr. Rothschild?

A. Yeah. That seems -- seems like a fair inference.

Q. In the second row, second thumbnail, it says "Interview with NPE Leigh Rothschild."
Do you see that, sir?

A. Mm-hmm.

Q. Do you know that to be Pat Muffo?

A. I don't recall. I don't recall, Ms. Lamkin, who the exact parties are in their pictures. If that's -- that's who it is, then yeah,

83

that's who it is.

MS. LAMKIN: Would you go up two more, please.

Down one, please.

BY MS. LAMKIN:

Q. Do you see this article from Hacker News?

A. What -- what page is this? I'm just -- I have a --

Q. 129 of the PDF.

A. Okay.

Q. It's a Y Combinator Hacker News article.

A. Mm-hmm.

Q. Is that correct?

A. Mm-hmm.

Q. And the title is "Gnome patent troll stripped of patent rights."
Do you see that?

A. Mm-hmm.

MR. LOBBIN: Objection.

BY MS. LAMKIN:

Q. Did you read that -- did you read that article, sir?

A. The Y news on -- I don't -- I don't believe so.

Q. How did you decide which articles in your

84

search to read and which not?

A. Naturally, I would look at what is featured and what is showing up under the collective group of keywords. I wouldn't be able to read everything. That's why I was supported by, you know, our team in putting together and taking some of the inventory. I simply can't read all results. I read as much as I can within the time frame I'm able to devote to the case.

Q. Understood.

MS. LAMKIN: Sir, we have going about another hour again. Do you want to take a break?

THE WITNESS: Yeah, that would be appreciated. Thank you.

MR. LOBBIN: Wonderful.

MS. LAMKIN: Mr. Somal, it's three hours ahead where you are. At some point, we'll need to break for lunch. We're probably a third through. I've skipped a bunch. I'm trying to go faster because I know it's three hours later there. But talk to me about when you want to have your lunch break, talk to me about the schedule today so we can accommodate you.

THE WITNESS: I think you're the shepherd, Ms. Lamkin. So . . .

Transcript of Sameer Somal
Conducted on November 12, 2025

---

85

MS. LAMKIN:  That's a first.  That's a first, a shepherd.

MR. LOBBIN:  Shepherd of the lost sheep.

Does anyone get that reference, shepherd to lost sheep?

MS. LAMKIN:  It's Jesus.

MR. LOBBIN:  That was from the "Dukes of Hazard" in the early '80s.  Okay.  Anyway.  Nobody's as old as I am.

THE STENOGRAPHER:  Would you like to go off the record?

MS. LAMKIN:  Oh, yes, sorry.

THE VIDEOGRAPHER:  Going off the record, time is 2:24 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record, time is 3:18 p.m.

BY MS. LAMKIN:

Q.  Welcome back, Mr. Somal.

A.  Thanks, Ms. Lamkin.

Q.  Did you speak with anyone on the break?  About the case?

A.  I'm sorry?

Q.  About the case.

A.  Yeah, no, I spoke with several people, but

---

86

it had nothing to do with this matter.  It had to do with other matters that are completely separate from anything to do with you or Mr. Rothschild.  So yeah.

Q.  Did you go try to find an article where I had called Mr. Rothschild a patent troll?

A.  You know, it's one of those things where I think the report, you know, is what it is.  And we are here to talk about that.  So I didn't go and try to do any work associated with this nor did I talk to counsel.

Q.  Okay.

MS. LAMKIN:  If we could please mark Exhibit 9, which is Exhibit 14 in the database, please.

MR. UTTERBACK-PAIR:  Stand by, please, for Exhibit 9.

(Exhibit No. 9 marked for identification.)

BY MS. LAMKIN:

Q.  Mr. Somal, do you recognize this document?

A.  Yes.

Q.  I'm assuming that you're responsible for this document and not Mr. Ryder; is that correct?

A.  Yes, me supported by, you know, our legal and research and search engine analytics team.  But correct, I'm --

---

87

Q.  Great.

If you could please turn to page 3 of the PDF.

A.  Sorry.  I just closed Windows.  I'm just going to try to -- I had a window that had the report.  I just can't find it.  So if you just give me one moment here.

Okay.  Appendix G, yep.  Okay.  Appendix G, mm-hmm.

Q.  Do you see the title "Examples of Unfavorable Links and Media"?

A.  Yes, Ms. Lamkin.

Q.  What does that mean?

A.  Anytime you have -- you're analyzing a reputation of someone online, there are articles, publications, assets that are positive or favorable.  You have those that are unfavorable that are harmful that I would perceive as being detractors from a positive digital presence.  So . . .

Q.  How were these examples selected?

A.  These examples are selected based upon my understanding of what is positive for someone's reputation and what is negative.  And when -- in the context of this case, the ones that were cited here are detractors to his reputation.

---

88

If I were objectively looking at them, the ones that I deemed unfavorable are based upon my experience and ones that I believe are harmful or adverse to his reputation.

Q.  But this isn't the universe of all articles that are negative about Mr. Rothschild, is it?

A.  No, Ms. Lamkin.

Q.  So how did you select these particular examples?

A.  These particular examples are ones that feature prominently and also have, I believe most, if not all of them, have a link or correlation to the case or the statements and information contained within this lawsuit.

Q.  What do you mean when you say "I believe most, if not all of them, have a link or correlation to the case or the statements and information contained within that lawsuit," what do you mean by that?

A.  I mean many of them have a relation to the statements and the parties with respect to this lawsuit, which is why some of them, you know, mentioned Starbucks.  I have it here, Starbucks, Baker Botts, which I think references Defendant Lamkin.

---

Q.   If you look about a little more than halfway down, there's that article from Y Combinator we were discussing earlier, "Gnome patent troll stripped of patent rights."

Do you see that?

A.   Mm-hmm.

Q.   Did you read that article?

A.   I -- I didn't read it recently.  I believe when we were onboarded for this case, I read it at that point.

MS. LAMKIN:  Can we please mark Exhibit 10 the PDF that's marked as Exhibit 12 in the database.

MR. UTTERBACK-PAIR:  Stand by, please, for Exhibit 10.

(Exhibit No. 10 marked for identification.)

MS. LAMKIN:  Actually, I'm sorry, before you pull up Exhibit 10, I apologize, can you please go to page 9 of Exhibit 9.

One more, please.  Okay.

BY MS. LAMKIN:

Q.   And you see this has the same URL, the Y Combinator link on the "Examples" page?

A.   Sure.  Yeah.

Q.   And the date on that article is April 28, 2022?

A.   Seems to be the right date, yeah.  I'm seeing --

MS. LAMKIN:  Can we please pull up Exhibit 10?

BY MS. LAMKIN:

Q.   This is an article from Hacker News dated April 28, 2022, titled "Gnome patent troll" strips -- "stripped of patent rights."

Is this the article that's in your expert report?

A.   I -- I -- I believe so.

Q.   If you could please turn to PDF page 3.

I'm going to read at the bottom, looks like Mr. Rothschild is being quoted.  It says:

"Leigh Rothschild said, 'I'm pleased that we have managed to settle this case amicably, I have always supported the innovation of open-source software and its developers and encourage its innovation and adoption.'"

And then it appears that someone is responding "For sure, buddy" to Mr. Rothschild' statement.

Do you see that?

A.   Yes, yes, yes, I do.

Q.   And underneath that, the person writes:

"That sounds like something Putin would say after he gets absolutely decimated by the Ukrainians."

Is it fair to say this poster is comparing Mr. Rothschild to Putin?

A.   He's comparing what Mr. Rothschild said to Mr. Putin, which I think looks like the poster is definitely making an inference to Putin and Mr. Rothschild as -- yeah, Mr. Rothschild said this, and this person is saying something analogous to what Vladimir Putin would say.

MS. LAMKIN:  If you could please turn to page 11 of Exhibit 10.

Just a little bit farther down, please.

BY MS. LAMKIN:

Q.   Okay.  Under April 28, 2022, mid-page, it says:

"The owner" -- and there's a Wiki link to Rothschild patent -- "seems to run a whole slew of patent-trolling shell companies."

"The owner" is commenting on Mr. Rothschild's business as "patent trolling shell companies"; correct?

A.   Yes.  Yes; correct.

Q.   That's -- the date of that is April 28, 2022; correct?

A.   Yes, Ms. Lamkin.

Q.   Two years before the alleged comments made by Defendant Lamkin?

A.   That's -- yes, that's the date, 2022.

MS. LAMKIN:  If you could please go to page 21 of the PDF.

Halfway down, it says -- try one more up.

MR. UTTERBACK-PAIR:  I'm sorry, Counsel, where?

MS. LAMKIN:  Page 20 of the PDF.

Let's try 22 of the PDF.

There we go.  Okay.

Just a little bit down, please.

BY MS. LAMKIN:

Q.   Do you see where it says "Leigh Rothschild, the troll in chief," and has a link to Mr. Rothschild's LinkedIn page; do you see that?

A.   Yes, Ms. Lamkin.

Q.   This poster is calling Mr. Rothschild "the troll in chief"; correct?

A.   That is correct.

93

Q. Did you read this article while you were working on your report?

A. Is -- is this cited in the report?

Q. It is. Multiple times. If you look --

A. Yeah, because I think that I recall reading that when we were putting this together.

MS. LAMKIN: Returning to Exhibit 9, if you please turn to page 25 of Exhibit 9.

One more, please. Okay.

BY MS. LAMKIN:

Q. What's on this page, Mr. Somal?

A. That's a listing of domain authorities or domain ratings for a number of the links cited as examples of harmful content.

Q. The Y Combinator article we just talked about, Y Combinator is ranked 90; correct?

A. Correct.

Q. Higher than Bloomberg?

A. Yes, in terms of its domain rating by Ahrefs, I think this was the tool taken for this, so yeah.

MS. LAMKIN: On the next page, please.

BY MS. LAMKIN:

Q. What's being depicted on this page of your expert report?

94

A. This is showing for these, it's more of just -- it's a deeper dive into some of the factors that result in the previous domain ratings.

Q. What's a "backlink"?

A. A backlink is a hyperlink from another website to a particular site. It's one of the factors Google measures in determining strength, the quality of the backlink, the number of backlinks. Generally speaking, the more quality backlinks, the higher the domain rating.

Q. The articles in Exhibit 9, which is Appendix G of your report, would trying to remove these articles or deprioritize these articles on the Internet be part of what you would do in your rehabilitation work?

A. Yes, to remove them, suppress them, or separately from being asked to opine on damages and assess brand value, reputation. Our core business is -- has been creating a positive perception for product service or company or mitigating harm from a negative 1.

Q. So part of the estimate for the costs to Mr. Rothschild for reputation repair would be to remove or deprioritize these articles?

A. If he wanted and if he wanted to address

95

the harmful narrative, these articles would be the primary ones in question to help rehabilitate the reputation harm different websites and different articles are having on his perceived narrative.

Q. And in your expert report, you have a figure that would approximately cost Mr. Rothschild to repair his reputation; correct?

A. Correct. Could you just point -- do you want to point on the report or just, generally speaking, I outline different categories of damages based upon the information received.

Q. Okay. We'll go to your expert report now, then.

MS. LAMKIN: If we could mark as Exhibit 11.

(Exhibit No. 11 marked for identification.)

MS. LAMKIN: I'm going to have to put it in the chat because I didn't send it to you.

Why don't we do it this way: Can we just go off the record for two minutes and I'll send it to the vendor?

THE VIDEOGRAPHER: We are going off the record, the time is 3:36 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record, the

96

time is 3:40 p.m.

MS. LAMKIN: We'll just wait for y'all to mark Exhibit 12, and then we can ask questions from there.

MR. UTTERBACK-PAIR: I believe this will be 11.

MS. LAMKIN: Okay.

MR. UTTERBACK-PAIR: All right. And stand by for Exhibit 11.

BY MS. LAMKIN:

Q. Do you recognize this document, Mr. Somal?

A. Yes, Ms. Lamkin.

Q. What is it?

A. It's the expert witness report prepared for this case by myself and Doug Ryder and supported by our team.

MS. LAMKIN: Will you please turn to the second page.

BY MS. LAMKIN:

Q. On the second page, Mr. Somal, is a prologue and then sections.

Starting with the prologue, can you identify the portions of this report that you worked on as opposed to Mr. Ryder?

A. We collaborated to pull the report

together. So, you know, I know we -- I wouldn't say there was a specific point where I would say he did this line, he did this section. Because of the nature of this being in the patent industry within the context of reputation, we worked on the report together. I wouldn't recall which part was exactly Sameer specific or Doug specific -- or Mr. Ryder specific.

MS. LAMKIN: Can we please go back to the table of contents?

BY MS. LAMKIN:

Q. I'm trying to get a sense for the parts of this report that your team would have done.

Can you -- looking at the table of contents, can you see things in this report that you were not involved in, for example, that Mr. Ryder worked on exclusively?

A. I mean, I recall there was a chart of Leigh's patents that was provided by him. That may be in an appendix or maybe cited in here.

Q. Anything else that Mr. Ryder would have worked on exclusively in this expert report?

A. No, not that I recall.

Q. Okay.

MS. LAMKIN: If we could please turn to the prologue.

BY MS. LAMKIN:

Q. This prologue was signed by both yourself and Mr. Ryder; correct? If we look at the signature page.

A. Mm-hmm.

Q. That's both you and Mr. Ryder's signature?

A. Yes, it is.

Q. Is there anything in this prologue you don't agree with or you think is wrong?

A. No, I -- I don't recall anything in this. Yeah.

Q. In the second paragraph of the prologue, it says:

"With our respective backgrounds in online reputation management and intellectual property law, we agree that defamation has occurred and that a damage award is due."

Is that a fair division of labor between yourself and Mr. Ryder, you doing the reputation management and Mr. Ryder doing the intellectual property law?

A. Yeah, we are -- understanding within the context of a business that does campaigns on patents

and what that involves, that, I think, you could group under intellectual property patents, the nature of defending intellectual property.

Q. The third paragraph, you write:

"The following expert report will show that the object of Ms. Lamkin's attacks is a man who has made and continues to make positive contributions to our nation."

Is that a true statement, Mr. Somal?

A. It's a statement based upon the inventions and my understanding of his work on innovation and being an inventor.

Q. Mr. Rothschild's positive contributions to our nation is as an inventor and his innovations? Is that your testimony?

A. You know, when I say "positive contributions," that's as an entrepreneur, as somebody who has built a business and has a profile, somebody who has contributed to society.

Q. What has Mr. Rothschild contributed to society?

A. Again, by being an inventor. And as his business supports and helps people be able to protect the intellectual property and inventions they've made. That's my understanding of his business.

Q. At the bottom of the paragraph in the prologue, it says:

"It is important to note that PAM creates separate LLCs to hold patents as assets and for each LLC, pays all fees necessary for legitimate corporate existence and pays out fully on any and all obligations."

Why is that important to note?

A. (Reading:)

"It is important to note that PAM creates separate LLCs to hold patents as assets and for each LLC pays all fees necessary."

You know, I would say, one, multiple entities are created. I know in question here is whether he creates shell companies and this notion of not paying fees or bankruptcy, it was alleged and based on my knowledge and what was provided to me and shared, that he pays out all and any of those obligations.

Q. So I want to make sure I understand your testimony here.

Transcript of Sameer Somal
Conducted on November 12, 2025

101

It's your opinion that the LLCs who assert Mr. Rothschild's patents are not shells because PAM pays their bills?

A. It's referring to the point that the company -- the companies are created for patent campaigns.

Q. Correct. But why is it important to know that PAM pays their bills?

A. Well, one, they're not -- as mentioned, PAM claims they're not shell companies. They're companies that are used for the campaign and that's how it's organized. That's his structure for organizing his business.

Q. How do you know that PAM pays the bills of the LLCs? What documents did you see?

A. How do I know that PAM -- you know, that's how they're defined to work. That was communicated by the plaintiff and I assume that to be true.

Q. You didn't see any documents. This is just Mr. Rothschild's word; correct?

A. That's correct, Ms. Lamkin.

Q. Then it says:
"While PAM is financially successful, Mr. Rothschild is known for contributing its returns to

102

charities."
What's your basis for believing Mr. Rothschild is known for contributing returns to charities?

A. Well, one, his -- you know, his word. So naturally, through not just my interviews, but then I know Mr. Ryder and Dr. Lajoux had spoken with him, in order to make conclusions, I -- I assume his -- his word to be true.

Q. You didn't see any documents that supports the claim that Rothschild is known for contributing PAM's returns to charities?

A. I -- I don't recall documentation received on that directly that point. That was made very, very clear and in multiple occasions by Mr. -- Mr. Rothschild. But we didn't receive documentation specifically highlighting. But he spoke of it quite often and I assume that to be true.

Q. If you could please turn to page 18 of the expert report. Not on the PDF, I'm now referring to the page numbers at the bottom.

A. Yes.

Q. Okay. Reading the first full paragraph:
"The Defendant has been making defamatory remarks about the

103

Plaintiff since 2013, as shown in the articles 'A Patent Troll Conversation,' and 'It Takes a Village to Kill a Patent Troll.'"
We already discussed those two articles; correct, Mr. Somal?

A. We did.

Q. And Mr. Rothschild is not mentioned in those articles, is he?

A. He's not mentioned by name.

Q. And Defendant Lamkin does not call Mr. Rothschild a "patent troll" in those articles, does he -- does she?

A. She did not directly call him a "patent troll" in those articles.

Q. So how are those articles defamatory about Mr. Rothschild?

A. The body of work in him running shell companies, him filing for bankruptcy, not being able to pay his bills is associated with him being called a "patent troll."
And as he explained, he's been called, and I don't recall the exact word, but he's been labeled and attacked by it, Ms. Lamkin, since 2013.

Q. Mr. -- there's quite a bit of bad press

104

about Mr. Rothschild, isn't there?

A. My focus was the nature of, you know, someone not being able to pay their bills.
I know one of the important ones is, of course, the Bloomberg article being called a "troll." So my focus was the Bloomberg article in question in this case.

Q. Defendant Lamkin is not responsible for everything bad said about Mr. Rothschild on the Internet, is she?

A. That -- I would agree with that.

MS. LAMKIN: If you could please go to page 22.

BY MS. LAMKIN:

Q. There's a --

MS. LAMKIN: Scroll down a little, please.

BY MS. LAMKIN:

Q. There's a definition of shell company in your expert report at paragraph 4 on page 22; yes?

A. Yes.

Q. You agree with that definition of a shell company?

A. Yeah, it -- I mean, correct. I mean, that's one of the definitions, but one that I found to be commonplace.

105

Q. Okay.

MS. LAMKIN: 25, page 25, please.

BY MS. LAMKIN:

Q. Top of page 25 says:

"This was not a fleeting remark but part of a strategic, multi-year defamation" claim -- "campaign."

What does that sentence mean, Mr. Somal?

A. The notion that Defendant Lamkin has labeled and sought to undermine the credibility and has made harmful statements, a number of them outlined in this case that have harmed Mr. Rothschild, which, as he explains, is the reason why he had to file this lawsuit, because of the harm that has resulted on him over the many years.

Q. Other than the October 2024 Bloomberg article, please name any articles that contain an opinion of Mr. Rothschild by Defendant Lamkin.

A. As explained, it's our understanding, my understanding, that you and Mr. Rothschild are -- I don't know if I should refer in third person, but we will just say Ms. Lamkin and Mr. Rothschild have been -- had a pretty harsh and contentious interaction, we'll call it, through cases and that ratcheted up, you know, with respect to Bloomberg on

106

social media.

I think Ms. Lamkin referred to Mr. Rothschild as a "prolific patent monetizer" and praised the entity involved in that case, Starbucks, for standing up. And this, of course, just, you know, perpetuates or furthers that narrative, and then --

Q. I'm sorry, Mr. Somal. My question to you was this: Other than the October 2024 Bloomberg article, please name any articles that contain an opinion of Mr. Rothschild by Defendant Lamkin.

Can you point to anything other than the October 2024 Bloomberg article in which Defendant Lamkin has stated an opinion of Mr. Rothschild?

MR. LOBBIN: Objection. Asked and answered.

THE WITNESS: Yeah, I don't recall any offhand other than the Bloomberg article.

BY MS. LAMKIN:

Q. So how do you support this "strategic, multi-year defamation campaign statement," what's your basis for that?

A. One, the Bloomberg article was widely disseminated, became public narrative. And based upon extensive feedback and conversation with the

107

plaintiff --

Q. That information comes from Mr. Rothschild; correct?

A. Correct.

Q. You haven't been able to independently confirm any alleged strategic, multi-year defamation campaign from Defendant Lamkin, have you?

A. I mean, I --

MR. LOBBIN: Objection. Asked and answered.

You can answer.

THE WITNESS: You didn't mention him by name in the IP Watch article where you discussed trolls. But the narrative that was since ratcheted up, you could say by the Bloomberg article makes that to an Internet user or somebody who's evaluating this independently as associated with Mr. Rothschild, that word.

BY MS. LAMKIN:

Q. It's your testimony that the word "patent troll" is associated with Mr. Rothschild?

A. It's my testimony that the narrative about shell companies, bankruptcy, and the contentious nature of the interaction between you and Mr. Rothschild ultimately creates a narrative.

108

Included within that narrative is this notion of him being labeled a "patent troll."

Q. So it's your testimony that someone reading the Bloomberg article from October of 2024 would go back and reread the interview from 2013 and conclude that Ms. Lamkin was talking about Leigh Rothschild in that 2013 article?

A. Well, one, I would say that one can't say with any certainty, when somebody finds out information, so that Bloomberg article, maybe somebody totally isolated would not, but when somebody reads that Bloomberg article and they naturally want to find out more about who this person is that creates shell companies or doesn't pay their bills, they're going to find that collective narrative and they're going to see that he's associated with those terms, so . . .

But anyone who knows the relationship between Ms. Lamkin and Ms. -- Mr. Rothschild would, you know -- yes. The answer would be yes, anyone who understands that relationship or takes a look at that.

Q. What do you mean "the relationship between Ms. Lamkin and Mr. Rothschild"?

MR. LOBBIN: Same objection. Asked and

Transcript of Sameer Somal
Conducted on November 12, 2025

28 (109 to 112)

109

answered.

THE WITNESS: I would -- I would describe the relationship as bad blood in previous cases, multiple cases. Like, I guess, maybe relation, I would say adversarial.

BY MS. LAMKIN:

Q. Can you be more specific, Mr. Somal? What do you mean "adversarial" relationship?

A. Well, you know, a prior public pattern from -- you know, you could say over that time period, 2013, demonstrates continuity and intent to discredit him within the patent industry. And, you know . . .

Q. What specifically are you referring to when you say "discredit him within the patent industry"?

A. Well, one, you've had prior litigations against each other. And, you know, the claims that his companies go bankrupt undermines trust with investors, licensees, partners, core to his business model, from my understanding, he hasn't gone bankrupt.

Q. If you could please turn to page 29 of your expert report.

Page 29 of your expert report, you refer to a 2023 interview with Pat Muffo; correct?

110

A. Yes.

Q. That's a YouTube video; correct?

A. Yes, I believe so. Yeah.

Q. Did you watch that video?

A. I believe I did back in August.

Q. Mr. Rothschild is referred to as a "patent troll" in that video, is he not?

A. I don't recall exactly what -- if -- if you're saying he is, I would -- I would believe that to be the case. I don't recall exactly.

Q. If you could please turn to Section 6, which is on page 51.

Who is going to opine about the material in Section 6 to a judge or jury?

A. As mentioned, you know, I'm not making any legal conclusions or providing legal advice, you know, any information with respect to legal cases decision is just for reference purposes only. So there's no plan for me to opine on those cases or decisions.

Q. You're not going to opine on any of the material in Section 6; correct?

A. No, I'm not.

Q. If you could please go to Section 7, be on page 62. It should start on page 65.

111

You are going to opine as to Section 7 and specifically to damages, not Mr. Ryder; correct?

A. Correct.

Q. Page 65, you list five kinds of economic damages; correct?

A. Yes, Ms. Lamkin.

Q. Will you be opining as to each of those five categories of economic damages.

A. Yes.

Q. Right underneath that, it says:

"For all of these, we will assume specific periods of damage."

What are the specific periods of damages that you are assuming?

A. Let me just -- I believe it's in the report and it's, like, what I meant and I -- what I mean by that statement is that we would put a time period associated, for instance, if he, you know, typically monetizes a particular campaign over the course of five years, that would be five years instead of perpetuity. So time periods are based upon information received. So that's simply meaning that we're going to look at a particular time period as opposed to one without an ending.

Q. Okay. On page 65, you have a section

112

called "Recent Opportunity Cost." Are we on the same page?

A. Yes, yes, yes, Ms. Lamkin.

Q. Okay. It says:

"Since the defamation, Mr. Rothschild and his inside chief operating officer . . ."

That's Mr. Falcucci; correct?

A. Yes, Mr. Daniel Falcucci; correct.

Q. Mr. Falcucci is the COO of PAM; correct?

A. That's correct, Ms. Lamkin.

Q. This section talks about the opportunity cost lost to PAM; correct?

A. Yeah, the -- the opportunity cost of Leigh and Daniel not doing billable work, which, as articulated by Mr. Rothschild and, I believe, Daniel, that significant amount of time is spent on the litigation and that is -- compromised their ability to take on new clients and be able to receive income. That's what the opportunity cost is outlined.

Q. I'm sorry for not being more clear, Mr. Somal. I'm trying to understand first --

A. Hmm.

Q. -- which entity is suffering the direct

Transcript of Sameer Somal
Conducted on November 12, 2025

---

113

loss?

And in this case, this first section, the opportunity cost loss is to PAM; correct?

A. Yes, PAM as the services delivered by, yeah, correct, by the CEO or founder and COO.

Q. How did you determine Mr. Rothschild and Mr. Falcucci's blended hourly rates?

A. That was provided to me.

Q. In what form?

A. I believe that was provided in -- in the course of the interviews and conversation, it was made very clear that this is what we typically bill, our blended rate is this, and these are the number of hours, on average, we've spent per week on this when we could have been billing clients.

Q. Did you see any payroll records?

A. I did not. This was verbal.

Q. Mr. Rothschild just gave you that number?

A. Yes, Ms. Lamkin.

Q. What was Mr. Falcucci's compensation at PAM over the last five years?

A. That information was not provided to me.

Q. What was Mr. Rothschild's compensation at PAM over the last five years?

A. That was not provided to me.

---

114

Q. How do you know that Mr. Rothschild and Mr. Falcucci were not able to work on campaigns?

A. This is the information that was strenuously articulated multiple times in conversation. I -- I assumed the information to be true.

Q. You didn't look at any litigation records?

A. I did not receive litigation records, no.

Q. The only piece of information you gave me was a number for Mr. Rothschild -- forgive me, let me reask that.

The only information you received as to this section was a verbal statement of $1800 an hour with no evidentiary support; correct?

A. Along with eight hours and, you know, this is the time they worked on this matter and they're -- they're not able to work on those other matters that would compensate them accordingly, as explained to me, and Mr. Ryder as well as, I believe, Dr. Lajoux.

I think there was -- I think it was Intellectual Ventures. They noted during work for Intellectual Ventures at this -- at this rate and, you know, they -- you know, they pay him to help with certain campaigns. That was one name that I

---

115

recall when speaking about this, Ms. Lamkin.

Q. Were you given any payment stubs from Intellectual Ventures?

A. I was not.

Q. Any bank statements?

A. No, Ms. Lamkin.

Q. No documents whatsoever. Just Mr. Rothschild's verbal communication about the value?

A. That's correct.

Q. The next section is called "PV of Reduction in Potential Future Revenue From Campaigns due to Decreased Activity." What does that mean?

A. Well, that means the present value of campaigns that Mr. Rothschild is no longer receiving as a result of the harmful narrative.

"Campaign" means, you know, getting investors to sell their intellectual property, my understanding of that, to Mr. Rothschild and each successful campaign gets, you know, around 800- -- $800,000 and he missed -- you know, he estimates, I think it was, you know, normally has around 15, now has -- has 10. I took a conservative approach and said in that instead of five that would be three. He has less campaigns than anticipated. We didn't

---

116

use all five.

And it was shared with me that each campaign is typically worth $800,000 to him. And so three of those campaigns at $2.4 million and discounting that back over the time it takes to implement the campaign is what the present value -- I'm sorry, I'm just looking where I have the report where I can read it -- present value of reduction and potential future revenue from campaigns due to decreased activity.

Q. This, again, is a direct loss to PAM; correct?

A. Yes.

Q. And again, you didn't see any documents or records to support this opinion; correct?

A. I -- I did not receive documentation on -- on this.

Q. Did you do anything to independently value patent litigation campaigns?

A. I know that it was pressure tested that patent litigation campaigns based on Mr. Ryder's experience. They can be within that range and as -- as mentioned, that was a figure provided to us.

Q. By Mr. Rothschild?

A. Correct.

---

Transcript of Sameer Somal
Conducted on November 12, 2025

**117**

Q. Did you look at any settlement records?

A. I did not receive any settlement records.

Q. Any industry data?

A. Well, that probably, with respect to industry data, is something that I know Mr. Ryder has considerable more experience in how patents -- I know it to a degree maybe, but that's a world he's worked in day in, day out.

Q. Does your expert report have any industry data that values patent litigation campaigns?

A. I don't believe we cited industry data. That figure was shared with us and we did verbally hear about some of his previous settlements.

Q. Verbally from Mr. Rothschild?

A. That's correct, Ms. Lamkin.

Q. The next section says "Recent Reduction in ROI From Campaigns Due to Difficulty in Adding Staff."

What does that mean?

A. Well, this articulates how it's difficult for him, as explained, to hire a new attorney, to bring people onboard because of the narrative surrounding him. And this section just outlined adding an in-house lawyer, what that would mean to him from an economic standpoint, if he could. Which

**118**

he explained he couldn't.

Basically a new attorney would provide -- I think I have here around 40 percent profit to the amount that they're being compensated. And so, you know, compensation for an in-house lawyer, I cited at 288,000. And 40 percent of that is how I got that figure. So . . .

Q. This, too, is a direct damage to PAM; correct?

A. Yeah, the attorney would be hired under PAM.

Q. PAM has hired attorneys before, has it not?

A. PAM has hired -- yes, I believe PAM has employed attorneys, et cetera, yeah.

Q. Were you shown any payment stubs or any sort of documentation to show you what an attorney inside PAM is paid?

A. Was I given any -- was I given any specific info inside of PAM? No, I mean, I did some independent re- -- but I didn't receive payment stubs from -- from PAM based upon what they're paid. So I -- I -- you know, my citation of an in-house lawyer is based upon my knowledge working in the industry and finding a citation. But I didn't -- I didn't receive that information. That was research

**119**

on our end.

Q. You assume a 40 percent midpoint return on litigation financing. What studies or market data supports this range?

A. I believe the citation for the -- the 40 percent is there. I don't recall what it was offhand. You could have used a range. I found that to be plausible. I've done work and collaborated on a number of situations with lawyers. But that was information found therein as I needed to get to a profit margin therein.

Q. What did you do to confirm that the alleged hiring difficulty was slowly due to defamation rather than other factors like salary offers for market competition?

A. Well, I -- we -- we -- now one being when there is a harmful narrative, one that is defining of one's brand, I know firsthand that that makes it difficult for a business to get clients, like -- and that, of course, is unique to the particular industry and situation.

Mr. Rothschild made it very clear that it's hard for him to grow and -- and to hire counsel because of the narrative, and the questions were, you know, if he's perceived as being bankrupt and

**120**

won't be able to pay somebody, that's stopping him from being able to hire someone as was articulated to me, Ms. Lamkin. And to Doug and to Alex.

Q. My question to you, Mr. Somal, was what did you do to confirm that the alleged hiring difficulty was due to defamation rather than other factors?

A. I know when there is a harmful narrative how it limits one's opportunity set. I didn't receive, you know, other information, but I know it to be when there is a harmful narrative, I know through experience that that does make it difficult to hire.

And multiple times in the conversation, Leigh mentioned that. I know based upon the timeline of events that appears to be the case. And is consistent with businesses and individuals who have statements made that are harmful, defamatory, negative. And --

Q. But you didn't do anything specifically to make sure that the hiring difficulties weren't due to factors other than defamation?

A. When you say "specifically," you know, I -- I know that when there's a harmful narrative, this makes it difficult. If there were other information that I could cite and support that I received, I --

121

I would have cited it.

Q. Understood.

Next section is "Loss of Exit Value for the Company PAM."

This is a -- this, again, is damages suffered by PAM; correct?

A. That's correct, Ms. Lamkin.

Q. In estimating the exit loss of value for PAM, you value the company at 12- to 20 million without reviewing any financial statements.

How did you arrive at this range?

A. This is data and information provided by Mr. Rothschild.

Q. By "provided," you mean he verbally told you that's what PAM was worth?

A. Says he has received offers and, you know, I believe that -- and I think this -- if I just have the report here. Let's see.

As -- as mentioned, this is -- I don't recall the exact conversation, but he said that he's been offered -- and this is definitely what it's -- what it's worth. And --

Q. Did he show you any of those offers?

A. No, he -- he said he received many offers. And -- yeah.

122

Q. Did you do anything to independently estimate the value of PAM?

A. Well, you know, I think it would be safe to say that Mr. Rothschild was -- is -- was reluctant to share financial data because he didn't want that out there in the public domain about his company. And so I didn't -- I didn't receive -- I mean, as you may have seen, probably from my background, I have a background in -- I'm a CFA charter holder, I understand valuation. And so in this particular case, this is the information that we were provided.

Q. As a chartered CFA and a former finance professional, you understand the importance of actually seeing the documentation behind the opinions; correct?

A. I do understand that. I also appreciate confidentiality and there's -- I would just say from my standpoint, I've been asked for information and there have been reasons I didn't want that info out there. I'm not -- I'm just stating what took place and so if -- if I had the actual data to go off, I could certainly look at the valuation numbers from my standpoint. But that was not provided to me.

Q. So just to dot the i's, for "Outgoing Out-of-Pocket Legal and Filing Costs," you say

123

150,000, but you weren't shown any documents in support of that number; correct?

A. I was not shown documentation.

Q. Okay.

A. That's correct, Ms. Lamkin.

Q. Under "General Damage to Professional Reputation," you say:

"Considering that he was going to be named to the Florida Inventors Hall of Fame but learned that he was no longer being considered."

Did Mr. Rothschild tell you that he was no longer being considered from the Florida Inventors Hall of Fame because of the allegedly defamatory statements by Defendant Lamkin?

A. I believe he explained that that was the questions and it was -- it was assumed that a harmful narrative contributed to that as articulated.

Q. Did Mr. Rothschild say expressly that the reason he was not going to be named to the Florida Inventors Hall of Fame was because of specifically Defendant Lamkin's alleged defamatory statements?

MR. LOBBIN: Objection. Asked and answered and vague.

124

THE WITNESS: I don't know if he specifically said that. The time frame aligned with that and -- and he certainly believed that to be the case based on my understanding of when there's a harmful narrative, that is plausible, that he explained that.

Would I be able to say that as an absolute certainty having not an affidavit or statement from someone there, I don't have that information. I know that people are oftentimes not considered or people, quote/unquote, ghost them because of information that can be, you know, a liability if someone is named for a recognition.

MS. LAMKIN: Mr. Somal, we've been going for about an hour and 15 minutes. We're probably within a half an hour or 45 minutes to being done. Do you want to break for about 10 minutes and then do the final stretch, does that work for you?

THE WITNESS: Sure, Ms. Lamkin. Thank you.

MS. LAMKIN: Okay. We can go off the record.

THE VIDEOGRAPHER: We are going off the record, time is 4:27 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the

Transcript of Sameer Somal
Conducted on November 12, 2025

125

record, time is 4:44 p.m.

BY MS. LAMKIN:

Q.  Welcome back, Mr. Somal.

A.  Thanks.

Q.  If we could -- if we could please turn to page 70 of Section 7 of your expert report.

A.  Okay.

Q.  Can you please describe this three-ring analysis you have on page 70, please?

A.  Yes, Ms. Lamkin.

So as an entrepreneur over the last 10, 15 years, I've used, specifically the last 10, the three-rings framework to conceptualize how the harm for defamation can be explained.

One, there's a Ring 1, there's people, when they hear negative things, your close family, friends, those you interact with often, they would have the opportunity to, in this case, speak with Mr. Rothschild and ask if these things are true. They would know better than that.

Ring 2 is -- again, it's used to conceptualize how harm is reached.  Ring 2 is a layer or a group of -- a larger group of acquaintances, people that maybe somebody like Mr. Rothschild doesn't speak to every week, every

126

month, even every year.  They're acquaintances. They know of him.  Many of them maybe wouldn't take the opportunity to speak with him or confer.

And then Ring 3 is all of the people, you know, somebody that, in this case, is interested in hiring Mr. Rothschild, working with Mr. Rothschild, and they learn about him, they are referred, and then they find negative information and that becomes the defining narrative.

So the three rings is used to explain and conceptualize the same.

Q.  Have you used this analysis -- like you said, you used this for 10 years before?

A.  Yeah, I've used to explain over the last 10 years to clients.  And then we started to use it in cases, in reports, to, again, conceptualize and explain how the harm actually is proliferated amongst people.  And also to bring some degree of understanding of just how impactful reputational harm can be.  And it's been -- it's been used in cases.  I recently wrote about it, and it's been published.

MS. LAMKIN:  Can you please mark the document in the chat as the next exhibit.

MR. UTTERBACK-PAIR:  Stand by, please.

127

And the next one will be 12.

(Exhibit No. 12 marked for identification.)

MS. LAMKIN:  Can you please go to the next page.

BY MS. LAMKIN:

Q.  Do you recognize this document, Mr. Somal?

A.  Yes.

Q.  What is it?

A.  It's an expert report that was prepared for a case, Brian Menge.

Q.  Brian what?

A.  Brian Menge.

MS. LAMKIN:  Will you please go to page 73 and 74.

BY MS. LAMKIN:

Q.  This is the three-ring analysis you used in Brian Menge's case; correct?

A.  73 -- can you just -- is it -- it's not labeled at the bottom.  So yeah.  Okay.

Sure, yes.

Q.  You use almost the same language in the Menge report in your report for Mr. Rothschild; correct?

A.  Explaining the conceptualization of three rings, sure.

128

Q.  Was this section of your expert report excluded in the Menge matter?

A.  In the Menge matter, you know, I'm -- the -- I don't recall the exact wording.  I'm sure -- I'm sure you have it, you know.  I'm only as capable as an expert based upon, as I mentioned, data is the compass or methodologies, the framework.

I know to explain the conceptualization, but specifically, the three-rings framework, I don't believe that was the -- I don't believe the framework was what was excluded.  It was information and data that was given to me by -- that was provided to me and that I assumed to be true.

MS. LAMKIN:  Will you please mark the next exhibit in the chat.

MR. UTTERBACK-PAIR:  Stand by, please.

Exhibit 13.

(Exhibit No. 13 marked for identification.)

BY MS. LAMKIN:

Q.  Have you seen this opinion before, Mr. Somal?

A.  Yeah, I think so, yeah.

MS. LAMKIN:  If you could please turn to the fifth page on the PDF.  Sorry, fourth.

129

BY MS. LAMKIN:

Q. Do you see at the bottom where it says "Reputational Damage"?

A. Yep, that's correct. Mm-hmm.

Q. I'm going to read this:

"Ash-Shafii also takes issue with Mr. Somal's conclusion that Menge is entitled to 550 to 750 in damages based on more generalized harm to his reputation."

That's almost the same number that you said Mr. Rothschild was entitled to; correct?

A. Yeah. It's similar, sure.

Q. Is it generally the figure you come up with when you use the three-rings methodology?

A. No, that's based upon my understanding of the business and -- yeah, I mean, as mentioned, the methodology has been used in many cases, many cases that settle. I recently published on the methodology in the "Midwest Law Journal" in a peer-reviewed paper.

Q. Are Mr. Menge and Mr. Rothschild's businesses similar?

A. No.

MS. LAMKIN: If you could please go to the

130

next page.

BY MS. LAMKIN:

Q. Do you see where the Court says:

"This opinion" -- that being your opinion, Mr. Somal -- "This opinion suffers from the twin faults of no stated methodology and no factual tether. Mr. Somal will not be permitted to testify about this opinion at trial."

Does this refresh your recollection as to whether your three-rings opinion has been excluded by a Court?

A. The three-rings opinion has not been excluded. As calculated in the Menge case, I was given attorneys, I believe, that referred him business that were no longer referring him business. And that was how I calculated damages. But I -- I was only as good as the information provided to me.

Q. I think that's factually accurate, Mr. Somal.

A. And I -- and I didn't cite the three-rings methodology for how I calculated damages. I referenced it for conceptualization. That was based upon opportunity, cost, and the information.

131

And, you know, as you can appreciate, Ms. Lamkin, you know, an expert is called in to give an independent objective opinion. You work within parameters if you're -- if you're given information and you're given evidence and then you use that; otherwise, then my report is -- well, assumptions have to be made. And I -- I made assumptions as I -- as I have to as an expert in order to create a report. I assume things to be true.

Q. Right. It's a garbage in, garbage out; right?

A. In -- in -- in this -- in this particular case, as mentioned, you know, there were examples and it turns out I didn't -- and so I made my calculations based upon the information provided.

Q. Page 70 of your expert report at the bottom, you say:

"Adding the three reputational rings together, and based on the narrative present, I conservatively recommend damages for this category of 500,000 to 750,000."

Where are your calculations for those numbers?

A. Yeah. Well, one, when, you know, you're

132

looking at long-term damages, so if you were to just say that, one, if he lost one, again, why I say conservative, if he lost one campaign and that was worth 800,000 in economic value, that would make this damage calculation conservative.

It also has a lot to do with brand value and legacy. Again, based on the information provided to me, that a business that has multiple campaigns that is, as explained, generating millions of dollars, for that business to now struggle and to go from 15 campaigns to 10, you know, the --

Q. Those are different, Mr. Somal, those are different categories of damages; right?

You've got economic damages as a separate category from reputational damages. So are you -- are you double-dipping here?

I'm asking how you're counting -- calculating specifically the reputational damage.

A. Look, when it comes to three rings, you know, as mentioned, I have the paper. And that is cited and, you know, legacy and their ability to live a normal life for many people, Mr. Rothschild will only be known by the statements and the narrative contained therein.

Q. Where does this number come from? Where

Transcript of Sameer Somal
Conducted on November 12, 2025

133

are your calculations? Where is your data? Where does the number 500- to $750,000 come from?

A. As -- as mentioned, the economic damages -- I'm giving you an example with respect to reputational harm. If you looked at legacy and you looked at, you know, 10 percent of real damages, there's oftentimes said that, you know, if you looked at his legacy being worth just 10 percent of economic damages, that's where that came from.

Q. Where are those calculations in your report?

A. Well, if economic damages is approximately $5 million, 10 percent of that would be 500,000.

Q. Economic damages and reputational damages are separate categories in your report, are they not?

A. Correct.

Q. So you're counting it twice? You're giving him 5 million and then 10 percent of 5 million?

A. No, I -- I said, as mentioned, that real damages, based upon economics and the numbers provided therein, was $5 million. And the reputational harm for somebody not being able to have a legacy and for long-term reasons, that was

134

10 percent.

That's not double-dipping, that's simply saying that it's a fair estimate to say that his legacy is worth 10 percent.

Q. Where is that in your report? In the "Reputational Damage," where do you show this is a calculation of 10 percent?

A. Because reputation is intangible. That's how I arrived at the number. I don't know if I put that specific number there.

Q. The next page of your expert report, this is for rehabilitation damages; correct?

A. Correct.

Q. The third bullet down is "Total target negative links: 20+."

What does that mean?

A. That's 20 detractor harmful links that are contributors to the negative narrative, that's at question.

Q. In other words, you want to try to remove 20 of the links that are in Appendix G of your report?

A. Yes.

So if Mr. Rothschild wasn't in litigation and said these are the links that are harmful that

135

are defining, I'd like to hire Blue Ocean Global Technology to address these links, this is how I would -- this is how our team would outline a campaign for him.

Which we do considerably more of as opposed to me being hired as an expert, which is how I became an expert.

Q. You have a section on "Emotional Distress Damages" in your report; correct?

A. Yes, I -- I mention emotional distress because I own a company that deals with these situations and I know when somebody has been harmed or there's information they can't control, that it does affect them emotionally.

I'm not a medical doctor. I'm not providing a medical opinion.

I would not -- I have many clients that are suicidal that struggle from this. I think it's fair to say that I've experienced that and I understand that.

But I would not be in a position, Ms. Lamkin, to provide testimony at trial on emotional distress damages given I didn't conduct a psychological evaluation given I'm not trained for the same.

136

Q. It's in your report, but you're not going to offer any opinions before the Court or at trial on emotional distress damages, correct?

A. Correct.

Q. Same with punitive damages? You're not going to offer any testimony or expert opinion on punitive damages before the Court or at trial; correct?

A. Correct, Ms. Lamkin.

Q. We've looked at a lot of bad press today about Mr. Rothschild; correct?

MR. LOBBIN: Objection. Mischaracterizes the record.

THE WITNESS: We -- we've looked at appendices and articles that are harmful; correct.

BY MS. LAMKIN:

Q. Okay. In preparing your report, did you conduct any baseline assessment of Mr. Rothschild's public reputation or media coverage prior to October 2024?

A. Naturally, I would -- you're not able to go back and look at what search results were previously. I can say that the narrative and what is currently out there and exists related to the bankruptcy, the shell companies is the one that is

permeating from this point forward.

Naturally, I do and our team does take an inventory and look is his business prior to these statements, it was shared, was doing well, and -- and since this collective narrative is defining of his presence and reputation, it's been explained it's not doing nearly as well and has suffered.

Q. My question, Mr. Somal, was, in preparing your report, did you conduct any baseline assessment of Mr. Rothschild's public reputation or media coverage prior to October 2024?

MR. LOBBIN: Objection. Compound. Asked and answered, vague.

BY MS. LAMKIN:

Q. Mr. Somal?

A. It's my understanding that with respect to shell companies and not -- and bankruptcy and not being able to pay his bills, there wasn't information prior to that narrative existing from this case.

Q. I'm sorry, your testimony is that prior to November 2024, there wasn't any information about Mr. Rothschild online?

A. I didn't say that, Ms. Lamkin.

I said that the defining narrative and the statements that now are ever present on -- his digital presence and his narrative, those statements and the nature of those statements with respect to him not being able to pay his bills and bankruptcy, that narrative didn't exist. And I know that that narrative, understanding that and being a digital reputation or reputation expert is harmful. And that didn't exist prior to the date in question.

Q. So is the answer no, Mr. Somal, in preparing your report, you did not conduct any baseline assessment of Mr. Rothschild's public reputation or media coverage prior to October 2024?

A. I, of course, would look at his reputation. But bankruptcy was added to his narrative and who he is by, you know, the defendant in this case, who is an attorney of prominence.

And so it's my understanding that there was no discussion of bankruptcy prior to that date and that's a harmful detractor, one that I've dealt with many situations with respect to people actually going bankrupt and being accused or labeled that. And it's -- and I know that to be harmful and that narrative didn't exist prior in looking at that.

So my answer would be yes, I looked at the narrative of bankruptcy originated and that is

harmful. To my understanding, there's no discussion of bankruptcy before that.

Q. So any discussion of Mr. Rothschild's companies being shells before that?

A. Yes, there is some discussion. I think you may have highlighted some of that today.

Q. Is there any discussion of Mr. Rothschild's companies not paying attorneys' fees awards before October 2024?

A. Is there any discussion of Mr. Rothschild's companies not paying attorney fees, is that the question?

Q. Mm-hmm.

A. I -- I don't recall exactly. I know that there -- there can be dispute not paying fees, I think you pointed out some of that.

I remember those were discussed in the course of conversation, and if I recall, Mr. Rothschild said that those were overturned and he didn't have to pay based on what I remember about a few of those that we asked that he was vindicated.

Q. Was there negative press about Mr. Rothschild before October 2024?

A. Yes, there was information that I would say is detractor in nature.

Q. How did your methodology account for and exclude the impact of prior negative press about Mr. Rothschild before November 10, 2024?

A. Well, my analysis is, was the reputation harmed when someone is labeled bankrupt? And it's -- nobody wants to -- it's hard to do business with somebody that's perceived not to have money or to be a charlatan or somebody who doesn't pay. And so my scope isn't to look at all prior media.

My scope is to understand those statements therein and ask about and understand business performance and to assess the degree of the harmful media. I'm -- I'm not arguing that other folks haven't called him things before. But bankrupt and -- and the issues at question are unique and weren't out there prevalently and now they're defining.

Q. How do you quantify the impact of the statement that Mr. Rothschild can't pay his bills or is bankrupt versus all the other negative press about him?

How do you quantify and separate those statements?

How do you quantify the damage of Defendant Lamkin's statements as opposed to the

Transcript of Sameer Somal
Conducted on November 12, 2025

---

**141**

other bad information online?

A.   One, not paying their bills versus someone making decisions where they're bankrupt, I think that there are disputes as mentioned, his business performance, change is notable, surrounded -- and the timeline in question and someone having a dispute, I'm probably not going out on a limb to say that, you know, there may have been disputes, you've had at times with fees, there's been disputes our company's had at times.  Those are just categorically different than being called somebody who's bankrupt.

Q.   How do you quantify the damage of Defendant Lamkin's statements as opposed to the other bad information online?

Where in your report is there some sort of attempt to differentiate the damage to his reputation based on Defendant Lamkin's statements versus the other bad information online about Mr. Rothschild?

A.   I know the nature of the statements prior to this bankruptcy was -- they're not as harmful, relatively speaking.  I know people don't want to work with those that maybe they see fee disputes or trolls, they certainly don't want to work with

---

**142**

someone that is going bankrupt.

Q.   Mr. Somal, point to me in your expert report where you differentiate the damage caused to Mr. Rothschild based on Defendant Lamkin's statements versus the other bad information about Mr. Rothschild online.

A.   Well, Ms. Lamkin, the harm to the business began in 2024 after those statements.

Q.   How do you know that?

A.   Based -- I mean, his business had grown and was doing fine with -- with --

Q.   How do you know that?

A.   -- what's been out there.

He shared this.

Q.   He didn't show you documents showing how his business did in 2022, did he?

A.   He did not, Ms. Lamkin.

Q.   Did you perform any sentiment analysis, media impression tracking, or other quantitative methods to compare the volume and impact of negative coverage about Mr. Rothschild before and after Ms. Lamkin's October 10, 2024, Bloomberg quote?

A.   We have enterprise subscriptions to many tools.  We look at that.

I think specifically, with this case, what

---

**143**

I was asked to do is look at the notion of being somebody that is labeled as bankrupt.  I know because I deal and I've built a company and a successful company that deals with these issues that -- that is quite different than the statements that existed previously.

Q.   Mr. Somal, Defendant Lamkin has been sued for defamation.  It's a serious matter.  You produced an expert report.  She has a right to answers to a very simple question:  Did you perform any sentiment analysis, media impression tracking, or quantitative methods to compare the volume and impact of negative coverage about Mr. Rothschild before and after Ms. Lamkin's October 10, 2024, Bloomberg quote?

MR. LOBBIN:  Objection.  Vague, compound, asked and answered.

THE WITNESS:  That's part of what we do in order to understand what it takes for rehabilitation and in order to pressure test when there's been harm.

BY MS. LAMKIN:

Q.   Point to where that is in your expert report.

A.   As mentioned, Ms. Lamkin, the notion that

---

**144**

he is bankrupt and doesn't have money originated and that's what resulted in this lawsuit.  That is distinctly different than the narrative that existed previous to it.  That's what --

Q.   Give you one more opportunity -- one more opportunity to answer the question.

Please point in your expert report where you've done any sort of quantitative analysis to measure the reputation of Mr. Rothschild before and after Ms. Lamkin's October 10, 2024, quote.

MR. LOBBIN:  Same objections.

THE WITNESS:  Ms. Lamkin, you just don't like the answer to my question.  That's something that I own a company that does.  So I'm -- my testimony in my report says that, yes, you know, when somebody is called "bankrupt," it harms their reputation.  That's what the whole nature of this case is.

BY MS. LAMKIN:

Q.   Regarding Analytical Technologies, where in your report do you opine on any sort of harm or damage to Analytical Technologies?

A.   Analytical Technologies?  Can -- I'm not sure I understand what you're asking me.

Q.   There's two plaintiffs in this case,

---

Mr. Somal. Mr. Rothschild and Analytical Technologies.

Does your expert report address any alleged harm to Analytical Technologies or only to Mr. Rothschild?

A. Does my report address the harm to Mr. Rothschild? I mean --

Q. Analytical Technologies. Does your report address any alleged harm or damage to Analytical Technologies?

A. I believe the report assesses the damages to -- to Mr. Rothschild, Patent Asset Management, and Analytical Technologies.

Q. Where does it address Analytical Technologies?

A. Well, there -- it -- they're all interlinked because he's the face and the person that's primarily associated with it.

Q. What do you mean "they're all interlinked"?

A. I believe it's a subsidiary of Patent Asset Management.

Q. So because Patent Asset Management has been harmed, each of its LLCs have been harmed?

A. I would say that the narrative around Mr. Rothschild is one based upon the statements that will be defining for him regardless of what business he's a part of.

Q. Is there any portion of your expert report that directly addresses harm to Analytical Technologies?

A. No, but this case was directly dealt with an Analytics Technologies campaign.

Q. What do you mean by that?

A. Well, there's -- the -- I believe the Starbucks case is directly with Analytical Technologies, is it not?

Q. And what does the Starbucks case have to do with this case?

A. That's a case that statements related to who Mr. Rothschild is were made. So I think the patent that sued Starbucks.

Q. Statements were made in that litigation in the pleadings and court filings of that litigation; correct?

A. And comments that circulated in the media, whether those came, yeah, directly from the case or separately.

Q. Okay. I'm going to just ask you one more time, Mr. Somal, where in your expert report do you address any direct harm or damages to Analytical Technologies?

A. I -- I don't directly address the harm to Analytical Technologies.

MS. LAMKIN: Mr. Somal, thank you for your time. Thank you for your honesty. I appreciate it. Pass the witness.

MR. LOBBIN: No questions from plaintiffs.

THE STENOGRAPHER: Mr. Lobbin, did you want a copy?

MR. LOBBIN: I'll let you know later. As of right now, no.

THE STENOGRAPHER: Thank you.

MS. LAMKIN: Lynette, I'm assuming my assistant made all of those arrangements?

THE STENOGRAPHER: Yes.

THE WITNESS: Am I free to go?

THE STENOGRAPHER: No, not yet.

THE VIDEOGRAPHER: This marks the end -- so we're going off the record at 5:17 p.m.

Sorry about that.

- - -

(Deposition was concluded at 5:17 p.m.)

- - -

///
///

DEPONENT'S CHANGES OR CORRECTIONS

Note: If you are adding to your testimony, print the exact words you want to add. If you are deleting from your testimony, print the exact words you want to delete. Specify with "Add" or "Delete" and sign this form.

DEPOSITION OF: SAMEER SOMAL
CASE: ROTHSCHILD V STARBUCKS
DATE OF DEPOSITION: NOVEMBER 12, 2025
PAGE    LINE    CHANGE/ADD/DELETE

_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

Deponent's Signature _____ Date _____

149

Declaration Under Penalty of Perjury

I, SAMEER SOMAL, the witness herein, declare under penalty of perjury that I have read the foregoing in its entirety; and that the testimony contained therein, as corrected by me, is a true and accurate transcription of my testimony elicited at said time and place.

Executed this _____ day of _____ 20__, at _____,_____.
(city)              (state)

_____
SAMEER SOMAL

150

REPORTER'S CERTIFICATE
-o0o-

I, LYNETTE M. NELSON, CA CSR No. 11585, OR CSR No. 250121, TN LCR No. 896, RPR, CRR, CCRR, CRG, duly licensed and qualified in and for the State of California, Oregon, and Tennessee, do hereby certify that there came before me on the 12th day of November, 2025, via web videoconference, the following named person, to-wit SAMEER SOMAL, who was duly sworn to testify the truth, the whole truth, and nothing but the truth of knowledge touching and concerning the matters in controversy in this case; and that he was thereupon examined under oath and his examination reduced to typewriting under my supervision; that the deposition is a true record of the testimony given by the witness.

I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent:
(X) Was requested by the deponent or a party before the completion of the deposition;
( ) Was not requested by the deponent of a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative, employee of any

151

attorney or counsel employed by the parties hereto, or financially interested in the action.

CERTIFIED TO BY ME on this 14th day of November, 2025.

*Lynette Nelson*
_____
LYNETTE M. NELSON,
CA CSR No. 11585, OR CSR No. 250121,
TN LCR No. 896, RPR, CRR, CCRR, CRG,
REALTIME SYSTEMS ADMIN.